UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| KAREN PETRO, as Administratrix of the<br>Estate of Mark Jackson | : <br> : <br> : | |
| v. | : <br> : | C.A. No. 2009-213S |
| TOWN OF WEST WARWICK, by and through<br>its Finance Director Malcolm A. Moore;<br>PATRICK J. KELLEY, individually and in his<br>representative capacity; SEAN LUKOWICZ,<br>individually and in his representative capacity; and<br>SCOTT THORNTON, individually and in his<br>representative capacity | : <br> : <br> : <br> : <br> : <br> : <br> : | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION *IN LIMINE* TO
EXCLUDE TESTIMONY BY DEFENDANTS' EXPERTS
DEBORAH MASH, CHARLES WETLI, AND GARY DIAS**

Plaintiff submits this Memorandum in support of her motion for an order excluding the testimony at trial of Defendants' experts Deborah Mash, Ph.D., Charles Wetli, M.D., and Gary Dias. Plaintiff requests that the Court conduct a preliminary hearing at which Defendants will have the burden of proving that Deborah Mash and Charles Wetli are qualified and that their opinions are scientifically and medically reliable. Plaintiff also seeks an Order excluding the testimony of Gary Dias on the grounds that it does not appear that he is qualified and his opinion addresses issues that are questions of law for the Court to decide.

## INTRODUCTION

Plaintiff filed this motion *in limine* at the suggestion of the Court, notwithstanding that Defendants have the burden of qualifying their experts under Daubert v. Merrell-Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786 (1993), and its progeny, as codified in Rule 702 of the Federal Rules of Evidence. However, Defendants have not

disclosed the grounds upon which they seek to qualify these experts and their opinions, and the reports of Deborah Mash and Charles Wetli do not even attempt to address the admissibility requirements of Rule 702 of the Federal Rules of Evidence. Apparently, Defendants intend to make the required showing at the preliminary hearing or at trial. Yet without this information, Plaintiff cannot in the motion *in limine* anticipate much less address the grounds upon which Defendants will seek to qualify their experts and their opinions. Thus, in this motion *in limine*, Plaintiff can only point out some of the glaring inadequacies that are apparent from Defendants' experts' reports, and reserve the right to fully address all issues when Defendants seek to meet their burden of proving admissibility at the preliminary hearing.

**PLAINTIFF'S EXPERT SUBMISSIONS RELATED TO THE MOTION *IN LIMINE***

Plaintiff's experts who have offered opinions that are relevant to the testimony of Deborah Mash and Charles Wetli are: (1) Peter Gillespie, M.D., who was the medical examiner who performed the autopsy upon Mark Jackson and concluded that the death was a homicide; (2) Kevin Brown, M.D., who is board-certified in emergency medicine; and, (3) Debra Pinals, M.D., who is a board-certified psychiatrist. Drs. Gillespie and Brown have submitted two reports and Dr. Pinals submitted one report, all of which have been produced to Defendants pursuant to Rule 26.

Dr. Gillespie summarizes his initial opinion as follows:

> It is my opinion, to a reasonable degree of medical certainty, that the cause of death for Mr. Jackson was sudden cardiac death (SCD). It is also my opinion that his death more likely than not was due to a ventricular arrhythmia. The factors which caused the arrhythmia were fixed cardiac structural abnormalities and the enhanced activation of his sympathetic nervous system resulting from the altercation with the police from the West Warwick Police Department on the night of June 27, 2008.

2

Tab A.[1]

Dr. Gillespie has also submitted a report in rebuttal to the reports of Deborah Mash and Charles Wetli. His opinion is summarized as follows:

> In my opinion expressed to a reasonable degree of medical certainty, Mark Jackson did not experience "excited delirium syndrome" ("EDS") prior to his death and "excited delirium did not cause his death.
>
> To consider a diagnosis of EDS, there must be, at a minimum, a presence of both "delirium" and an "excited" state. "Delirium" is a medical term of art characterized by a disturbance in consciousness and a change in cognition. This disturbance typically develops over hours to days and tends to fluctuate during the day. The disturbance in consciousness means a reduced understanding of one's environment. The cognition change often means memory impairment, disorientation to place or time, or an impaired ability to articulate speech or name objects.
>
> The "excited" behavior observed in the case studies typically involves a witnessed state of agitation, restlessness, acts of violence, delusions, rambling speech, or combative behavior that leads a witness to contact legal or medical personnel for intervention.
>
> * * * *
>
> Jackson's behavior including the strength he manifested in resisting the officers' use of force is consistent with the normal stress responses of a very frightened, very large, mentally ill person rather than excited delirium. His continuing to resist after pepper spray and baton strikes to his legs is also consistent with panic and fear for his life.
>
> * * * *

