

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KAREN PETRO, as Administratrix of the
Estate of Mark Jackson

v.     C.A. No. 2009-213S

TOWN OF WEST WARWICK, by and through
its Finance Director Malcolm A. Moore;
PATRICK J. KELLEY, individually and in his
representative capacity; SEAN LUKOWICZ,
individually and in his representative capacity; and
SCOTT THORNTON, individually and in his
representative capacity

## UNSWORN DECLARATION OF DEBRA A. PINALS, M.D.

I declare, under penalty of perjury, under the laws of the United States of America, that my attached report dated September 7, 2010 is true and correct.

Also attached is a true and complete copy of my Curriculum Vitae.

Executed on January 30, 2011.

_____
Debra A. Pinals, M.D.

# Debra A. Pinals, M.D.

Board Certified in Adult and Forensic Psychiatry

September 7, 2010

Stephen P. Sheehan, Esq.
Wistow & Barylick Incorporated
Attorneys at Law
61 Weybosset Street
Providence, Rhode Island 02903

                               **Case:** *Karen Petro v. Town of West Warwick, et al.*
                               **Decedent:** Mr. Mark Jackson

Dear Mr. Sheehan,

       As you know, on 6/27/08, the West Warwick Police Department (WWPD) was called to respond to the scene of a possible vandalism by unidentified suspect(s) to a sign located at the front of a liquor store. Mr. Mark Jackson was behind the liquor store at the time the police arrived. A subsequent encounter between WWPD officers and Mr. Jackson entailed a physical struggle, followed by Mr. Jackson's death. Mr. Jackson was a 47 year-old (DOB: 7/2/60) male at the time of his death. He had a history of a mental illness that was diagnosed variably as Schizophrenia, Organic Delusional Syndrome, Autistic Disorder, and Posttraumatic Stress Disorder, among others. According to available information, he was not in the care and treatment of a mental health professional at the time of his death and was not on any psychiatric medications.

       Per your request, this report is being written to provide you with my opinions regarding Mr. Jackson's psychiatric history and his mental state on the night of 6/27/08, and whether his symptoms and behavior and other available data indicated he was in a state of "Excited Delirium" at that time.

       For the purposes of this report, my summary of the records is focused primarily upon the psychiatric history of Mr. Jackson and a brief description, based on the information available, of the circumstances surrounding his death.

Qualifications:

       I have provided you with a copy of my *curriculum vitae*, which states my qualifications to perform this evaluation.

Record of Testimony:

I have provided you with a list of cases in which during the previous four years I have testified as an expert at trial or by deposition.

Statement of Compensation:

Billing rate of $400 per 60 minute hour to be paid for all work done on this case.

Sources of Information:

In the preparation of this report, I reviewed the following materials provided by you:

A. Current Medical Records

1. Kent Hospital 6/27/08
2. West Warwick Fire Department 6/27/08
3. RI Medical Examiner - Autopsy Report
4. Autopsy Photographs
5. Death Certificate

B. Past Medical Records

1. Rhode Island Hospital 1994-1995
2. Documents attached to 9/17/09 Letter to DeSisto
3. RI Department of Human Services Letter 9/23/09
4. Blue Cross – Marsella Letter 10/8/09 (NO CLAIMS)
5. West Bay Community Action (NO RECORDS)
6. Stephen DiZio, MD Letter 9/3/09 (NO RECORDS)
7. The Kent Center Letter 6/9/09 (NO RECORDS)

C. Social Security Administration File for Mark Jackson

D. Depositions, with or without digests:

1. Patrick Kelly
2. Sean Lukowicz
3. Juanita Jackson
4. Karen Petro

        5. Jack Lombardi
        6. Paul Joyal
        7. Elaine Beauregard
        8. Colin Dawson
        9. Dana Coli
        10. Patricia Rajotte
        11. Nicole Frink

    E. Expert Reports

        1. Dr. Welti
        2. Dr. Mash
        3. Lou Reiter
        4. Dr. Brown
        5. Dr. Gillespie
        6. Al Peterson
        7. John Peters

