# EXHIBIT K

2 Berkery Pl.
Alpine, NJ
07620-0398

**Charles V. Wetli, MD**
*FORENSIC PATHOLOGIST*                        201-750-8220 (FAX 750-8221)

*Thanatopsis888@yahoo.com*

25 June 2010

Mr. Marc DeSisto, Esq.
c/o DeSisto Law
211 Angell Street
PO Box 2563
Providence, RI 02906-2563

Re: Petro/Jackson v. West Warwick

Dear Mr. DeSisto:

Regarding the death of Mr. Mark Jackson, the following items were reviewed:

> Investigative Narrative of the West Warwick Police Dept. (Capt. Ramsay)
> Investigative Narrative of the Rhode Island State Police (Cpl. Russell)
> Medico-legal Death Investigator Report (Medical Examiner)
> Autopsy, Toxicology, and Chemistry Reports (including notes and diagrams)
> RISP Photographs of Scene and Mr. Jackson in the Hospital and at Autopsy
> Medical Examiner Autopsy Photographs
> Plaintiff Responses to Request for Production of Documents
> EMS Ambulance Run Report
> Kent Hospital Emergency Department Record
> Multiple Psychiatric Records
> Interview Statements of Kelley, Lukowicz, T. Nye, Palazzo, M. Nye, Thronton,
>     Pineda, Irving, Lesiuk, Cahoon, Croft, Houle, Warfield, Jackson, Fiore,
>     Frink, Beauregard, Morrison, Joyal, Rajotte, Bulpitt, Hall, Pacheco,
>     Raposa, Martel, Johnson, Dawson, Coli, and Dunham
> Depositions (with exhibits) of Jackson (2), Howe, Kelly, Frink, Kelley, Lukowicz,
>     T. Nye, M. Nye, Palazzo, Thornton, Pineda, Croft, Cahoon, Simko, Petro,
>     and Beauregard

Very briefly, police were dispatched at 2300h in response to a citizen who reported she saw two individuals that were apparently vandalizing a store sign. When the police arrived they encountered Mr. Mark Jackson who would not respond to the requests of the

police officers to stop and to remove his right hand from his pocket. When one of the officers approached Mr. Jackson he took his hand out of his pocket and flailed it at a police officer. A struggle ensued during which time Mr. Jackson was flailing his arms, kicking, and screaming profanities or unintelligibly. At one point he stated to the police that "I love you guys". Pepper (OC) spray and baton strikes to the lower extremities had no effect on Mr. Jackson. Back-up units responded to the scene and Mr. Jackson was handcuffed. He would not walk and was therefore lifted into the back of a police car, being placed on the rear seat but leaning over so his torso was on the driver side facing forward. While being placed into the police cruiser he continued to verbalize unintelligibly. Upon arrival at the police station a few minutes later (about 2312h) it was noted that Mr. Jackson was unresponsive. He was removed from the vehicle, the handcuffs were removed, and medical rescue was summoned. They found him to be without vital signs and in asystole (no electrical or mechanical activity of the heart). CPR failed to restore any vital signs and he was pronounced deceased upon arrival at the hospital. The post mortem examination revealed he was obese (74", 259lbs, BMI = 33.2), and had abrasions of the knees and contusions of the wrists. He had no other significant injuries. His 520 gram heart was enlarged (predicted normal for his height is 349 grams) and there was a 75% stenosis of one major coronary artery. Other findings included pulmonary congestion and edema, organomegaly, and chronic pancreatitis. About one liter of food was in the stomach. At issue is the cause and mechanism of death, and whether any actions or lack of appropriate response by the police were contributory to his death.

Mr. Jackson was obese, had an enlarged heart, significant coronary arteriosclerosis, had approximately one liter of food in his stomach, and had been in a violent struggle shortly before he was found without vital signs. Such a scenario has all the ingredients for a sudden unexpected cardiac death. However, the expected heart rhythm for a sudden cardiac death is ventricular fibrillation, not asystole as seen in this case. Had he been in ventricular fibrillation the AED would have delivered the potentially life-saving electrical shock, but such was not the case.

Mr. Jackson had a long history of schizophrenia. Although he was once prescribed risperidone for this disorder in 1996, he apparently never took the medication and, indeed, no drugs were detected in postmortem toxicological testing. The terminal event had many of the characteristics of an entity known as excited delirium: violent and aggressive behavior, a marked apparent increase in strength, no response to pain compliance techniques (pepper spray and baton strikes in this case), unintelligible and inappropriate verbalization, and sudden loss of vital signs shortly after cessation of the struggle. The most common causes of excited delirium seen today are intoxication with stimulant or hallucinogenic drugs, or untreated/under-treated mental illness, especially schizophrenia. The typical heart rhythm seen in these cases is either asystole or pulseless electrical activity. Once the loss of vital signs occurs, CPR is either ineffective or, if vital signs are restored, death invariably occurs within a few days from multi-organ failure. The mechanism of sudden death is thought to be related to the marked lactic acidosis as a result of the struggle coupled with shifts of blood potassium levels and the surge of nor-adrenalin that occurs upon cessation of the intense physical exertion.

Other factors that should be considered as possibly contributing to his death include the effects of the pepper spray and the mechanical interference with respiration related to the restraint (i.e. "positional" or restraint "asphyxia").

Pepper spray (*Oleoresin capsicum*) is a mucosal irritant that causes a burning sensation, lacrimation, and reflex coughing from oropharyngeal irritation. The particles are too large to get to the lower airway (lungs). Should this substance actually impair respiration it would be associated with wheezing and respiratory stridor. Mr. Jackson was totally unaffected by the OC spray except that he was seen to wipe it off his face. He clearly had no respiratory compromise from this and therefore the pepper spray had absolutely no contribution to his death.

"Positional" or "restraint" asphyxia was once hypothesized as a mechanism of death in restrained persons. The thought was that the prone position while restrained with handcuffs, and particularly where maximum restraint was used ("hog-tying"), interfered with the mechanics of respiration. In particular, it was thought that the prone position in an obese person inhibited adequate movement of the diaphragm. The meager scientific support for this hypothesis has been thoroughly debunked by numerous studies which have demonstrated no respiratory impairment from being restrained and placed in a prone position. Furthermore, the original studies supporting the hypothesis have been shown to be flawed in both experimental design and statistical analysis. Also, it should be noted that the sudden loss of vital signs is typical for a sudden cardiac death whereas a (mechanical) respiratory death is slower and more gradual. In the case of Mr. Jackson, he was prone for only short periods without any detrimental effects before being placed into the police cruiser. Once in the cruiser he was on his side facing forward and therefore had no respiratory obstruction. Although handcuffed, he could change his position if necessary or if desired. Clearly, Mr. Jackson did not die from any respiratory compromise.

It is therefore my opinion to a degree of reasonable medical certainty that Mr. Mark Jackson died from excited delirium which was the result of his untreated schizophrenia by the mechanism outlined above. For purposes of death certification, his underlying heart disease would be listed as a contributory factor in his death. Since the manner of death is related to the cause of the excited delirium, it would properly be listed as "natural" since it was the result of a natural disease process (viz. schizophrenia). Furthermore, again within reasonable medical certainty, the pepper spray and the restrained position did not contribute to his death, and any allegation that earlier CPR would have altered the course of events is specious since, once vital signs are lost, death is the inevitable outcome.

Yours Truly,

Charles V. Wetli, MD