---

[1] The reports and Curriculum Vitae of Deborah Mash, Charles Wetli, and Gary Dias (report only) and Plaintiff's experts are attached to the Affidavit of Stephen P. Sheehan sworn to on February 3, 2011, and are referred to herein by the tab reference in said affidavit. All of the reports of Plaintiffs' experts are certified pursuant to 28 U.S.C. § 1746 and, therefore, should be considered in connection with the motion pursuant to Rule 43(c) of the Federal Rules of Civil Procedure ("the court may hear the matter on affidavits").

3

> By definition, a classification of EDS is dependent on an autopsy that provides no clear cause of death. EDS is essentially a diagnosis of exclusion, potentially appropriate only where there is no other explanation for the cause of death. The Dimaio text on EDS categorically states at page 69:
>
> Excited delirium syndrome involves the sudden death of an individual during or following an episode of excited delirium, in which an autopsy fails to reveal evidence of sufficient trauma or natural disease to explain the death.
>
> That is not the case here. The autopsy did not exclude other explanations than EDS for the cause of death. To the contrary, the autopsy showed indisputable cardiac lesions and other cardiac abnormalities which are universally recognized to cause and contribute to sudden cardiac death ("SCD"). The diagnosis of Drs. Mash and Wetli of EDS in this case, when the autopsy shows positive evidence to explain the cause of death, is completely contrary to the accepted pathological standards for determining cause of death. This is not an issue upon which pathologists may reasonably differ.

Tab C.

Dr. Brown prepared an initial and a rebuttal report. His initial opinion is summarized as follows:

> Jackson's pre-existing heart disease and mental health history, coupled with the altercation itself (which from all accounts was intense and certainly resulted in an increased heart rate and elevated blood pressure) more likely than not caused a stress on his abnormal heart leading to SCD [sudden cardiac death], consistent with the autopsy report. In my opinion the SCD would not have occurred if Jackson had not been in the physical altercation with the police.
>
> * * * *
>
> It is my opinion that had Kelley, Lukowicz, and Thornton acted in conformity with their knowledge and training (as discussed above), then CPR could and should have been started immediately at or near the time of Jackson's arrival at the station (23:10:29), or about 4:20 sooner than happened here. Under such a scenario, at a minimum, the AED would

4

have been started by about 23:12:20, or about 3:30 earlier than happened here. It is my opinion that under such a scenario, Jackson more probably than not would have recovered.

\* \* \* \*

Early CPR helps preserve the heart's electrical arrhythmia in, for example, VF. Untreated, VF and VT deteriorates into a total lack of cardiac activity termed *asystole* and death within minutes. By the time the rescue personnel attempted the AED here, Jackson was asystole. He briefly registered a VF rhythm en route to the hospital in the Fire Rescue ambulance. Based on the above, I believe that had CPR and AED been started earlier, Jackson more probably than not would have recovered.

Tab D.

Dr. Brown also prepared a rebuttal report. That opinion is summarized as follows:

At your request, I read the reports of Drs. Wetli and Mash. I disagree with their conclusions. Mark Jackson did not experience "excited delirium syndrome" (ExDS) prior to his death. Accordingly, he clearly did not die from ExDS.

\* \* \* \*

Assuming that ExDS can be a valid cause of death, it is indisputable that not all deaths that occur suddenly in police custody are caused by excited delirium. To the contrary, in cases that attributed ExDS as the cause of death, an autopsy has failed to reveal evidence of a clear cause of death such as sufficieint trauma or natural disease to explain the death. In other words, the classification of ExDS is dependent on an autopsy that provides no clear cause of death and thus ExDS is essentially a diagnosis of exclusion, potentially appropriate only where there is no other explanation for the cause of death.

That is not the case here with Mr. Jackson. Sudden cardiac death (SCD) is a medically recognized cause of death. As previously referred to in my earlier report, the cardiac abnormalities and struggle with the police present more than sufficient evidence to support SCD as the cause of death for Mr. Jackson.