    F. Certified Rhode Island criminal arrest record for Mr. Jackson

## Brief Review of Psychiatric Records:

Mr. Jackson's records note that he was born in Pittsburgh the youngest of five children. His father had difficulties with alcohol and Mr. Jackson witnessed him batter his mother. His father had died several years prior to Mr. Jackson's death from a cardiac event. According to available records, as a child Mr. Jackson got along well with others though was not overtly expressive with his emotions. Some reports described him as having minimal social skills as a youth. He graduated from high school in 1978 and had not required special education. After high school, he worked sporadically. His longest job may have been as an auto mechanic for five years. After that he worked at a gas station, briefly as a security guard, and on an assembly line. These latter jobs lasted only months.

Records vary as to the timing, but point to Mr. Jackson having had a serious head injury somewhere between 1979 and 1983. He had moved to Texas and was homeless for some period of time. Some reports say that Mr. Jackson's head injury occurred there. An undated letter in the file from his mother indicates that he had been disabled since 1979 and she brought him to Rhode Island from Texas as a result of his difficulties. Mr. Jackson never married. Though he did not live with his mother at the time of his death, he spent nearly every day at her apartment and helped her drive around. Witness accounts indicate he did not socialize with others. He had no known criminal or arrest history and no known history of violence or suicide attempts.

*Karen Petro v. Town of West Warwick, et al.*
September 7, 2010

Regarding his formal psychiatric history, it appears that Mr. Jackson was first seen for psychiatric care on 12/16/93. Notes from a clinical initial psychiatric evaluation signed by Leo Cok, M.D. indicated he was referred by a human services worker who had worked at the senior center where he had been living with his mother. At the time of this initial evaluation, he complained primarily of headaches related to the head injury. He was cooperative at the time and was not seen as having any active psychotic symptoms on exam, though he was given a diagnosis of Posttraumatic Stress Disorder and Organic Delusional Disorder. He was prescribed Stelazine, which is a medication used to treat psychotic thinking. He was referred for outpatient treatment, which he continued for a couple years the time frame of his treatment is not entirely clear). Pharmacy records indicate his medication was changed and he was prescribed Risperidone (a type of antipsychotic medication) from July 1994 until July 1996. At that time he was also given Hydroxyzine (a medication that can help with anxiety and sleep). He had case management visits. Notes are not fully legible, but it appeared that prior to the psychiatric appointment he was seen at the Kent County Mental Health Center on 9/29/03 after he was reported to be swearing at his mother. He was doing so because he was preoccupied that his mother and friend were driving at excess speed. Notes say he was not threatening to others at the time.

Mr. Jackson was referred in February 1994 to a neurology clinic by Kent County Mental Health. He had carried a diagnosis at the time of "Organic Delusional Syndrome," which was described as a result of the automobile accident. The neurology records state that in addition to becoming unmotivated after the accident, Mr. Jackson began to have delusional (i.e., fixed, false) beliefs. For example he believed he was paralyzed even though he was moving. His mother also described that it seemed he was experiencing hallucinations (perceptual disturbances as a sign of psychotic thinking) such as seeing "red lights." He experienced headaches as well. The neurologist felt that Mr. Jackson's difficulties, including his reports of headaches, were primarily psychiatric and referred him back to psychiatric care.

There are no records of active psychiatric treatment after 1996, and the information available suggests that Mr. Jackson dropped out of treatment in part because he did not find the medications helpful. Nevertheless, Mrs. Jackson described in her deposition her son's marked social isolation and his tendency to live in a dream world. For example, she recalled him saying he believed he lived on the sun, and she described him as never being aware and living in a "dream." He spent his days getting and smoking cigarettes, and drinking coffee. He laid on his bed and watched television, though the content may not have registered given his preoccupations.

Because of his impairments, Mrs. Jackson attempted to help her son obtain social security benefits around the time Mr. Jackson first saw Dr. Cok. Social Security records indicate that Mr. Jackson had a diagnosis of Paranoid Schizophrenia, "other psychotic disorders," and Posttraumatic Stress Disorder. Though he appeared able to care for his own hygiene and cooking, his functional impairments included difficulty with understanding, memory, and concentration. He exhibited blunted emotional expression, poor judgment, lack of social awareness and disconnected thoughts. Mr. Jackson was seen every few years for an updated psychiatric evaluation related to his disability claim.