5

* * * *

> Notably, the case studies of ExDS involve individuals already in a state of delirium when approached by police or mental health provider. Unlike these cases, here it was the police officers themselves who triggered a response from Jackson. Jackson did not exhibit any signs of violence, agitation, delusions, etc. that caused the police or medical personnel to intervene. Jackson's response – walking away from the officers in response to commands of "stop" and having spotlights shone on him, and stating "You're not the boss of me" – does not rise to the level of "excited" or "delirium" required for an ExDS diagnosis. Instead, such behavior is consistent with a mentally ill person's stress response. Jackson's use of the phrase "I love you guys" is consistent with his peaceable nature (as described by witnesses below) and with a fear of the police, rather than delirium.
>
> Jackson's' behavior including the strength he manifested in resisting the officers' use of force is consistent with the normal stress responses of a very frightened, very large, mentally ill person rather than excited delirium. His continuing to resist after pepper spray and baton strikes to his legs is also consistent with panic and fear for his life.

* * * *

> It is not possible to diagnose ExDS here chiefly on the fact that, over five minutes after Jackson had arrived at the station, he was found to be in asystole. This is because asystole (ECG showing a flat-line) is, of course, the final end state of no cardiac electrical activity regardless of any preceding cardiac rhythm. The fact that Jackson was in asystole more than five minutes after arriving at the station is not the same as stating that Jackson first went into asystole immediately following his collapse. While the initial detected cardiac rhythm was not a shockable rhythm as assessed by an AED – this likely was because the AED was not applied for at least five minutes from the time of arrival at the station and in that period it may have missed the shockable VF rhythm.

Tab E.

Dr. Pinals also submitted a rebuttal report. Her opinion is summarized as follows:

> In my opinion, to a reasonable degree of medical certainty, Mr. Mark Jackson was not experiencing any atypical mental state from his usual presentation prior to his encounter with the police on 6/27/08. It is further my opinion that the data available supports that Mr. Jackson acted consistent with his social and psychiatric history when he attempted to walk away from the police and then resisted their efforts to forcibly restrain him.
>
> * * * *
>
> Excited delirium is often reported in the literature to be associated primarily with cocaine or other stimulant use but also may be seen with other drug or psychiatric medication involvement or withdrawal from substances. None of these conditions were present at the time of Mr. Jackson's death. Also, his seeming "intoxication" and bizarre statements were consistent with how he interacted with the world. Officer Kelly recognized him as an "EDP" by the time they were bringing Mr. Jackson back to the station, further supporting that something about his presentation seemed unusual to an observer, though it was consistent with prior observations of him as noted in medical records and witness statements, rather than an acute change that would be seen with delirium.

Tab F.

## SUMMARY OF EXPERT TESTIMONY TO BE EXCLUDED

### Deborah Mash

Deborah Mash summarizes her opinions as follows:

> Based on my review of the information provided to me in this matter, as well as my professional education, experience and background, it is also my opinion to a reasonable degree of medical probability that Mr. Jackson was in a state of excited delirium on June 27, 2008. Most individuals who experience excited delirium die at the scene or in immediate police custody or shortly thereafter despite medical

7

intervention. Those who do survive usually evidence subsequent metabolic, respiratory, hepatic, renal and cardiac failure. Mr. Jackson was at risk for fatal excited delirium because of the lack of proper medication and follow up care for his underlying psychiatric disease.

Tab H.

### Charles V. Wetli

Dr. Wetli summarizes his opinions as follows:

> It is therefore my opinion to a degree of reasonable medical certainty that Mr. Mark Jackson died from excited delirium which was the result of his untreated schizophrenia by the mechanism outlined above. For the purposes of death certification, his underlying heart disease would be listed as a contributory factor in his death. Since the manner of death is related to the cause of the excited delirium, it would properly be listed as "natural" since it was the result of a natural disease process (viz. schizophrenia). Furthermore, again within reasonable medical certainty, the pepper spray and the restrained position did not contribute to his death, and any allegation that earlier CPR would have altered the course of events is specious since, once vital signs are lost, death is the inevitable outcome.

Tab J.