Bruno Franek, M.D. evaluated Mr. Jackson on 6/11/97 as part of his social security determination process. Mr. Jackson's major complaints related to headaches and his mother's concerns that his mind was "very far away." He described a total lack of interest in communicating with others. This record indicated Mr. Jackson drank alcohol until age 21 and then stopped. It also indicated he had an overdose on LSD once at age 20 (there was no reported subsequent alcohol or substance use in the available records). Notes indicated he had been seen at some point at the Institute of Mental Health in Cranston but was discharged as being considered "without risk to himself or others" with an unknown diagnosis

Mr. Jackson was diagnosed by Dr. Franek as having Schizophrenia, Residual Type, With Predominantly Negative Symptoms (negative symptoms consist of signs such as decreased motivation and socialization and can be part of Schizophrenia), Autistic Disorder, and "Past Polysubstance Abuse Disorder in Recovery." Dr. Franek also recorded a learning disorder (reading), and a personality disorder (Schizotypal) as well noting that Mr. Jackson had been the victim of paternal emotional abuse. He wrote of the car accident ten years prior. Dr. Franek indicated that Mr. Jackson's prognosis was "very poor" commenting that disability arrangements should be continued because Mr. Jackson did "not have the ability to understand, carry out and remember instructions or respond appropriately to supervision...[in a work setting]."

Further Social Security Administration documentation from 2000 indicated that Mr. Jackson had not been taking medications and experienced "continued slow deterioration" regarding functioning. It was noted that he continued to spend a great deal of time with his mother, had almost no other contacts, and she was the one who interacted with others on his behalf. He had no apparent awareness of events around him and provided primarily yes/no responses. Frederick Evans, M.D. evaluated him on 7/6/00 and described Mr. Jackson as "quiet...volunteers little information and sits quietly with little motion or change in his facial expression..." He described a past thought of electricity from the sun influencing computers and said he was prescribed medication around the time he had those

thoughts. Medications were recommended to help with "apathy" and negative symptoms.

An examination dated 12/1/04 for a Social Security Disability determination conducted by William Curt LaFrance, Jr., M.D. showed Mr. Jackson to have disconnected and bizarre speech and some grand ideas. He was not on medications at the time of that evaluation. Dr. LaFrance diagnosed him with Schizophrenia but also noted a rule out diagnosis of Asperger's Disorder.

Thus, overall psychiatric and other records indicate that Mr. Jackson had for many years (and likely after a head injury around 1979 or early 80s) been extremely socially isolative, with limited ability to communicate fully or clearly. He spent his days primarily watching television and getting coffee and cigarettes. He did not have social contacts outside of his mother (and perhaps later, his sister to a limited extent). He had one incident in 1993 when reports said he had sworn at his mother but was not viewed as threatening. One witness (Mr. Dana Coli) said he once saw Mr. Jackson swear at children who were throwing rocks but he also saw Mr. Jackson as a very quiet person. Others described him as being peaceful, causing no difficulties and as a "gentle giant." Reports indicated he gave primarily yes/no answers if he spoke at all. Other reports said he processed information slowly. He had a possible remote history of alcohol and/or drug use but none noted since the age of about 20. He was unmotivated for usual activities and displayed disorganized and at times bizarre speech. He occasionally expressed delusional ideas of a bizarre but non-violent nature. He had no recorded history of violence or suicidal behavior. He had been prescribed antipsychotic and anti-anxiety medications but had only taken them for a few years in the mid 1990s.