### Gary P. Dias

Gary P. Dias has summarized his opinions as follows:

> It is my opinion that a Rhode Island police officer has a duty to render medical aid to anyone who is injured or ill. "Rendering Aid" is an open-ended term that can encompass many different options. Those options may include summoning medical assistance to applying basic first aid to administering advanced life support. The level of one's response is dependent on his/her training and level of certification and upon one's assessment of the medical problem and aid required.
>
> It is my opinion that a Rhode Island police officer does not have specific duty to administer CPR in an injured/ill person. If it were a specific duty, it would be mandatory for all police officers to be trained and certified in CPR and also required

to administer first aid and/or CPR on all medical calls for
service to which they responded.

Tab L.

## ARGUMENT

**I.  Plaintiff's motion is appropriate under Rules 104 and
702 under the Federal Rules of Evidence**

"The Supreme Court clearly held that the scientific validity of expert testimony is a question that the trial judge must determine pursuant to Rule 104(a)." Wright & Gold, Federal Practice and Procedure: Evidence 2d §6266 (2005), citing Daubert v. Merrell-Dow Pharmaceuticals, Inc., 509 U.S. 579, 593, 113 S.Ct. 2786, 2796 (1993). Rule 104(a) of the Federal Rules of Evidence states as follows:

> **Rule 104.    Preliminary Questions**
>
> **(a)  Questions of admissibility generally.**  Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

When the matter is considered at an *in limine* hearing, "'the trial court may consider, *inter alia*, offers of proof, affidavits, stipulations, or learned treatises, in addition to testimony or other documentary evidence (and, of course, legal argument).'" Oddi v. Ford Motor Company, 234 F.3d 136, 154, (3rd Cir. 2000), quoting United States v. Downing, 753 F.2d 1224, 1241 (3rd Cir. 1985).

The criteria to be addressed are set forth in Rule 702 of the Federal Rules of Evidence:

> **Rule 702.    Testimony of Experts**
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to

9

> determine a fact in issue, a witness qualified as an expert by
> knowledge, skill, experience, training, or education, may
> testify thereto in the form of an opinion or otherwise, if (1) the
> testimony is based upon sufficient facts or data, (2) the
> testimony is the product of reliable principles and methods,
> and (3) the witness has applied the principles and methods
> reliably to the facts of the case.

See Advisory Committees Notes to the 2000 Amendments to F.R.E. 702 ("The amendment makes clear that the sufficiency of the basis of the expert's opinion is to be decided under Rule 702.").

## II.     Defendants have the burden of proving that their experts' opinions meet the admissibility requirements of F.R.E. 702

The burden of satisfying the requirements of Rule 702 of the Federal Rules of Evidence is on the proponent for admission of the experts' opinion. Hartford Insurance Co. v. General Electric Co., 526 F.Supp 2d 250, 252 (D.R.I. 2007)(Smith, D.J.), citing Daubert, 509 U.S. at 592. See Advisory Committee Notes on the 2000 Amendments to F.R.E. 702 ("[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence.").

## III.    Deborah Mash is not qualified to render the opinion she offers in this case.

The preliminary determination under Daubert includes the determination of whether the proffered expert witness is qualified to render the opinion offered in the particular case. "The court must first ascertain whether the proffered expert has the educational background or training in a relevant field. Then the court should further compare the expert's area of expertise with the particular opinion the expert seeks to offer and permit the expert to testify only if the expert's particular expertise enables the expert to give an opinion that is capable of assisting the trier of fact." TC Systems, Inc. v. Town of Colonie, 213 F.Supp.2d 171, 174 (N.D.N.Y. 2002).

A threshold issue, therefore, is determining what is the "relevant field" to which Deborah Mash's opinion pertains. She purports to diagnose excited delirium and express an opinion as to the prognosis for Mark Jackson as of June 27, 2008. By definition, "diagnosis" and an expression of opinion as to "prognosis" are activities in the field of medicine. Summers v. Missouri Pacific Railroad, 897 F.Supp. 533, 540 (E.D.Ok. 1995); Grenitz v. Tomlian, 858 So.2d 999, 1003 (Fl. 2003). Deborah Mash has a Ph.D. in pharmacology, but is not a medical doctor. Therefore, she is not qualified to offer the opinions she expresses in this case. Conde v. Velsicol Chemical Corp., 24 F.3d 809, 813 (6th Cir. 1994) ("non-medical doctors [are] unqualified to render differential diagnoses of medical conditions"); Plourde v. Gladstone, 190 F.Supp.2d 708, 719 (D.Vt. 2002)(excluding expert with Ph.D. in toxicology from offering opinion on diagnoses of medical condition); Summers v. Missouri Pacific Railroad, *supra*; Grenitz v. Tomlian, *supra*.