Brief Review of Events Surrounding June 27, 2008:

According to Juanita Jackson, Mark Jackson had a normal evening and was acting in his usual way when at around 11:00 p.m. he went outside to have a smoke. This was consistent with his daily routine. Other reports indicate that Officers Lukowicz and Kelly had been dispatched to the front of a liquor store to investigate a report of possible vandalism to a sign at the front of the parking lot. They observed no damage to the sign in the front, but went around the back of the building to a parking lot. The parking lot was adjacent to Mrs. Jackson's apartment and also was shared by the liquor store. The officers observed Mr. Jackson standing near the loading docks and shone their spotlights at him. The officers got out of their cars and approached him, telling him to take his hand out of his pocket. Mr. Jackson did not do so and began to walk away towards a path that led to his mother's apartment. The officers shouted for him to stop and he

refused, stating on at least one occasion that "'you're not the boss of me.'" A short while later, as Officer Kelly reached to physically take hold of Mr. Jackson, Mr. Jackson "swatted" at Officer Kelly's arm and continued walking away. Officers Lukowicz and Kelly then attempted to bring Mr. Jackson, who was over six feet tall and about 259 pounds, to the ground and handcuff him. Witnesses reported hearing them yell something to the effect of "'on the ground.'" Mr. Jackson initially was able to break loose. The officers used pepper spray to subdue him, but he apparently wiped the pepper spray from his face. The officers eventually were able to bring Mr. Jackson to the ground after further struggles, and used their batons and struck him with their legs to do so. Mr. Jackson physically resisted but was ultimately handcuffed. During the struggle with the officers, Mr. Jackson was heard to say repeatedly something to the effect of "'I love you guys.'" A neighbor, Nicole Frink, also said he was swearing and kicking his legs during the incident. Mr. Jackson was described by witnesses as seeming afraid and seeming confused. Some witnesses wondered if he was intoxicated, because of his statement about loving the officers. He was noted to be sweaty.

After he was handcuffed, Mr. Jackson was physically placed in the back of Officer Lukowicz's patrol car laying on his side, according to police reports. He seemed to go limp at times during this transition of getting him into the car and several officers had to move him together. Officer Lukowicz transported Mr. Jackson to the police station. According to his statements, Officer Lukowicz initially heard Mr. Jackson making noises from the back seat, but at some point on the way there, the noises stopped.

On the way back to the station, Officer Kelly had notified the Officer in Charge of the situation. According to Officer Kelly's deposition, at that time he referred to Mr. Jackson as an "EDP [Emotionally Disturbed Person]." The Officers arrived at the station. Officer Lukowicz stated he secured his firearm upon arrival. Officer Kelly noted that Mr. Jackson was not moving. After they opened the door to get Mr. Jackson out of the patrol car, Mr. Jackson was observed to be silent and not moving. Mr. Jackson had no pulse when it was checked. Rescue was called but by the time rescue took over, Mr. Jackson's heart was in asystole and he was unable to be resuscitated and died.

Brief Summary of Autopsy Report:

The autopsy report completed by Thomas Gilson, M.D. for Peter Gillespie, M.D., Medical Examiners, indicated that Mr. Jackson's cause of death was a "Sudden death complicating ischemic heart disease following physical altercation with police in a schizophrenic person." Toxicology testing for drugs and alcohol

7

and other products did not alter this conclusion. The manner of death was determined as a homicide.

Opinions:

In my opinion, to a reasonable degree of medical certainty, Mr. Mark Jackson was not experiencing any atypical mental state from his usual presentation prior to his encounter with the police on 6/27/08. It is further my opinion that the data available supports that Mr. Jackson acted consistent with his social and psychiatric history when he attempted to walk away from the police and then resisted their efforts to forcibly restrain him. Data that supports these opinions includes the following:

1) Mr. Jackson was very limited in that he had extremely poor social and occupational functioning. He had a long history of social isolation, minimal communicativeness and difficulty interacting freely with others. These behaviors were consistent with his diagnoses of Schizophrenia or psychosis secondary to a head injury.

2) Mr. Jackson's initial silence with police would have been typical for his mental condition. Given his history, it appeared he processed information slowly and may have had difficulty taking in the situation with the police and what they wanted from him, especially in light of the fact that he had not had experience dealing with police in the past.