Moreover, it appears that her only training or experience in making such diagnoses is in cases involving cocaine intoxication and other drug exposure, or on the basis of microscopic examination of brain tissue, issues which are not involved in this case. In short, her expertise in the fields of pharmacology, toxicology and post-mortem analysis of brain tissue does not qualify her to testify in this case, which does not raise issues within those fields of expertise since Mr. Jackson was not on drugs and no post-mortem analysis of brain tissue is available.

**IV.  Charles Wetli's and Deborah Mash's reasoning and methodology are not scientifically valid or properly applied to the facts in issue.**

As noted above, in this motion *in limine*, Plaintiff cannot anticipate much less address the grounds upon which Defendants will seek to qualify their experts under

11

F.R.E. Rule 702. However, a fatal deficiency is already apparent from the reports of Deborah Mash and Charles Wetli.

Plaintiff has offered the declarations of an emergency physician, Kevin Brown, M.D. and a pathologist, Peter Gillespie, M.D., that the diagnosis of excited delirium is a diagnosis of exclusion, which is made only after that there is no evidence of another disease process that was at work. The reports of Deborah Mash and Charles Wetli do not address much less dispute that contention. In this case, however, the pathologic evidence is undisputed that Mr. Jackson had several cardiac anomalies and lesions which placed him at risk for sudden death. Drs. Gillespie and Brown opine that these cardiac problems were the cause of death, together with the altercation with the police. Dr. Wetli and Deborah Mash acknowledge these cardiac findings, and opine that these lesions were a "contributory cause" for Mr. Jackson's death. However, they offer no explanation as to why Mr. Jackson's cardiac abnormalities and the police altercation alone (with no excited delirium) are not sufficient to produce this outcome. Accordingly, their reasoning and methodology is not scientifically valid or properly applied to the facts in issue in this case. Best v. Lowe's Home Center, 563 F.3d 171, 179 (6th Cir. 2009) (expert's report is inadmissible if he provides no explanation why an alternative cause was not the sole cause).

**V.  Gary P. Dias is not qualified to offer an opinion.**

Although defendants have submitted a rebuttal report from Gary P. Dias, they have not provided a curriculum vitae or other information concerning Mr. Dias's qualifications. Accordingly, it is impossible for Plaintiff (or for the Court) to determine if he is qualified to offer any opinions in this case as an expert.

**VI.    Gary P. Dias's opinions are not the proper subject for expert testimony, but rather pertain to issues of law, which are for the court to decide.**

Gary Dias's opinions are limited to the issue of "does a Rhode Island police officer have a duty to render medical aid to an injured/ill person; does a Rhode Island police officer have a duty to administer CPR to an injured/ill person." However, the question of whether a party owes a duty upon which a duty of care arises is a question of law for the court to decide. Berman v. Sitrin, 991 A.2d 1038, 1043 (R.I. 2010)(citation omitted). Accordingly, Mr. Dias's opinion should be stricken for this reason. National Union Fire Insurance Co. of Pittsburgh v. Midwestern General Brokerage, 2007 WL 1529011 (W.D. Mo.) ("[T]he existence of a duty is a question of law for the court to decide and not the proper subject for expert testimony."), citing Southern Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc., 320 F.3d 838, 841 (8th Cir. 2003)("expert testimony on legal matters is not admissible").

## CONCLUSION

The opinions offered by Defendants' experts Deborah Mash, Charles Wetli, and Gary P. Dias should be excluded.

                                      Plaintiff, Karen Petro,
                                      By her Attorney,

                                      /s/Stephen P. Sheehan
                                      Stephen P. Sheehan, Esq.  #4030
                                      Wistow & Barylick, Inc.
                                      61 Weybosset Street
                                      Providence, RI  02903
                                      (401) 831-2700
                                      (401) 272-9752 (fax)

Dated:  February 3, 2011

## **CERTIFICATION**

I hereby certify that I caused to be served by electronic means (ECF) a copy of the within on the 3rd day of February, 2011, to the following:

Marc DeSisto, Esq.
marc@desistolaw.com

/s/Daria L. Souza_____