3) Mrs. Jackson said that nothing seemed unusual that evening when her son left to get cigarettes. It was his usual routine to be walking around the vicinity of his mother's home to the places he seemed to frequent- Joyal's Liquors and Dunkin' Donuts and the parking lot where police found him. Nothing in his behavior seemed out of the ordinary in the time preceding his encounter with police.

Although the label of Excited Delirium has been in some medical literature, in my opinion, the weight of the data does not support a conclusion to a reasonable degree of medical certainty that Mr. Jackson had a delirium of this type. In my opinion it is more likely than not that Mr. Jackson was not experiencing an Excited Delirium. Data that supports these opinions includes the following:

1) Excited Delirium is not mentioned in the autopsy report. In fact, the autopsy report is clear in its conclusions that Mr. Jackson's cause of death was due to a cardiovascular event after the altercation with police. Mr. Jackson had a number of risk factors for cardiovascular demise, including a family history of heart disease (his father died of a heart attack),

smoking, obesity, a sedentary lifestyle, and chronic mental illness, to name a few. Thus, the stressful encounter with police, and the associated physiological changes that would be expected from that, would further increase his risk for a fatal cardiac event.

2) There is no data, in my opinion, to directly support a diagnosis of Delirium at the time of this confrontation with the police. Delirium is marked by fluctuating consciousness and it did not appear that Mr. Jackson was coming in and out of awareness.

3) Excited Delirium has been associated with signs such as extreme aggression, fear, elevated temperature, grunting noises, unexpected physical strength, shouting, and bizarre behavior. However, many of these are non-specific findings and can be associated with a number of other causes. For example:

   a. Mr. Jackson's statements of "'I love you guys'" do not seem out of the ordinary for him given that he lived his life without a sense of reality or an ability to clearly communicate.

   b. Reports that he was fearful would more likely be explained by an expected response for someone with limited experience with police, rather than a mark of delirium.

   c. Regarding whether he showed great physical strength that evening, Mr. Jackson also was a large man, who was fighting being handcuffed. Some individuals are able to resist pepper spray, and we do not know exactly how the spray was aimed. Thus, the fact that he appeared strong and resisted the spray can be explained by causes unrelated to excited delirium.

4) Witnesses may have said he seemed intoxicated, but toxicology testing did not bear this out. Excited delirium is often reported in the literature to be associated primarily with cocaine or other stimulant use but also may be seen with other drug or psychiatric medication involvement or withdrawal from substances. None of these conditions were present at the time of Mr. Jackson's death. Also, his seeming "intoxication" and bizarre statements were consistent with how he interacted with the world. Officer Kelly recognized him as an "EDP" by the time they were bringing Mr. Jackson back to the station, further supporting that something about his presentation seemed unusual to an observer, though it was consistent with prior observations of him as noted in medical records and witness statements, rather than an acute change that would be seen with delirium.

5) Body temperature elevation can be considered strong support for the diagnosis of Excited Delirium but not an absolute requirement. Mr. Jackson's sweating would have been consistent with his having been part of a major physical struggle with police and thus is not direct data of a delirium.

6) The condition of Excited Delirium is generally viewed as descriptive and theoretical in the literature and one that falls along a spectrum of related disorders. It lacks precise consensus criteria that have been adopted in formal diagnostic manuals such as the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR), making it even more difficult to identify Excited Delirium as a definitive part of the clinical picture in this case.

7) Excited Delirium has been reported in some cases to be associated with individuals who have a history of prior violence. Mr. Jackson was known as peaceful and as a "gentle giant" in the neighborhood. Though he was reported as having once yelled at neighborhood children for throwing rocks and once yelled at others for speeding, he was not viewed as a threat to others. He had no known history of violence and had never been arrested in Rhode Island.

8) Given Mr. Jackson's history of generally being peaceful with no acute changes prior to the police encounter, in my opinion, had police utilized a planned approach for communication and coordinated restraint they would have had a more favorable chance of interacting safely with Mr. Jackson.

The above information is based on the information available at this time. New information could lead me to different conclusions. Please be in touch as needed if you have any questions regarding this report.

Sincerely,

*Debra A. Pinals*

Debra A. Pinals, M.D.
Board Certified
in Adult and Forensic Psychiatry