IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


```
* * * * * * * * * * * * *   CIVIL ACTION
KAREN PETRO, ET AL         *   09-213
                           *
VS.                        *   MAY 17, 2011
                           *   VOLUME II
TOWN OF WEST WARWICK,       *
ET AL                      *   PROVIDENCE, RI
* * * * * * * * * * * * *
```


HEARD BEFORE THE HONORABLE WILLIAM E. SMITH

DISTRICT JUDGE

(Daubert Hearing)

**APPEARANCES**:

FOR THE PLAINTIFF:        STEPHEN P. SHEEHAN, ESQ.
                         Wistow & Barylick, Inc.
                         61 Weybosset St.
                         Providence, RI  02903

FOR THE DEFENDANT:       BRIAN J. CLIFFORD, ESQ.
                         DeSisto Law
                         211 Angell St.
                         Providence, RI  02906

Court Reporter:          Anne M. Clayton, RPR
                         One Exchange Terrace
                         Providence, RI  02903

Proceeding reported and produced by computer-aided
stenography

## I N D E X

WITNESS                                                    PAGE

CHARLES WETLI, M.D.

  Direct Examination by Mr. Clifford:            4
  Cross-Examination by Mr. Sheehan:             12
  Redirect Examination by Mr. Clifford:         82
  Recross-Examination by Mr. Sheehan:           86

DEFENDANTS EXHIBITS

1        -                                                 6

_____

1    17 MAY 2011 -- 9:35 A.M.

2          THE COURT:  Good morning.  So we're here in

3    Petro versus the Town of West Warwick, the continuation

4    of the Daubert hearing.

5          So let's have you all identify yourselves for

6    the record.

7          MR. SHEEHAN:  Your Honor, it's Stephen Sheehan

8    appearing for the Plaintiff.

9          MR. CLIFFORD:  Brian Clifford appearing for the

10   Defendant.

11         MR. SHEEHAN:  Your Honor, may we have permission

12   to approach?

13         THE COURT:  Sure.

14         (Bench conference off the record.)

15         THE COURT:  All right.  Mr. Clifford, you may

16   proceed.

17         MR. CLIFFORD:  Thank you, your Honor.

18         At the outset of this hearing, it was my

19   understanding that there were three issues for the

20   Court to address.  There's the issue of whether or not

21   the signs of Excited Delirium is reliable for expert

22   testimony; whether Drs. Wetli and Mash were qualified

23   to offer testimony on Excited Delirium; and finally, as

24   far as Dr. Wetli is concerned, in preparing his expert

25   testimony, is there an analytical gap between the data

1  that he reviewed and the conclusions that he ultimately

2  drew.  And it's further my understanding that those

3  first issues have been conceded by Mr. Sheehan and that

4  what we're here today to address is that third issue of

5  whether there's an analytical gap between the data that

6  Dr. Wetli reviewed and the conclusion that he drew.

7         So with your Honor's permission, I'll call

8  Dr. Wetli to the stand.

9         THE COURT:  That's fine.

10        **CHARLES WETLI, M.D.**, first having been duly

11  sworn, testified as follows:

12        THE CLERK:  Please state your name and spell

13  your last name for the record.

14        THE WITNESS:  I'm Dr. Charles Wetli, W-E-T-L-I.

15        THE COURT:  Good morning, Dr. Wetli.

16        THE WITNESS:  Good morning.

17        THE COURT:  And welcome.

18        And you may inquire, Mr. Clifford.

19        MR. CLIFFORD:  Thank you, your Honor.

20        **DIRECT EXAMINATION BY MR. CLIFFORD**

21  **Q.**   Dr. Wetli, if you could, please, could you explain

22  your involvement with Excited Delirium?

23  **A.**   Back in the late 1970's, cocaine was considered to

24  be a very safe recreational drug.  And in Miami at that

25  time, which was the crossroads of cocaine trafficking,

1  we were seeing people dying from the use of cocaine.

2  One of the cases I encountered was a person who

3  was intoxicated with cocaine and exhibited very bizarre

4  behavior, which a psychiatrist pointed out to me was

5  what they called Excited Delirium or agitated delirium,

6  which is the first time I had heard about this.

7  The psychiatrist was Dr. David Fishbain, and we

8  actually wrote the case up and submitted it as a report

9  to an emergency medicine journal. Over the next

10  several years of about five years, after that, I began

11  to see the same syndrome appearing in recreational

12  cocaine users. The first case was a body packer, a

13  person who swallowed condoms filled with cocaine from

14  South America.

15  But as I began to see these same cases occurring

16  in recreational cocaine users, they all had the same

17  characteristics of behavior, all were associated with

18  sudden death shortly after being restrained. I went

19  back to Dr. Fishbain and said: To me these look the

20  same, what do you think. And he concurred and that's

21  when we reported the series of cases in the Journal of

22  Forensic Sciences, I believe it was 1985.

23  Since then, I have been looking at

24  cocaine-related deaths and in particular cases of

25  Excited Delirium ever since that time.

1   **Q.**   Is this involvement reflected in your CV?

2   **A.**   It is reflected in my CV as far as the

3   publications are concerned, not as far as the various

4   cases that I have studied, testified on and so forth.

5          MR. CLIFFORD:  Very well.

6          Your Honor, with your permission, I'd like to

7   admit Dr. Wetli's CV.

8          MR. SHEEHAN:  No objection.

9          THE COURT:  All right.  We'll make that Exhibit

10  1.

11         (Defendant's Exhibit 1 admitted in full.)

12  **Q.**   Dr. Wetli, what is the accepted methodology for

13  determining the presence of Excited Delirium?

14  **A.**   The diagnosis of Excited Delirium is based upon

15  the behavior of the individual.  It is a purely

16  behavior diagnosis.  It has certain other features

17  associated with it, such as the various causes of

18  Excited Delirium, but the syndrome itself is based on

19  the behavior of the individual.

20  **Q.**   What are some of those behaviors?

21  **A.**   The behaviors, basically, the person is in fact

22  delusional.  They have -- it's a transient mental

23  defect where they have lack of perception of the

24  environment and inappropriate behavior with it.  It is

25  characterized by usually very violent behavior with

1    unexpected strength.  It is frequently accompanied by

2    hyperthermia.  Many individuals have a propensity to

3    smash glass objects such as mirrors and windows.

4    Inappropriate disrobing is a frequent component of it.

5    Frequently, profuse sweating.

6           Characteristically, they are completely

7    impervious to any pain compliance techniques such as

8    the use of electronic control devices, pepper sprays,

9    baton strikes and what have you.  And once they, in

10   fact, are restrained, generally after a prolonged

11   struggle, they will either recover from this in a

12   hospital, generally within 24 hours, or they suddenly

13   lose all vital signs within a few minutes after being

14   restrained.  If they are successfully resuscitated

15   after their loss of vital signs, they invariably die

16   within three to five days of the multi-organ failure.

17   **Q.**   Are there any particular postmortem indications?

18   **A.**   No.  The autopsy itself is essentially negative.

19   It's not a diagnosis of exclusion, as I said before.

20   It is based upon the behavior of the individual.  The

21   autopsy findings in general are characteristically

22   negative and do not show you a cause of death.

23          In other words, serious injury has been excluded

24   such as a punctured lung or a puncture from part of a

25   fractured rib, that type of thing has been excluded.

1    And likewise, an active significant disease process has

2    also been excluded as a direct cause of death anyway.

3    **Q.** For the present case, what did you do to prepare

4    your opinion?

5    **A.** Basically, I reviewed numerous documents. Did you

6    want me to summarize these?

7    **Q.** If you will, please.

8    **A.** The investigative narrative reports of the West

9    Warwick Police Department; investigative narrative of

10    the Rhode Island State Police; medical/legal death

11    investigator report by the Medical Examiner's Office;

12    the autopsy report along with toxicology and chemistry

13    reports done postmortem, including various notes and

14    diagrams that were in the medical examiner case file;

15    the Rhode Island State Police photographs of the scene

16    and of Mr. Jackson at the hospital and at the autopsy;

17    the medical examiner autopsy photographs; Plaintiff

18    responses to request for production of documents; EMS

19    ambulance run report; Kent Hospital Emergency

20    Department record, which I believe also included the

21    fire rescue unit response to Mr. Jackson.

22        I reviewed multiple psychiatric records,

23    interview statements of numerous individuals. Did you

24    want me to list these?

25    **Q.** No. That's sufficient, I think.

1    **A.**   And then depositions with exhibits of numerous

2    individuals.  Basically, how I -- materials I review to

3    issue my report and come to my conclusions.

4    **Q.**   And what conclusions did you ultimately draw?

5    **A.**   That, basically, my analysis indicated Mr. Jackson

6    had two processes going on.  One was he had significant

7    heart disease.  His heart was significantly enlarged.

8    He was an obese man, and he also had some fairly -- I

9    think stenosis or narrowing of one of his major

10   coronary arteries.  This on top of a full stomach of

11   one liter of material in his stomach at a time

12   following a violent struggle would be very consistent

13   with a sudden cardiac death.

14        He also had many of the signs and symptoms of

15   Excited Delirium, the agitated behavior, the marked

16   increase in strength, the being now impervious to pain

17   compliance techniques, in this particular case the

18   baton strikes as well as the application of pepper

19   spray directly to the face, unintelligible muttering

20   and lack of shall I say cooperation with the police in

21   the sense that he did not seem to be responding to them

22   appropriately.  So all of these would be indicative of

23   Excited Delirium.

24        If the death was due to sudden cardiac death

25   basis of its own just because of the heart disease, I

would expect that his terminal heart rhythm would have
been ventricular fibrillation.  As forensic
pathologists, we see ventricular fibrillation almost
invariably as the result of primary cardiac disease,
sudden death from a cardiac disease.

In cases of Excited Delirium, the death occurs
shortly after being restrained, not during the time of
the struggle but shortly after being restrained and the
terminal rhythm is one of asystole, A-S-Y-S-T-O-L-E,
which basically means there is no electrical or
mechanical activity of the heart itself.  It's just
suddenly like flipping a switch and the heart comes to
a sudden standstill, and that's what we had here.

So my conclusion is basically that Mr. Jackson
died from the syndrome of Excited Delirium and that was
due to his schizophrenia, his underlying mental
illness, and he died with the heart disease but not
because of it.

**Q.**    Did Mr. Jackson have all of the signs and symptoms
associated with Excited Delirium?

**A.**    No, he did not.

**Q.**    Could you explain why not.

**A.**    There are two reasons.  First of all, in any
medical syndrome, not every person develops all the
signs and symptoms of any disease process, whether it's

rheumatic fever, heart disease, no matter what.  Not
everybody has signs and symptoms, all the possible
signs and symptoms that could be associated with the
syndrome.

Secondly, in the case of Mr. Jackson, he was a
little bit unusual in that the police were responding
to an alleged incident of sign vandalization.  They
were not responding, as is more frequently the case, to
a person who is exhibiting bizarre behavior and
encountering a person in that situation.  By bizarre
behavior, I mean somebody who's totally naked, smashing
windows, screaming and yelling through the
neighborhood.

Police were called for that scenario versus the
one with Mr. Jackson, where they saw somebody in an
area where there was a suspicion of a crime being
committed, they encountered Mr. Jackson and then the
violence precipitated at that point, which meant that
he did not have sufficient time during this particular
scenario to develop more of the signs and symptoms that
would be typical for Excited Delirium.

**Q.**   Okay.

**A.**   In other words, the police encountered Mr. Jackson
at the very beginning of the syndrome as opposed to in
the middle of it.

1    MR. CLIFFORD:  Very well.  Your Honor, I have

2 nothing more.

3    THE COURT:  I'm sorry?

4    MR. CLIFFORD:  I have nothing more.

5    THE COURT:  Thank you.

6    Mr. Sheehan.

7    MR. SHEEHAN:  Your Honor, just to clarify the

8 remarks by my brother at the beginning of his

9 presentation, with respect to Dr. Wetli, there is no

10 objection to either the scientific sufficiency of

11 Excited Delirium as a diagnostic entity or his

12 qualifications.

13    With respect to Dr. Mash, that second point of

14 qualifications has not been waived by the Plaintiff.

15    THE COURT:  Thank you.

16    <u>**CROSS-EXAMINATION BY MR. SHEEHAN**</u>

17 **Q.**  Good morning, again, Doctor.

18 **A.**  Good morning.

19 **Q.**  How are you?

20 **A.**  Good.

21 **Q.**  Doctor, you're testifying today in your capacity

22 as a forensic pathologist, correct?

23 **A.**  Correct.

24 **Q.**  And first and foremost, forensic pathologists are

25 physicians.  Do you agree with that?

1   **A.**   Yes.

2   **Q.**   The understanding of medicine is fundamental to

3   the practice of forensic pathology.  Do you agree with

4   that?

5   **A.**   Yes.

6   **Q.**   One of the fundamental tasks of a physician is

7   diagnosis.  Do you agree with that?

8   **A.**   Correct.

9   **Q.**   Doctor, do you agree that a definition of

10  "diagnosis" that is accurate is the determination of

11  the nature of a case of disease?

12  **A.**   I'm sorry.  I don't understand your question.

13  **Q.**   Sure.  Doctor, you're familiar with Dorland's

14  Medical Dictionary, are you not?

15  **A.**   Yes.

16       MR. SHEEHAN:  Your Honor, with the Court's

17  permission, I'd like to give the witness a copy of my

18  exhibit so I don't have to go back and forth.

19       THE COURT:  That's fine, yes.

20       MR. SHEEHAN:  Doctor, these are all numbered.

21  **Q.**   Referring to Exhibit 20, the excerpt from

22  Dorland's Medical Dictionary, there's a definition of

23  "diagnosis."  Do you see that?

24       MR. SHEEHAN:  May I approach, your Honor?

25       THE COURT:  Yes.

1    **A.**    Yes.

2    **Q.**    And the first two definitions are the

3    determination of the nature of a case of disease, and

4    the second is the art of distinguishing one disease

5    from another.  Have I read that correctly?

6    **A.**    Yes.

7    **Q.**    Do you agree with those definitions for diagnosis?

8    **A.**    I'm not sure what the first one means.

9    Determination of the nature of a case of disease, I

10    don't know what that means.

11    **Q.**    Okay.  How about the second one, the art of

12    distinguishing one disease from another?

13    **A.**    Yes.

14    **Q.**    Okay.  Now, the primary method that physicians use

15    to distinguish one disease from another is the

16    differential diagnosis, correct, Doctor?

17    **A.**    Well, that doesn't distinguish it.  That just

18    lists the possibilities of the various things a person

19    could have based upon the signs and symptoms that are

20    known at that particular time.  Usually, the

21    differential diagnosis is made upon first examining the

22    patient and then various things are eliminated or

23    confirmed in the subsequent workup.

24    **Q.**    Sometimes physicians use the term "differential

25    diagnosis" to encompass both the initial listing of the

1    diseases that are compatible with the signs and

2    symptoms and the ensuing process of ruling in and

3    ruling out; is that correct?

4    **A.**    Exactly.  That's the way the process works.

5    **Q.**    Okay.  So using differential diagnosis to

6    encompass both those elements, first the listing and

7    then the ruling out, you accept that is the primary

8    method that physicians use to distinguish one disease

9    from another?

10   **A.**    Well, ruling out and ruling in.  Both together.

11   **Q.**    But the answer, therefore, is yes?

12   **A.**    Yes.

13   **Q.**    Okay.  Now, you believe that Excited Delirium

14   caused Mr. Jackson's heart to stop pumping?

15   **A.**    Correct.

16   **Q.**    You, therefore, believe that he suffered a cardiac

17   arrest from Excited Delirium?

18   **A.**    Correct.

19   **Q.**    You are aware that the Medical Examiner's Office

20   in Rhode Island conducted an autopsy of Mr. Jackson; is

21   that correct?

22   **A.**    Correct.

23   **Q.**    And that was performed by a forensic pathologist

24   by the name of Dr. Peter Gillespie, correct?

25   **A.**    Correct.

1   **Q.**   Now, you disagree with his opinion concerning the

2   cause of death, correct?

3   **A.**   Correct.

4   **Q.**   His opinion was that Mr. Jackson died as the

5   result of ischemic heart disease following the physical

6   altercation, correct?

7   **A.**   Correct.

8   **Q.**   And the cause of death he gives is sudden death

9   complicating ischemic heart disease following physical

10   altercation with police in a schizophrenic person,

11   correct?

12   **A.**   Correct.

13   **Q.**   And you disagree with that as the cause of death?

14   **A.**   Correct.

15   **Q.**   Now, he also classified his death as a homicide,

16   correct?

17   **A.**   Correct.

18   **Q.**   And in this case, all homicide means is the taking

19   of one's life by another?

20   **A.**   Correct.

21   **Q.**   Without raising the issue of whether that was

22   justified or not?

23   **A.**   Correct.

24   **Q.**   So you understand that Dr. Gillespie's opinion is

25   that Mark Jackson died from a sudden unexpected cardiac

1  death?

2  **A.**   From cardiac disease, yes.

3  **Q.**   From cardiac disease?

4  **A.**   Correct.

5  **Q.**   In other words, you and Dr. Gillespie both believe

6  that he died from a cardiac arrest.  You believe it was

7  due to Excited Delirium; it's Dr. Gillespie's opinion

8  that it was due from cardiac disease?

9  **A.**   That's exactly right.

10  **Q.**   Now, shall we use the term "sudden death from

11  cardiac disease" to encompass that opinion I've just

12  described for Dr. Gillespie and to differentiate it

13  from your opinion?

14  **A.**   Yes.  Can I just clarify one thing?  The mechanism

15  of death would be virtually the same.  In other words,

16  the sudden cessation of cardiac function.  It's the

17  cause of death where we differ.

18  **Q.**   Thank you.  Many conditions can cause sudden

19  cardiac death?

20  **A.**   Correct.

21  **Q.**   One of which is trauma?

22  **A.**   Yes.

23  **Q.**   And obviously, that's not involved here?

24  **A.**   Correct.

25  **Q.**   There are a number of non-traumatic causes of

1    sudden cardiac death, correct?

2    **A.**    Correct.

3    **Q.**    The largest category of those is due to primary

4    cardiac disease?

5    **A.**    Correct.

6    **Q.**    And it's called "primary" because the cardiac

7    arrest starts with a disease process in the heart or

8    directly affecting the heart?

9    **A.**    No.  It's a disease process involving the heart

10   itself.  You have other disease processes outside the

11   heart which can also affect the heart, but if you're

12   saying "primary," by that you mean that it's a primary

13   disease of the heart muscle or of the blood vessels or

14   other structures inside the heart.

15   **Q.**    Right.  And you understand that Dr. Gillespie's

16   opinion is that the cause of Mr. Jackson's sudden

17   cardiac death was primary cardiac disease?

18   **A.**    Correct.

19   **Q.**    Now, there are also conditions outside the heart

20   that can cause sudden cardiac death?

21   **A.**    Sure.

22   **Q.**    One of which is your opinion happened here,

23   Excited Delirium?

24   **A.**    Correct.

25   **Q.**    And those are called secondary conditions?

1   **A.**   Correct.

2   **Q.**   Now, Doctor, you know that a great many people die

3   every year from sudden cardiac arrest?

4   **A.**   That's very true.

5   **Q.**   Doctor, if you would just turn to Tab 23, which is

6   an extract from the emergency medicine text by

7   Dr. Rosen or rather edited by Dr. Rosen.  And referring

8   you to the page that's number 36 and there's a caption

9   "Epidemiology."  Do you see that?

10  **A.**   Yes.

11  **Q.**   In this paragraph, it's stated that of the two

12  million annual non-traumatic deaths in the United

13  States in 1992, 670,000 will occur suddenly.  Do you

14  see that?

15  **A.**   Yes.

16  **Q.**   And there's a statement:  Of these, 500,000 will

17  be attributed to cardiovascular disease and the

18  remaining 170,000 to non-cardiac causes.  Do you see

19  that?

20  **A.**   Yes.

21  **Q.**   Do you have any reason to disagree with those

22  figures, Doctor?

23  **A.**   No.

24  **Q.**   From the epidemiologic point of view?

25  **A.**   No, I see no reason to dispute it.  That's

1　probably abut right, just based on medical examiner

2　experience.

3　**Q.**　Okay.  Now, do you have a reliable estimate from

4　the number of deaths each year from Excited Delirium

5　syndrome?

6　**A.**　No.

7　**Q.**　Is it more than 200?

8　**A.**　I wouldn't have the faintest idea.

9　**Q.**　Doctor, is it less than 100?

10　**A.**　I don't know.

11　**Q.**　Would you agree that it is a small fraction of the

12　total number of sudden cardiac deaths each year?

13　**A.**　Absolutely.

14　**Q.**　A very small fraction, Doctor?

15　**A.**　Correct.

16　**Q.**　Doctor, would you be surprised if there were a

17　thousand deaths per year due to -- I'm sorry, a

18　thousand deaths from sudden cardiac arrests per year

19　due to primary cardiac disease for every one death to

20　Excited Delirium Syndrome?

21　**A.**　That would not surprise me, no.  I don't know

22　where you get the figures for that, but I think what

23　you're basically getting at is that Excited Delirium

24　deaths are relatively unusual, and I would agree with

25　that, yes.

1    **Q.**   And sudden death from primary cardiac disease is

2    extremely common?

3    **A.**   Yes, it is.

4    **Q.**   Doctor, in your report, which is at Tab 21, on

5    page two -- I'll give you a moment, Doctor.  I'd like

6    to draw your attention to a paragraph.

7    **A.**   Okay.

8    **Q.**   There's a middle paragraph that starts

9    "Mr. Jackson was obese"?

10    **A.**   Correct.

11    **Q.**   It states, quote:  Mr. Jackson was obese, had an

12    enlarged heart, significant coronary arteriosclerosis,

13    had approximately one liter of food in his stomach and

14    had been in a violent struggle shortly before he was

15    found without vital signs.

16         Have I read that sentence correctly?

17    **A.**   Yes, you have.

18    **Q.**   Then the next sentence starts:  Such a scenario,

19    correct?

20    **A.**   Yes.

21    **Q.**   The scenario you're referring to is your prior

22    sentence?

23    **A.**   Correct.

24    **Q.**   And you state:  Such a scenario has all the

25    ingredients for sudden unexpected cardiac death,

1    correct?

2    **A.**    Correct.

3    **Q.**    And that sentence, the phrase "sudden unexpected

4    cardiac death," you're meaning to refer to sudden

5    cardiac death due to primary cardiac disease?

6    **A.**    That is correct.

7    **Q.**    There's no question in your mind, Doctor, that

8    obesity is a risk factor in an individual such as

9    Mr. Jackson for sudden cardiac death from primary

10   cardiac disease?

11   **A.**    Correct.

12   **Q.**    You note that he had an enlarged heart, correct?

13   **A.**    Correct.

14   **Q.**    The term for that is cardiomegaly?

15   **A.**    Correct.

16   **Q.**    And you note that Dr. Gillespie weighed the heart

17   as 520 grams?

18   **A.**    Correct.

19   **Q.**    And you note the predicted normal for

20   Mr. Jackson's height is 349 grams?

21   **A.**    Correct.

22   **Q.**    When you performed autopsies, Doctor, before your

23   retirement from clinical forensic medicine, you used a

24   table to determine what was the normal predicted heart

25   weight for an individual?

1    **A.**    I still use that table, yes.

2    **Q.**    Okay.  You get it from the Mayo Clinic?

3    **A.**    Correct.

4    **Q.**    And that predicts normal based on the height of

5    the individual?

6    **A.**    There are two tables.  One is the weight predicted

7    for the height, and the other is predicted for the

8    weight.  We generally use the one for the height

9    because the weight would be artificially increased

10   because obesity means your heart works harder and

11   becomes enlarged secondary to obesity so it's a false

12   number.

13   **Q.**    All right.  So you generally use the one based on

14   height?

15   **A.**    Correct.

16   **Q.**    And using that, what we have here is Mr. Jackson's

17   heart was 50 percent larger than normal?

18   **A.**    Correct.

19   **Q.**    You have written, Doctor, that sudden -- I'm

20   sorry, that an enlarged heart increases the risk of

21   sudden cardiac death from primary cardiac disease?

22   **A.**    Most definitely that's correct.

23   **Q.**    You're aware, Doctor, that the autopsy also found

24   patchy fibrosis in the heart?

25   **A.**    Yes.

1    **Q.** And you know that that also increases the risk of

2    sudden cardiac death from primary cardiac disease?

3    **A.** That's correct.

4    **Q.** You commented in response to my brother's

5    questioning that Mr. Jackson had significant coronary

6    arteriosclerosis in one coronary artery?

7    **A.** Correct.

8    **Q.** And that was a 75 percent stenosis, correct?

9    **A.** Correct.

10   **Q.** And in your discipline, that is accepted to

11   constitute significant coronary arteriosclerosis?

12   **A.** Correct.

13   **Q.** Again, raising the risk for sudden cardiac death

14   from primary cardiac disease?

15   **A.** That's correct.

16   **Q.** Now, you agree with Dr. Gillespie that, in fact,

17   Mr. Jackson has ischemic heart disease?

18   **A.** Correct.

19   **Q.** And "ischemic" in this context means that the

20   abnormalities in his heart could result in reduced

21   blood flow under certain circumstances to vital organs,

22   including the heart?

23   **A.** Yes.

24   **Q.** Now, referring back to Mr. -- I'm sorry,

25   Dr. Gillespie's cause of death of ischemic heart

1    disease complicated by an altercation with the police,

2    you, obviously, accept that there was an altercation

3    with the police?

4    A.   Yes.

5    Q.   And you agree that such an altercation -- well,

6    let me back up a bit.

7         You agree, in general, that physical exertion

8    can provoke a heart attack in someone with ischemic

9    heart disease?

10   A.   Correct.

11   Q.   And you believe there was sufficient physical

12   exertion in this case to provoke Mr. Jackson's ischemic

13   heart disease?

14   A.   Correct.

15   Q.   Leading him to die from sudden cardiac death due

16   to that heart disease?

17   A.   It's conceivable, yes.

18   Q.   The risk factor of physical exertion for this type

19   of death is present in this case?

20   A.   Right.

21   Q.   Now, your next sentence in your report states,

22   quote:  However, the expected rhythm for sudden cardiac

23   death is ventricular fibrillation, not asystole as seen

24   in this case.

25        Have I read that correctly?

1  **A.**   Yes.

2  **Q.**   What you're referring to there, Doctor, is the

3  heart rhythm found when the EMS applied the automatic

4  external defibrillator in the back parking lot at the

5  West Warwick police station?

6  **A.**   Correct.

7  **Q.**   That's the first evidence of what Mr. Jackson's

8  heart rhythm was, correct?

9  **A.**   Correct.

10  **Q.**   Now, I'd like you for the purpose of my next

11  series of questions to assume something for me, Doctor.

12  **A.**   Okay.

13  **Q.**   I'd like you to assume that at that time that the

14  AED had shown ventricular fibrillation.  We know that's

15  not true but I'd like you to assume it.  Can you do

16  that?

17  **A.**   Sure.

18  **Q.**   Doctor, in that case, you would have all of the

19  risk factors for sudden unexpected cardiac death due to

20  primary disease, correct?

21  **A.**   Correct.

22  **Q.**   You would have an autopsy that was positive and

23  indeed conclusive for sudden unexpected cardiac death

24  due to primary cardiac disease?

25  **A.**   Correct.

1   **Q.**   It would be reasonable for the medical examiner to

2   opine that the cause of death was ischemic heart

3   disease in that situation?

4   **A.**   Correct.

5   **Q.**   And to express such an opinion to a reasonable

6   degree of medical certainty?

7   **A.**   Correct.

8   **Q.**   Now, I'd like you to assume something different

9   this time.  Assume for the purposes of my next series

10   of questions that we have no information whatsoever

11   about what Mr. Jackson's heart rhythm was before he was

12   pronounced dead.  Do you understand that?

13   **A.**   Yes.

14   **Q.**   In other words, let's assume that the AED did not

15   produce any information whatsoever, either because it

16   wasn't there or it malfunctioned or for whatever

17   reason.  Are you following me?

18   **A.**   Yes.  In other words, no AED period.

19   **Q.**   No AED and no other determination of what the

20   heart rhythm was, okay?

21   **A.**   Gotcha.

22   **Q.**   Now, in that instance, we would still have an

23   autopsy that's quite positive for sudden unexpected

24   cardiac death due to primary cardiac disease, correct?

25   **A.**   Correct.

1    **Q.**   And in that situation, it would still be

2    reasonable for the medical examiner to give an opinion

3    that the cause of death was ischemic heart disease

4    complicated by an altercation with the police?

5    **A.**   Yes.  That could well be, but then you'd have to

6    go one step further and say that he died with Excited

7    Delirium but not because of it, and you'd have to have

8    some other basis for saying -- choosing one over the

9    other.

10   **Q.**   Doctor, a moment ago -- I understand.

11         One of the reasons why you believe that

12   Mr. Jackson had Excited Delirium in this case was that

13   you believe that the heart rhythm he had after he

14   collapsed was asystole?

15   **A.**   That's one of the reasons, yes.

16   **Q.**   As opposed to ventricular fibrillation?

17   **A.**   Correct.

18   **Q.**   Doctor, is it your opinion to a reasonable degree

19   of medical certainty that Mr. Jackson had Excited

20   Delirium regardless of the fact of what his terminal

21   heart rhythm was determined to be?

22   **A.**   Yes.

23   **Q.**   Now, in your report, Doctor, you state:  Such a

24   scenario has all the ingredients for sudden unexpected

25   cardiac death.  Correct?

1    **A.**   Correct.  Referring to the prior sentence.

2    **Q.**  Right.

3    **A.**  Right.

4    **Q.**  And the prior sentence lists a number of different

5    elements?

6    **A.**  Exactly.

7    **Q.**  None of them include a determination that his

8    heart rhythm was ventricular fibrillation?

9    **A.**  Correct.

10   **Q.**  The scenario that you say has all the ingredients

11   for sudden unexpected cardiac death is based upon

12   obesity, enlarged heart, coronary arteriosclerosis, a

13   liter of food in the stomach and a violent struggle

14   shortly before he was found without vital signs?

15   **A.**  Correct.

16   **Q.**  You do not need to have a confirmed determination

17   of a heart rhythm of V-fib for a medical examiner to

18   conclude that the cause of death was ischemic heart

19   disease?

20   **A.**  Correct.

21   **Q.**  In fact, if you have all the ingredients for

22   sudden unexpected cardiac death, a medical examiner is

23   entitled to rely upon those ingredients to reach a

24   conclusion of cause of death due to ischemic heart

25   disease even in the absence of evidence as to what the

1  final rhythm was, correct?

2  **A.**   Mostly correct.  It would depend upon the

3  circumstances in which the person was found, but

4  basically, for example, if I found he was found lying

5  dead in his driveway, shoveling snow and there was no

6  rescue response, for example, then, yes, you would be

7  correct.

8  **Q.**   Doctor, in your direct -- well, I'm going to

9  withdraw that.

10      You understand that at some point after

11  Mr. Jackson was placed in the back of Officer

12  Lukowicz's patrol car, his heart stopped pumping and he

13  became unconscious?

14  **A.**   Correct.

15  **Q.**   And it's your opinion that once the heart stops

16  pumping blood, you have only about 13 seconds of

17  consciousness?

18  **A.**   Correct.

19  **Q.**   And that's whether the heart stops pumping blood

20  because the heart is in asystole or because the heart

21  is in V-fib?

22  **A.**   Correct.

23  **Q.**   Either way?

24  **A.**   Correct.

25  **Q.**   Now, you know that Mr. Jackson was conscious when

1  he was put into the patrol car?

2  **A.**   Correct.

3  **Q.**   And that he was making noises and moving for at

4  least the beginning of the ride to the station?

5  **A.**   Correct.

6  **Q.**   Both of which are some indicators of

7  consciousness, making noises and moving?

8  **A.**   Correct.

9  **Q.**   You also know that he became completely silent,

10  was making no noises and was not moving in that back

11  seat?

12  **A.**   Correct.

13  **Q.**   You know that Officer Kelley, when they arrived at

14  the station, looked in the back seat about six seconds

15  after arrival?

16  **A.**   Correct.

17  **Q.**   And saw Mr. Jackson and that Mr. Jackson appeared

18  unconscious to Officer Kelley?

19  **A.**   Correct.

20  **Q.**   Doctor, do you believe to a reasonable degree of

21  medical certainty that Mr. Jackson was unconscious at

22  some point in the back seat of Officer Lukowicz's

23  patrol car?

24  **A.**   Yes.

25  **Q.**   And you believe that he never, thereafter,

1　regained consciousness?

2　**A.**　Correct.

3　**Q.**　Now, the usual way -- let me back up a bit.

4　Doctor, you used the term in response to the direct

5　examination "terminal heart rhythm"?

6　**A.**　Correct.

7　**Q.**　By "terminal," you mean the heart rhythm at the

8　point that the subject collapses?

9　**A.**　Right.

10　**Q.**　When people die, ultimately, usually their last

11　rhythm is asystole, right?

12　**A.**　No.　I think we're getting into some semantics

13　here.　Eventually, the heart is going to be in an

14　asystole, that's true.

15　**Q.**　But by "terminal," you don't mean that, you don't

16　mean the last act.　You mean the point right when the

17　individual collapses?

18　**A.**　Correct.　What this is based on is studies that

19　were done primarily in Miami and in Seattle where fire

20　rescue units that were responding within a matter of

21　just like a few minutes of somebody collapsing, using

22　that particular rhythm when the rescue units were

23　there.　In the cases of Excited Delirium, rescue units

24　are frequently already there for various other reasons

25　and you get it within a matter of seconds.　Other times

1    it's a matter of a couple of minutes.  But these are

2    the terminal rhythms we're talking about, not one that

3    is taken hours later, for example, and obviously not

4    one occurring immediately as a person loses

5    consciousness because EKG pads are usually not on these

6    people at that time.

7    **Q.**   Okay, Doctor.  But I just want to confirm your use

8    of "terminal" means that the Plaintiff collapsed?

9    **A.**   Correct.  Or the first two minutes or so

10   afterwards.  That's what I was trying to convey.

11   **Q.**   Okay.  Doctor, the usual way to determine the

12   heart rhythm that caused the death is to look at the

13   heart rate within the first minute after the person is

14   unconscious, correct?

15   **A.**   Well, that would be ideal, but in the real world

16   it's usually the first two or three minutes.

17   **Q.**   Doctor, I wasn't asking whether that would be

18   ideal.  I was asking whether that's the usual way.  Do

19   you disagree with that, the usual way to determine what

20   heart rhythm caused the death?

21   **A.**   Yes.

22         MR. SHEEHAN:  May I ask that the screens be

23   turned on, your Honor.

24         THE COURT:  Yes.

25   **Q.**   Doctor, you testified before?

1    **A.**   Correct.

2    **Q.**   And you testified in a case, rather gave a

3    deposition in a case that I think went to trial in fact

4    in the Northern District of California brought by a

5    Plaintiff named Heston against the City of Salinas,

6    correct?

7    **A.**   Correct.

8    **Q.**   Referring to page 128 from your deposition,

9    Doctor -- first of all, does this appear to you to be

10   your deposition?

11   **A.**   Yes.

12   **Q.**   No reason to dispute that, right?

13   **A.**   Correct.

14   **Q.**   On page 128, there's the question on line 6:

15         I asked earlier -- I'm sorry.

16         I earlier asked you whether based on the autopsy

17   findings it was possible to determine if Mr. Heston

18   went into ventricular fibrillation, and I think your

19   answer was there was no way to tell.  Is that correct?

20         Answer:  Correct.

21         Have I read that correctly?

22   **A.**   I can't see it on here.  I have pages 126 and 128.

23   **Q.**   I'm reading on page 128, line 6.

24   **A.**   Okay.

25   **Q.**   Line 6 through line 11.

1    **A.**   Correct.  I gotcha.  Okay.

2    **Q.**   I read that correctly?

3    **A.**   Correct.

4    **Q.**   And then there's down the bottom a rephrasing.

5    If someone were to opine in this case that

6    direct electrical stimulation of the heart could not

7    have caused ventricular fibrillation, there would be no

8    way to prove that theory or that opinion, correct,

9    because there's no evidence of ventricular

10   fibrillation?

11   Have I read that correctly?

12   **A.**   Yes.

13   **Q.**   Then there's the answer.  And would you read that

14   answer slowly into the record.

15   **A.**   Sure.  (Reading:)  Not only that, you not only

16   have no evidence for it but I don't know the time frame

17   from when he was cyanotic and the paramedics actually

18   put the EKG monitor on him.  If more than several

19   minutes has gone by, then the asystole means nothing.

20   Usually, we look at the initial heart rhythm to

21   determine within the first minute after the person

22   collapses and then you can be sure of what the

23   electrical rhythm was that terminated their life.

24   **Q.**   Now, in your deposition, you used the phrase

25   "Usually we look at initial heart rhythm to determine

1  within the first minute after the person collapses,"

2  right?

3  **A.**   If that's possible, yes.

4  **Q.**   No, no, Doctor.  It's not possible that you used

5  that phrase.  You did use that phrase?

6  **A.**   Yes, I did.

7  **Q.**   And you were testifying under oath?

8  **A.**   Correct.

9  **Q.**   Were you testifying truthfully?

10  **A.**   Of course.

11  **Q.**   Was the answer "of course"?  I didn't hear it.

12  **A.**   Yes.  Of course.

13  **Q.**   Now, you are familiar with the work that has been

14  done by Dr. Stratton and his colleagues in this area?

15  **A.**   Yes.

16  **Q.**   You rely on that work in your testimony from time

17  to time?

18  **A.**   I may have.  I don't recall.  I'm familiar with

19  the work.  I know I've quoted it in papers I've

20  written, but I don't know if I've quoted it in the

21  context of testimony.  I may have.  I just don't

22  recall.

23  **Q.**   You definitely have quoted it in the papers you've

24  written in the learned literature.

25  **A.**   Sure.

1    **Q.**   Dr. Stratton wrote a paper to attempt to determine

2    the terminal rhythm with Excited Delirium Syndrome?

3    **A.**   Correct.

4    **Q.**   Again, using "terminal" to mean the initial

5    presenting rhythm after the collapse?

6    **A.**   Correct.

7    **Q.**   And if you turn to Tab 25, Doctor, have you found

8    it?

9    **A.**   Yes.

10    **Q.**   This is Dr. Stratton's paper on that issue,

11    correct?

12    **A.**   Correct.

13    **Q.**   And we have it up on the screen, at least the

14    first page of it, correct?

15    **A.**   Yes.

16    **Q.**   And if you turn under "Methods," that's where he

17    describes, rather Dr. Stratton and his colleagues

18    describe the methods they used in their study?

19    **A.**   Correct.

20    **Q.**   And he states, and I've highlighted it:  Cases of

21    Excited Delirium with respiratory or cardiac arrest

22    were entered onto the scene -- I'm sorry, onto the

23    study if EMS paramedics witnessed the arrest at the

24    scene.

25         Have I read that correctly?

1    **A.**    Yes.

2    **Q.**    What that means is that although he had data from

3    a number of additional cases of individuals who had

4    died from Excited Delirium Syndrome, he did not use

5    that data, at least with respect to determining the

6    terminal rhythm because there was no paramedics who

7    witnessed the arrest at the scene, right?

8    **A.**    Correct.

9    **Q.**    And, Doctor, that limitation makes sense to you?

10   **A.**    Yes.

11   **Q.**    Doctor, in cases where the terminal rhythm

12   disturbance is known, it's because paramedics checked

13   the rhythm within 30 to 60 seconds of the person

14   becoming cyanotic?

15   **A.**    That's in the study, yes.

16   **Q.**    You agree with that statement, whether it's in the

17   study or not, Doctor?

18   **A.**    In this case, yes.

19   **Q.**    No, no.  Doctor, I'm stating that as a matter of

20   general fact that where the cases where the presenting

21   rhythm disturbance or what you call the terminal rhythm

22   is known it's because paramedics check the rhythm

23   within 30 to 60 seconds of a person becoming cyanotic?

24   **A.**    In general, no, I would not say that's true at

25   all.

**Q.**   Okay.

**A.**   Because it takes them longer to get to the victim.

**Q.**   I didn't hear the back of your response.

**A.**   It takes them longer to get to the victim.  In a study such as this, they could narrow it down to within 30 to 60 seconds.  In the real world, when somebody collapses at home and the wife calls 911, paramedics usually cannot get there within 30 to 60 seconds.  It's going to be usually a minute or two longer than that.

**Q.**   Doctor, in many, many cases of sudden cardiac arrest, the presenting rhythm disturbance is never determined?

**A.**   That's true.

**Q.**   Because an attempt was made to determine the rhythm too late after the arrest or no attempt was made at all?

**A.**   Correct.

**Q.**   Doctor, turning to page 129 from your sworn testimony in the Heston case, the next question and answer after what we've read, I'd like to read the question and I'd like you to read the answer.

      Question:  In this case, there's no evidence of that, correct?

      And by "that," you understand it means what the initial presenting rhythm was, right, Doctor?

1     **A.**   I don't recall the <u>Heston</u> case that well, but --

2     **Q.**   I mean, from the context you can see that the

3     questioner's use of the word "that" is referring to

4     what was the initial heart rhythm after the collapse.

5     **A.**   Okay.

6     **Q.**   Would you agree with that, Doctor?  I don't want

7     to put words in your mouth.

8     **A.**   I believe that's correct, yes.

9     **Q.**   Would you read the answer.

10    **A.**   (Reading:)  Exactly.  I'm not sure of the time

11    frame that's going on at that particular time, but

12    usually in these cases the paramedics are already on

13    the scene.  They are not called to the scene after the

14    person turns cyanotic.  They're already on the scene

15    and within 30 to 60 seconds you know what the rhythm

16    is.  In that case, I don't think you have that in this

17    case, therefore, it's impossible to be definitive about

18    it.  As I said before, in cases of Excited Delirium

19    almost invariably you see their -- it says PDA.  It

20    should be PEA, or asystole -- PEA meaning pulses

21    electrical activity.  But, again, in this particular

22    case, we don't know for sure.

23    **Q.**   Doctor, in your answer, you did not refer to or

24    rather limit your answer to scientific studies that

25    have been published in the literature, did you?

**A.**   No.

**Q.**   When was Mr. Jackson noted to be cyanotic?

**A.**   I believe when he was taken out of the police car.

**Q.**   His lips were blue, right?

**A.**   Right.

**Q.**   That's indicative of a central cyanosis, right, Doctor?

**A.**   I don't know what you mean by central cyanosis. It is cyanosis in the fact that his lips are blue.

**Q.**   You don't know what the term "central cyanosis" means, Doctor?

**A.**   Never heard that before.

**Q.**   Okay.  Do you understand that there's peripheral cyanosis and a central cyanosis and they can be caused by different things?

**A.**   No, I do not.

**Q.**   Now, you know from your review of the record that from the moment that Mr. Jackson was observed in the back lot, it was noted that his lips were bluish?

**A.**   Correct.

**Q.**   He was already cyanotic?

**A.**   Correct.

     MR. SHEEHAN:  Your Honor, with the Court's permission, I'd like to play the video from the back lot, which is Exhibit 26, I believe.

1    THE COURT:  Okay.

2    MR. CLIFFORD:  No objection, your Honor.

3    THE COURT:  Very good.  Let's do that.

4    MR. SHEEHAN:  And as a preface, what we have,

5    your Honor, and it's on the screen already, it's going

6    to have a counter that's going to come on -- and

7    Doctor, I'd appreciate your attention also -- at the

8    point that the squad cars stopped.  And I can represent

9    to the Court, I believe, without objection that those

10   are the squad cars that contained Mr. Jackson.  We're

11   going to see that as they pull him out.  But a counter

12   is going to appear in the top left corner, and I want

13   to use that counter to determine time intervals.

14   THE COURT:  So are you going to be stopping the

15   video in order to direct attention to that counter, or

16   are you just going to let it play all the way through?

17   MR. SHEEHAN:  I'm going to let it run from the

18   point that the counter starts, which is when the squad

19   cars arrive, up to the point that the AED is attempted,

20   and I'd like to determine that interval.

21   THE COURT:  So this video begins when the squad

22   cars arrive?

23   MR. SHEEHAN:  Correct.

24   THE COURT:  Okay.

25   MR. SHEEHAN:  And I am going to ask it be

1   stopped once in the middle, and that is at the point

2   that he's taken out of the car.  So there's going to be

3   point of arrival, which is zero seconds, then there's

4   going to be when he's taken out of the squad car, and

5   the time will be on the screen, and then there's the

6   time the AED is applied.  Proceed?

7   　　　THE COURT:  Yes.

8   　　　(Video played.)

9   Q.   Two minutes, can we agree, he's taken out of the

10  car?

11  A.   Yes.

12  　　　(Video played.)

13  Q.   Doctor, can we agree that at five minutes and 30

14  seconds the AED is applied?

15  A.   Yes.

16  Q.   And that's the point that there was a

17  determination made concerning what Mr. Jackson's heart

18  rhythm was for the first time?

19  A.   Correct.

20  Q.   In your report, you state that the expected heart

21  rhythm for sudden unexpected cardiac death due to

22  ischemic heart disease is ventricular fibrillation?

23  A.   Correct.

24  Q.   In V-fib, the heart has electrical charges

25  fluttering through it, correct?

1    **A.** Correct.

2    **Q.** But it is not pumping?

3    **A.** Correct.

4    **Q.** And AED is designed to deliver an electrical shock

5    to stop the heart and then the heart will be restarted?

6    **A.** Correct.

7    **Q.** And obviously, if you're already in asystole, that

8    means there are no electrical charges in the heart,

9    there's nothing to stop?

10    **A.** Correct.

11    **Q.** So the AED doesn't work with asystole?

12    **A.** Correct.

13    **Q.** It's designed to work with V-fib?

14    **A.** Correct.

15    **Q.** The purpose of the shock is to defibrillate by

16    stopping the heart and with CPR restarting it in a

17    normal sinus rhythm, correct?

18    **A.** Correct.

19    **Q.** That's usually what happens with V-fib?

20    **A.** Hopefully, that's what happens, yes.

21    **Q.** That's usually what happens with V-fib?

22    **A.** I don't know if it's usually what happens. That's

23    what you hope happens.

24    **Q.** Doctor, referring to your testimony in <u>Heston</u>

25    again, page 130, the part I've highlighted states,

1  quote:  But skipping all that, ventricular fibrillation

2  is better because you can defibrillate them and cause

3  the heart to come to a standstill and then start it

4  again.  That's usually what happens.

5       That's your testimony, isn't it, Doctor?  Have I

6  read that correctly?  Have I read that correctly?

7  **A.**  You read it correctly but that's misleading.

8  **Q.**  Thank you.

9       THE COURT:  Mr. Sheehan, you need to put that in

10  context with the question.

11       MR. SHEEHAN:  Sure.

12  **Q.**  Doctor, you were asked --

13       THE COURT:  Would you just read the question in

14  and then if you want to abbreviate the answer or you

15  can put the -- you should probably put the whole answer

16  in.  I think that would be best.

17  **Q.**  Doctor, I'm going to read the question.  Would you

18  read the answer, please.

19       Question:  It is more difficult to gain a sinus

20  rhythm from someone who is in asystole versus

21  ventricular fibrillation?

22  **A.**  (Reading:)  Generally speaking, it's easier from

23  ventricular fibrillation if it's a healthy individual

24  to begin with.  The asystole, when people die with

25  asystole -- again it should be PEA not PDA -- it's my

1   understanding that their chances of survival are very,

2   very slim unless it's in an operating room, for

3   example.  Skipping all that, ventricular fibrillation

4   is better because you -- and then I ran out of space.

5        THE COURT:  You need to move it up.

6   **A.**   (Reading:)  Skipping all that, ventricular

7   fibrillation is better because you can defibrillate

8   them and cause the heart to come to a standstill and

9   then start it again.  That's usually what happens.  In

10  fact, CPR was begun, the whole concept came about

11  because of young men who were getting electrocuted and

12  dying and the idea was to defibrillate them and start

13  their hearts again.

14  **Q.**   Just confirming, that's the end of the answer,

15  right, Doctor?

16  **A.**   Correct.

17  **Q.**   Now, in an individual who is experiencing a

18  cardiac arrest due to primary cardiac disease whose

19  initial presenting rhythm is V-fib, there's no

20  circulation being provided to the brain?

21  **A.**   Correct.

22  **Q.**   What usually happens if there's no intervention

23  for such an individual is that the heart will stop

24  beating entirely?

25  **A.**   Correct.  Well, the heart will come to a

1    standstill entirely, electrical standstill entirely.

2    **Q.**    It will come to an electrical standstill entirely?

3    **A.**    Correct.

4    **Q.**    In other words, it will go from V-fib to asystole?

5    **A.**    Correct.

6    **Q.**    In other words, the condition of the patient will

7    deteriorate through V-fib into asystole?

8    **A.**    Correct.

9    **Q.**    For that reason, if more than several minutes have

10   gone by from the heart stopping pumping until the

11   paramedics place the EKG on a patient, the fact that

12   the EKG then shows asystole means nothing?

13   **A.**    Correct.

14   **Q.**    Now, in this case, we know that more than five

15   minutes and 30 seconds passed?

16   **A.**    Correct.

17   **Q.**    Because you've already testified in your opinion

18   he was unconscious in the squad car?

19   **A.**    Correct.

20   **Q.**    And by the way, Doctor, the unconsciousness comes

21   after the cardiac arrest?

22   **A.**    Right.

23        THE WITNESS:  Excuse me.  Can we take a break

24   for five minutes?

25        THE COURT:  Yes, we can.  We'll take a short

1    break, reconvene in about five, ten minutes.

2           (Recess.)

3    **Q.**    Just before we took the break, you were testifying

4    that the temporal sequence of cardiac arrest is that

5    the heart stops, then within say 13 seconds or so, the

6    individual becomes unconscious and very quickly

7    thereafter becomes cyanotic?

8    **A.**    Correct.

9    **Q.**    Now, in your opinion, Mr. Jackson was already

10   unconscious in Officer Lukowicz's patrol car?

11   **A.**    Correct.

12   **Q.**    And you relate that opinion to Officer Lukowicz's

13   account that he became completely silent and there was

14   no noise?

15   **A.**    Correct.

16   **Q.**    And Officer Lukowicz testified that happened at

17   some point along the midpoint of the ride back to the

18   station, do you recall that?

19   **A.**    Yes.

20   **Q.**    And he said that it takes at most a minute or two

21   to get from the location at the parking lot for Joyal's

22   Liquors to the station, do you recall that?

23   **A.**    Yes.

24   **Q.**    So it's reasonable under those facts to assume

25   that Mr. Jackson was unconscious for somewhere in the

1    area of 30 seconds to a minute before they arrived at

2    the station?

3    **A.**   Correct.

4    **Q.**   And that preceded by that is at least 13 seconds

5    of heart stop but still conscious?

6    **A.**   Right.

7    **Q.**   So we can push the point of cardiac arrest back to

8    about 45 seconds prior to arrival at the station, if

9    not longer?

10   **A.**   It's conceivable, yes.

11   **Q.**   Well, that's reasonable under these facts?

12   **A.**   Right.

13   **Q.**   That's the best scenario under these facts, right?

14   **A.**   Right.

15   **Q.**   And with that scenario, it would be six minutes

16   and 15 seconds from the cardiac arrest to the point in

17   time the AED was applied?

18   **A.**   Correct.

19   **Q.**   At a minimum?

20   **A.**   Correct.

21   **Q.**   That's more than several minutes, Doctor?

22   **A.**   Pardon?

23   **Q.**   That's more than several minutes?

24   **A.**   Well, I'd say several minutes.  I'm not sure how

25   you define "several."  To me, it's more than three or

1    four.

2    **Q.**   That's certainly more than three or four, Doctor?

3    **A.**   Right.

4    **Q.**   And Doctor, you've testified that if an individual

5    goes without breathing for two to four minutes, you

6    would expect to have some degree of permanent injury?

7    **A.**   Correct.

8    **Q.**   And if an individual goes without breathing for

9    more than four minutes, you expect in most cases he's

10   going to die?

11   **A.**   Correct.

12   **Q.**   And that's whether he starts in V-fib or asystole?

13   **A.**   Right.

14   **Q.**   It's simply oxygen deprivation resulting in

15   hypoxia, anoxia and death?

16   **A.**   Correct.

17   **Q.**   Doctor, you would agree that the finding of

18   asystole when the AED was applied in this case does not

19   rule out that Mr. Jackson was in V-fib as the initial

20   presenting rhythm, correct, because of the time period

21   that went by?

22   **A.**   You can't completely exclude it, no.  The problem

23   you have is that you don't know how long a person can

24   remain in V-fib before they actually go into asystole.

25   The time frame is more characteristic of real life

1  scenarios that I see in sudden cardiac death where you
2  don't have somebody within 30 seconds or a minute
3  applying the AED.  It usually is several minutes from
4  the time that rescue gets the call, by the time they
5  get there and they find the person in V-fib.  Having
6  said that, we don't know how long it takes once a
7  person is in ventricular fibrillation to actually then
8  eventually go into asystole.
9  **Q.**  Doctor, hasn't the American Heart Association
10 published how long it takes to go from V-fib to
11 asystole?
12 **A.**  I have no idea.
13 **Q.**  That's not within your area of expertise, Doctor,
14 correct?
15 **A.**  No, it's not.
16 **Q.**  And you don't know whether that's four minutes or
17 not?
18 **A.**  I have no idea.  I'm not sure how you would figure
19 it out, either.
20 **Q.**  Now, Doctor, the chances of resuscitation are much
21 better if the individual is found in V-fib than in
22 asystole?
23 **A.**  Correct.  Sorry.  But to qualify, like I said in
24 my deposition, it has been, provided a person has a
25 normal cardiovascular status.

1    **Q.**    Individuals pay a heavy price for deteriorating

2    through V-fib into asystole?

3    **A.**    Correct.

4    **Q.**    In that they cannot be brought back by AED?

5    **A.**    Correct.

6    **Q.**    Now, Doctor, you testified in the direct that with

7    Excited Delirium Syndrome, there's no anatomic cause of

8    death noted on autopsy?

9    **A.**    Correct.

10    **Q.**    In other words, there are no abnormal findings on

11    autopsy attributable to Excited Delirium?

12    **A.**    Correct.

13    **Q.**    In this particular case, obviously, for

14    Mr. Jackson's autopsy, you would agree that there were

15    no abnormal findings indicative of Excited Delirium

16    Syndrome, right?

17    **A.**    There are none.

18    **Q.**    There are none, in general or in this case?

19    **A.**    Always.

20    **Q.**    Right.  Now, you're familiar with Vincent DiMaio's

21    book on Excited Delirium?

22    **A.**    Right.

23    **Q.**    Dr. DiMaio, I should say.  And you believe it's a

24    very good account of the history and mechanism of

25    Excited Delirium?

1    **A.**    Pretty much, yes.  There are a few things in the

2    book I disagree with but, in general, yes, it's a good

3    book.

4    **Q.**    You certainly respect Dr. DiMaio on the issue of

5    Excited Delirium?

6    **A.**    Of course.

7    **Q.**    And you're aware it's Dr. DiMaio's opinion that

8    the diagnosis of Excited Delirium as a cause of death

9    is a diagnosis of exclusion?

10   **A.**    I don't recall, but I disagree with that one

11   hundred percent.

12   **Q.**    Fine.  But before we get to whether you disagree

13   with it or not, my question was are you aware that it

14   is his opinion that a diagnosis of ED as a cause of

15   death is a diagnosis of exclusion?

16   **A.**    I know he said that, yes.

17   **Q.**    In fact, you agree with that opinion in the sense

18   that a pathologist confronted with a possible case of

19   Excited Delirium must exclude sudden death from natural

20   disease process and exclude sudden death from trauma?

21   **A.**    Correct.

22   **Q.**    You agree that one of the criteria for a

23   pathologist to give Excited Delirium Syndrome as a

24   cause of death is that the pathologist must have a

25   negative autopsy?

1    **A.** No. You must exclude trauma and you must exclude

2    natural disease processes as a cause of death. In that

3    sense, you have a negative autopsy but you can have a

4    natural disease process and die with Excited Delirium

5    with the disease process but not because of a disease

6    process.

7    **Q.** Doctor, let's be clear. "Negative" means that the

8    autopsy reveals no disease process or injury that

9    independently could account for the death of the

10   individual?

11   **A.** Correct.

12   **Q.** Okay. Now, here we had a positive autopsy

13   suggestive of sudden unexpected cardiac disease from

14   primary cardiac disease?

15   **A.** Correct.

16   **Q.** I'm sorry. Sudden unexpected cardiac death. If I

17   may correct myself.

18   **A.** Correct.

19   **Q.** In other cases of suspected Excited Delirium that

20   you're aware of, postmortem brain samples have been

21   taken from the autopsy and analyzed at Dr. Mash's lab

22   in Florida?

23   **A.** Correct.

24   **Q.** And the results of that analysis provides

25   supportive objective evidence to validate or rule out a

1    finding of Excited Delirium?

2    **A.**    Right.

3    **Q.**    It is not required for a pathologist such as

4    Dr. Gillespie to take postmortem brain samples and send

5    them to Dr. Mash if the autopsy showed positive

6    evidence suggestive of sudden unexpected death due to

7    heart disease?

8    **A.**    I would disagree with that.

9    **Q.**    So you fault Dr. Gillespie in this case for not

10   taking brain tissue from Mr. Jackson?

11   **A.**    Not exactly.

12   **Q.**    I asked you was it required, and you said you

13   would disagree with that.

14   **A.**    No.  I was disagreeing with other statements

15   you've made.  Was it required?  No, it's never

16   required, no.  But not considering Excited Delirium in

17   the differential I think is a mistake.

18   **Q.**    Doctor, my question is quite simple.  You do not

19   believe that it was required for Dr. Gillespie in this

20   case to take postmortem brain samples and send them to

21   Dr. Mash?

22   **A.**    No.  It's not required, no.

23   **Q.**    And absent analysis of such brain samples, the

24   diagnosis of EDS is based solely on the pathologist's

25   evaluation of reported observations of behavior?

1    **A.**    Of course.

2    **Q.**    That's why you say Excited Delirium Syndrome is

3    diagnosed on behavior?

4    **A.**    Correct.

5    **Q.**    The pathologist isn't there, obviously?

6    **A.**    Correct.

7    **Q.**    Has to rely on observations of witnesses?

8    **A.**    Correct.

9    **Q.**    If witnesses are police, they have a bias, which

10   is to exaggerate how violent the suspect was to justify

11   their response?

12          MR. CLIFFORD:  Your Honor, I object.

13          THE COURT:  Grounds?

14          MR. CLIFFORD:  I'm not sure the Doctor is expert

15   to testify on the biases of police.

16          THE COURT:  Well, he just asked him if there's a

17   bias so I'm going to allow it.  It's legitimate

18   cross-examination.  Go ahead.

19   **A.**    Could you repeat the question, please.

20   **Q.**    Sure.  If the witness that's providing the

21   information about the behavior of the suspect is the

22   police, they have a potential bias, which is they want

23   to vindicate their own behavior in the event?

24          THE COURT:  Well, I'm not going to allow that.

25   That wasn't your question.

1    MR. SHEEHAN:  I didn't mean to change it, your

2 Honor.  I frankly didn't.

3    THE COURT:  At least I didn't understand that to

4 be what you were asking.  I thought you were asking

5 that if a witness has a bias, then that is reflected in

6 the information that is conveyed, but he cannot testify

7 as to whether police officers have a bias or not.

8    So if that's what you objected to, I sustain

9 your objection.

10    MR. CLIFFORD:  Thank you, your Honor.

11 **Q.**   Just for the record, you've testified in probably

12 a thousand cases where your testimony depended in part

13 on the testimony of police, right?

14 **A.**   Absolutely.  Sure.

15 **Q.**   And you're quite familiar with the factors that go

16 into evaluating testimony of police in a courtroom?

17 **A.**   No.  Not in a courtroom.  I evaluate what any

18 witness, including police will tell me based on the

19 autopsy findings and everything else I know about the

20 case.  Sometimes police, like anybody else, are

21 truthful; sometimes they exaggerate; sometimes they

22 underestimate.  You have to evaluate -- there's no

23 difference with lay witnesses or police as far as I'm

24 concerned.

25 **Q.**   Now, different pathologists may take the same

1    behavioral history and reach different conclusions as
2    to whether or not that history justifies a diagnosis of
3    Excited Delirium?
4    **A.**    That's true.
5    **Q.**    There has been no research whatsoever done to
6    validate a pathologist's diagnosis of Excited Delirium
7    either as to the accuracy of the diagnosis, the
8    sensitivity of the diagnosis or the specificity of the
9    diagnosis, correct?
10   **A.**    I don't know that.
11   **Q.**    Certainly, you're not aware of any?
12   **A.**    Correct.  I don't know if anybody's done any
13   study, surveys of pathologists and their diagnosis of
14   Excited Delirium, which I think is what you're getting
15   at.  I don't know of any study like that.
16   **Q.**    As far as you know, it's never been determined the
17   extent to which different medical examiners would
18   diagnose Excited Delirium on the same set of facts?
19   **A.**    Right.
20   **Q.**    As far as you know, the mechanism of death for
21   Excited Delirium has not been scientifically studied?
22   **A.**    Correct.
23        MR. CLIFFORD:  Your Honor, I object on the
24   grounds that I think this hearing was designed not to
25   try the credibility of Excited Delirium but to address

1    the analysis of Dr. Wetli.

2         THE COURT:  Well, Mr. Sheehan, I think that's

3    correct, but do you want to respond to that?

4         MR. SHEEHAN:  I'm moving on, your Honor.  I

5    don't need to belabor that issue.

6         THE COURT:  Okay.  Go ahead.

7    Q.   Doctor, there are two fundamental diagnostic

8    criteria for Excited Delirium that subjects must have.

9    They must have agitation and delirium, correct?

10   A.   Correct.

11   Q.   When determining Excited Delirium as a cause of

12   death, the pathologist is expected to determine what

13   caused the Excited Delirium?

14   A.   Correct.

15   Q.   Because Excited Delirium is caused by something?

16   A.   Correct.

17   Q.   With cocaine, it's caused by the intoxicating

18   effects of the cocaine?

19   A.   Essentially, yes.

20   Q.   It's your opinion that Mark Jackson died from

21   Excited Delirium caused by untreated schizophrenia?

22   A.   Right.

23   Q.   By untreated, you refer to the fact that although

24   he was prescribed medication many years ago, there's no

25   evidence that he took it?

1    **A.**    Right.  And the toxicology was negative.

2    **Q.**    Negative for medication?

3    **A.**    Correct.

4    **Q.**    So it's your opinion that his delirium was caused

5    by schizophrenia, not medication or withdrawal from

6    medication?

7    **A.**    Correct.

8    **Q.**    Doctor, delirium is a psychiatric disorder,

9    correct?

10   **A.**    Correct.

11   **Q.**    It's specified and spelled out in the DSM,

12   correct?

13   **A.**    Correct.

14   **Q.**    The DSM is a diagnostic tool in psychiatry?

15   **A.**    Correct.

16   **Q.**    Excited Delirium is a psychiatric diagnosis?

17   **A.**    Correct.

18   **Q.**    You are aware that according to the DSM, the

19   primary or rather predominant disturbance of delirium

20   is a clinically significant deficit in organization

21   that represents a significant change from a previous

22   level of functioning?

23   **A.**    Correct.

24   **Q.**    You are aware that the DSM defines delirium as

25   having a disturbance of consciousness manifested by a

1    reduced awareness of environment, a change in cognition

2    and takes place over a short period of time, usually

3    hours to days?

4    **A.**    Correct.

5    **Q.**    You also know that according to the DSM the

6    diagnosis of delirium can only be used if the cause of

7    the delirium is either a general medical condition, a

8    drug or a toxin?

9    **A.**    Okay.

10    **Q.**    Correct?

11    **A.**    Yes.  Whatever you mean by general medical

12    condition.  I would presume it would also mean

13    schizophrenia.

14    **Q.**    Doctor, general medical conditions are not mental

15    disorders, are they?

16    **A.**    As far as I'm concerned, they are.

17    **Q.**    In the DSM by definition, general medical

18    conditions are not mental disorders?

19    **A.**    You're ignoring the cases where they have

20    schizophrenia.

21    **Q.**    So let's just first clarify.  You agree that in

22    the DSM general medical conditions are not mental

23    disorders, but you're rejecting the DSM in this context

24    with respect to schizophrenia?

25    **A.**    One thing I consider general medical disorder as

1    including schizophrenia.  You're telling me that it's

2    in the DSM that in psychiatry it is not, so I'll take

3    your word for that.  But then if that's the case, then

4    you cannot have delirium with schizophrenia and that

5    doesn't make any sense whatsoever.  We see it.

6    **Q.**   Now, Doctor, in fact, in this case you believe

7    that Mr. Jackson's Excited Delirium was caused by

8    schizophrenia?

9    **A.**   Correct.

10    **Q.**   You're not an expert on schizophrenia?

11    **A.**   No, of course not.

12    **Q.**   Doctor, in your report, you list the various

13    things that you read at the time you wrote your report,

14    or rather reviewed, correct?

15    **A.**   Correct.

16    **Q.**   You don't review there the video that we just

17    showed, correct?

18    **A.**   No, I did not see the video.  I had seen -- I have

19    photographs -- wait a minute.

20    **Q.**   So at the time you wrote your report, you had not

21    seen the video, right, Doctor?

22    **A.**   I don't recall it, no.  No, I didn't --

23    **Q.**   Now, Doctor --

24    **A.**   I'm sorry.  I'm trying to answer your question.

25    **Q.**   I beg your pardon.

1    **A.**   I had two CDs of photographs, but I did not have a

2    DVD of the scene that you just showed me.

3    **Q.**   Okay.  At the time you wrote your report?

4    **A.**   Correct.

5    **Q.**   And subsequently, Doctor, when did you first see

6    the video?

7    **A.**   Just now.

8    **Q.**   So up to today in this courtroom, you had not seen

9    that video?

10    **A.**   Correct.

11    **Q.**   Up to today in this courtroom, you did not know

12    the time interval shown on the video between when

13    Mr. Jackson arrived at the back lot and when the AED

14    was applied?

15    **A.**   Correct.

16    **Q.**   Have you read Dr. Pinals' report in this case,

17    Debra Pinals, a psychiatrist?

18    **A.**   Yes.

19    **Q.**   Do you dispute that she's an expert on

20    schizophrenia?

21    **A.**   No.

22    **Q.**   Doctor, do you know if there are different types

23    of schizophrenia?

24    **A.**   Yes, there are.

25    **Q.**   What are the types?

**A.**   I have no idea.  I just know undifferentiated paranoid.  There are several other types.  I don't know what they are.  I don't classify them.  I'm not a psychiatrist.

**Q.**   Do you know what type Mr. Jackson was?

**A.**   No.

**Q.**   Do you know what types of schizophrenia are associated with Excited Delirium?

**A.**   No.

**Q.**   Now, are you aware that schizophrenia can exist in a chronic, relatively steady state in an individual?

**A.**   Sure.

**Q.**   Or it can exist in an acutely psychotic state?

**A.**   Exactly.

**Q.**   And you understand that Excited Delirium is associated with schizophrenia in the acutely psychotic state, right?

**A.**   I don't know that.  I do know that I've seen cases of Excited Delirium with schizophrenia where they are smoldering along untreated or undiagnosed for a period of time and then they have that psychotic break which we associate with -- you know, they have manifestations of Excited Delirium.  They don't necessary have any agitated psychotic state or acute psychotic state before getting into Excited Delirium, I have not made

1    that association, no.

2    **Q.**   Doctor, let me ask you this.  Is it your opinion

3    that the cases of schizophrenia associated with Excited

4    Delirium are not limited to cases that involved an

5    acutely psychotic state?

6    **A.**   No.  As I said, the cases that I recall seeing are

7    generally individuals who have a history of

8    schizophrenia which is untreated or undiagnosed, and

9    then the manifestation of Excited Delirium becomes

10   apparent but not necessarily in an acute psychotic

11   state prior to the development of Excited Delirium.

12   I've seen that happen, but that's not always the case.

13   **Q.**   In those examples, the Excited Delirium and the

14   acute psychotic state are contemporaneous, concurrent?

15   **A.**   Yes.  They frequently are, yes.

16   **Q.**   So it's been your experience that, in fact,

17   Excited Delirium is associated in schizophrenia with

18   individuals that were either in an acute psychotic

19   state before the Excited Delirium or entered into a

20   psychotic state in connection with the Excited

21   Delirium, right?

22   **A.**   Yes.  That's true.

23   **Q.**   Now, another term for Excited Delirium used in the

24   literature is acute exhaustive mania, correct?

25   **A.**   Yes.

1   **Q.** And you know of no history involving Mr. Jackson

2   of mania, correct?

3   **A.** Correct.

4   **Q.** You agree that the pathologists should consider

5   the medical and psychosocial history of the decedent as

6   part of the forensic pathology investigation?

7   **A.** Of course.

8   **Q.** And in Mr. Jackson's case, you know that he had no

9   prior history of either mania, violence, paranoia or

10   prior episodes of Excited Delirium?

11   **A.** Correct.

12   **Q.** Doctor, you agree that in Excited Delirium the

13   Excited Delirium precedes and is not precipitated by

14   the encounter with the police?

15   **A.** That's not always true.

16   **Q.** Doctor, you testified at trial in Tennessee in the

17   case of **Bud Lee versus Metropolitan Government of**

18   **Nashville**, correct?

19   **A.** Correct.

20   **Q.** And Doctor, I'm putting on the screen the

21   transcript at page 2350 where you are sworn. Do you

22   see that?

23   **A.** Yes.

24   **Q.** And then if we continue to page 2401, the answer

25   at line -- I'm sorry, the question at line 21 is:

1   Okay --

2   **A.**   I can't see it on the screen.

3   **Q.**   I beg your pardon, Doctor, and I appreciate your

4   pointing that out to me.  I've got to figure that out a

5   little bit better.

6       The question is:  Okay.  So you had no evidence

7   that he had Excited Delirium at the time he was

8   sprayed?

9       And then if you would just read your answer, it

10  goes on to the next page.

11  **A.**   (Reading:)  Well, except when you look back at the

12  whole episode and so forth, you'd know that he had

13  Excited Delirium at that time.  He wasn't having any

14  outward manifestations of it.  The encounter with the

15  police does not precipitate Excited Delirium.  Excited

16  Delirium is precipitated by the drug.

17  **Q.**   So the statement in your testimony is that the

18  encounter with the police does not precipitate the

19  Excited Delirium, correct?

20  **A.**   In this case, that's true.  Only in this case.  I

21  was referring specifically to this case, the Lee case,

22  not as a general statement for all the cases of Excited

23  Delirium.

24  **Q.**   Doctor, as a matter of the general statement, the

25  biochemical process that creates Excited Delirium

1  begins before the interaction with the police, correct?

2  **A.**   In this particular case --

3  **Q.**   No, no.  Doctor, as a general case, as a point of

4  science, the biochemical process that causes Excited

5  Delirium begins before the interaction with the police?

6  **A.**   In general, that's true, but there are exceptions.

7  I've seen them.

8  **Q.**   Doctor, in your testimony in the Lee case, you

9  don't refer to any exceptions?

10  **A.**   I was referring only to the Lee case.

11  **Q.**   And in your answer, Doctor, if you were just

12  referring to the Lee case, you could have said in this

13  case, the encounter with the police does not

14  precipitate the Excited Delirium, correct?

15  **A.**   I could have said that, but we were talking about

16  the Lee case during the trial, that's what I was

17  referring to.  I wasn't giving a lecture on Excited

18  Delirium.

19  **Q.**   Doctor, one of the most accepted explanations for

20  the biochemical process that causes Excited Delirium

21  involves catacholamines, correct?

22  **A.**   Yes.  Catacholamines, dopamine and a whole variety

23  of hormones in the brain.

24  **Q.**   Doctor, referring now to the Heston case, page

25  126, line 19:

1     Question:  And you attribute the surge of

2     catacholamines to his struggle with the police,

3     correct?

4          What was your answer?

5     **A.**  (Reading:)  Well, it began before the struggles

6     with the police.  It began with whatever demons he was

7     recognizing that was causing him to have Excited

8     Delirium to begin with.  I'm sure the struggle with the

9     police may or may not have added to it.  He may have

10    already been at the maximum level of catacholamines by

11    the time the police interacted with him.  There is no

12    way of knowing.

13    **Q.**  Doctor, it's your experience that people with

14    Excited Delirium are intensely paranoid and violent

15    even without encounters by police?

16    **A.**  Very frequently, that's true.

17    **Q.**  They smash glass, inflict lethal-size wounds to

18    their upper extremities, jump into pools of water and

19    drown, jump from one building to another, jump down

20    stairs and rupture spleens.  Those are all kinds of

21    things that can happen to these people even without

22    encounters by the police?

23    **A.**  Correct.

24    **Q.**  In fact, it's your opinion that police involvement

25    prevents a person with Excited Delirium from

1  experiencing those adverse events?

2  **A.**  Exactly.

3  **Q.**  Now, Doctor, in all of your published articles,

4  the suspect, or rather the decedent from Excited

5  Delirium was already demonstrating behavior showing

6  that he was in a state of Excited Delirium when the

7  police arrived?

8  **A.**  In my published articles, that's probably true.

9  **Q.**  Doctor, if there's any doubt in your mind, I'll go

10  through them with you.

11  **A.**  No.  No.  I'm saying in my published articles

12  that's probably true.  I don't know -- I could have

13  mentioned a case where that didn't happen, but I don't

14  recall that.

15      As far as the usual scenario is that the police

16  are called because of the abnormal behavior of an

17  individual.

18  **Q.**  Doctor, let's just turn to Tab 7, and we'll look

19  at one of your published articles.

20      And I'm going to turn to page 30, Doctor.  Page

21  number 30.

22  **A.**  Okay.

23  **Q.**  And I've highlighted a sentence -- actually, two

24  sentences.  Do you see that?

25  **A.**  Yes.

1    **Q.**   Could you read those two sentences into the
2    record.
3    **A.**   (Reading:)  Descriptions of the events that
4    preceded death indicate that all victims showed clear
5    evidence of Excited Delirium before encountering a law
6    enforcement officer.   Therefore, events that occurred
7    in police custody are not involved at the onset of
8    Excited Delirium.
9    **Q.**   Thank you, Doctor.   Now, in that article, you
10   viewed the fact that all victims showed clear evidence
11   of Excited Delirium before encountering a law
12   enforcement officer as some logical evidence for the
13   conclusion that the events that occurred in police
14   custody were not involved in the onset of ED?
15   **A.**   Right.
16   **Q.**   You make no reference to any cases in which the
17   events that occurred in police custody were involved in
18   the onset of ED, do you?
19   **A.**   Correct.   1995, that was true.
20   **Q.**   Doctor, was it also true in 2009?
21   **A.**   No.   Because since then, I've seen cases in which
22   a person -- everything was precipitated upon an
23   encounter with the police.   I've seen cases like that
24   happen since --
25   **Q.**   Doctor, so it was not true in 2009, is that what

1  you're saying?

2  **A.**   I'm not sure what the question was.  I think the

3  question was, basically, have I seen cases in which the

4  person was not exhibiting signs and symptoms of

5  Excited Delirium prior to the police encounter.  The

6  answer to that is, yes, I have seen that.

7  **Q.**   That wasn't the question, Doctor.

8  **A.**   Okay.  I'm sorry.  I misunderstood the question.

9  **Q.**   You said that in 1985, when the article was

10  published, the data demonstrated that the onset of

11  Excited Delirium occurred prior to the police

12  encounter.

13  **A.**   In those cases we studied, yes.

14  **Q.**   And then I said to you was that also true in 2009.

15  **A.**   My answer would be no.  We've seen cases other

16  than that.

17  **Q.**   Now, in 2009, you, again, published in the learned

18  literature, did you not?

19  **A.**   I don't recall.

20  **Q.**   If you'd turn to Tab 3.  You are an author of that

21  article, are you not, Doctor?

22  **A.**   Correct.

23  **Q.**   Page E-15 -- by the way, Doctor, this article

24  reports on 90 cases, right?

25  **A.**   Correct.

1  **Q.**  If you turn to page E-15, there's a paragraph that

2  begins "Arrest circumstances."  Do you see that?

3  **A.**  Yes.

4  **Q.**  Would you read that paragraph into the record.

5  **A.**  Sure.  (Reading:)  Arrest circumstances and police

6  force measures are shown in Table 2.  Disturbance call

7  encounters evidenced agitated behaviors including

8  destruction of property, disorderly conduct,

9  inappropriate disrobing, running wildly in and out of

10  traffic on streets and kicking residents' doors, or the

11  compulsion to break or bang on glass.  Aggravated

12  assaults on friends or family members and attempted

13  breaking and entering are also reported.  One subject

14  in detention experienced hallucinations and flooded his

15  cell after confinement.  Attempts by correctional

16  personnel to restrain a prisoner resulted in him

17  violently resisting their attempts to control him

18  followed by sudden death.

19  **Q.**  Thank you.  Now, disturbance call encounters, you

20  understand, is a shorthand for a call made to the

21  police reporting a disturbance?

22  **A.**  Correct.

23  **Q.**  If we look at the Table 2, the circumstances that

24  led to the police encounter are broken out for all 90

25  cases, correct?

1  **A.**  Correct.

2  **Q.**  And in every one of those circumstances, the

3  individual was already demonstrating agitation at the

4  point that the police intervened?

5  **A.**  No.  That's not what it says at all.

6  **Q.**  Okay.  Disturbance call.

7  **A.**  Could be destroying property.  Could be destroying

8  signs.

9  **Q.**  Okay.  And Doctor, destroying signs and destroying

10  property, you understand can be a sign or symptom of

11  Excited Delirium?

12  **A.**  Or not.

13  **Q.**  I'm sorry.  Could you answer my question?

14  **A.**  Can be a sign?  Sure, it can be.

15  **Q.**  Okay.  And the statement is made that the

16  disturbance call encounters evidenced agitated

17  behaviors?

18  **A.**  Correct.

19  **Q.**  Including destruction of property?

20  **A.**  Correct.

21  **Q.**  So the article is referencing destruction of

22  property as an agitated behavior?

23  **A.**  Okay.

24  **Q.**  Correct?

25  **A.**  Correct.

1   **Q.**   All of the examples of the disturbance calls are

2   given as agitated behaviors in your article in the

3   medical literature.

4   **A.**   It's actually Dr. Mash's article.  I was a

5   co-author, yes.

6   **Q.**   Doctor, do you stand by this article?

7   **A.**   Of course.

8   **Q.**   So is the answer yes, that all of the incidents

9   that involved a disturbance call involved agitated

10  behaviors?

11  **A.**   Of the cases reported in this article, yes.

12  **Q.**   And then we have aggravated assaults, and the list

13  goes on, Doctor, all of these under incident

14  circumstances are agitated behaviors that occurred

15  prior to the police encounter?

16  **A.**   Correct.

17  **Q.**   For 2009?

18  **A.**   Correct.

19  **Q.**   And in 2009, you still had not seen fit to publish

20  in the literature any examples of Excited Delirium

21  where the agitation was precipitated by the police

22  encounter?

23  **A.**   Never occurred to me to do that, no.

24  **Q.**   Whether it occurred to you or not, the fact is

25  that you didn't?

1    **A.**    Correct.

2    **Q.**    Now, you acknowledge that to have delirium for

3    purposes of Excited Delirium, the suspect must

4    experience a significant change from a previous level

5    of functioning?

6    **A.**    Correct.

7    **Q.**    Therefore, normal behavior for an individual does

8    not constitute delirium?

9    **A.**    Correct.

10    **Q.**    Normal behavior of a chronic schizophrenic does

11    not constitute Excited Delirium?

12    **A.**    Correct.

13    **Q.**    You understand that chronic schizophrenics

14    normally or rather frequently and within the range of

15    normal for their disease react differently when they

16    interact with the police than people who are not

17    schizophrenic?

18    **A.**    I would imagine that's true, but I'm not a

19    psychiatrist.  I don't have any firsthand knowledge of

20    that.

21    **Q.**    So you don't know whether it's normal for a

22    chronic schizophrenic to have difficulty following

23    police commands?

24    **A.**    You would have to ask a police officer that or a

25    psychiatrist that.  I don't know.

1  **Q.**   Nor do you know whether it's normal for a chronic

2  schizophrenic to have diminished speech?

3  **A.**   They can, obviously, but I don't know that's true

4  of all schizophrenics.

5  **Q.**   Do you know whether one of the features of chronic

6  schizophrenia is marked poverty of speech?

7  **A.**   No, I don't know that.  I thought it was chronic.

8  I know that's one of the criteria that's used in

9  diagnosis.  I don't know that's always constant with a

10 person who has a diagnosis of schizophrenia.  Again,

11 I'm not a psychiatrist.

12 **Q.**   I didn't ask whether it's always present.  I said

13 one of the criteria or rather one of the signs or

14 symptoms associated with chronic schizophrenia is

15 marked poverty of speech.

16 **A.**   Schizophrenia, acute or chronic, I don't know.  I

17 know that's one of the symptoms of it, yes, or one of

18 the signs of it.

19 **Q.**   Do you know whether saying something immature to

20 the police like "You're not the boss of me" is typical

21 for a chronic schizophrenic?

22 **A.**   I have no idea.

23 **Q.**   Do you whether saying "I love you guys" is typical

24 for a chronic schizophrenic?

25 **A.**   I have no idea.  I'm not a psychiatrist.

1    **Q.**    Do you know whether a schizophrenic walking away

2    from the police in a tense situation is typical or

3    normal for chronic schizophrenia?

4    **A.**    No idea.

5    **Q.**    Is panicking and resisting the police when they

6    act aggressively typical for a chronic schizophrenic?

7    **A.**    Again, I'm not a psychiatrist.  I don't know.

8    **Q.**    You don't know whether the behaviors that

9    Mr. Jackson demonstrated were typical for a chronic

10   schizophrenic, correct?

11   **A.**    At the time of the encounters that I read and so

12   forth, they would not be typical for a schizophrenic,

13   but it's typical for Excited Delirium.

14   **Q.**    No, no.  Doctor, if you could just focus on my

15   question.

16         You do not know whether Mr. Jackson's walking

17   away from the police was typical for a chronic

18   schizophrenic?

19   **A.**    That's correct.

20   **Q.**    Nor whether his statements "You're not the boss of

21   me" or "I love you guys" was typical for a chronic

22   schizophrenic, correct?

23   **A.**    Again, I'm not a psychiatrist.  I don't know.

24   **Q.**    Okay.  Nor do you know whether his panicking and

25   resisting the police was typical for a chronic

1  schizophrenic?

2  **A.**  No idea.

3  **Q.**  Now, one thing that causes someone to show

4  enormous strength is if they are fighting for their

5  lives?

6  **A.**  Possible, yes.

7  **Q.**  Or for the life of someone dear to them?

8  **A.**  Correct.

9  **Q.**  We all know the stories of mothers picking up

10  automobiles?

11  **A.**  Right.

12  **Q.**  In this case, two officers, Lukowicz and Kelley,

13  were able to restrain Mr. Jackson and put the cuffs on

14  him, correct?

15  **A.**  It's my understanding it took five officers to

16  restrain him and put the cuffs on him.

17  **Q.**  And that's part of your opinion in this case?

18  **A.**  That's part of what I read, yes.

19  **Q.**  And that's part of your opinion that he exhibited

20  extraordinary strength?  That's one of the reasons?

21  **A.**  Right.  Right.

22  **Q.**  Okay.  But the fact is, Doctor, and I suggest to

23  you that it's clear in the records, that by the time

24  the next three officers arrived, he was already down on

25  the ground and had the cuffs on him.  You didn't

1   realize that, did you?

2   **A.**   No, I did not.

3   **Q.**   Now, you don't know whether Mr. Jackson's act of

4   swatting at Officer Kelley was typical for a chronic

5   schizophrenic?

6   **A.**   True.

7   **Q.**   You don't know whether Mr. Jackson's failure to

8   give in when he was pepper sprayed or hit in his legs

9   with a baton was consistent for a chronic schizophrenic

10  fighting in fear for his life?

11  **A.**   That I would find very hard to believe.  In my

12  opinion, that is not typical.  We're talking about

13  physiologic responses here and unless -- and this is

14  typical again for people who are totally impervious to

15  pain, this is typical for Excited Delirium.  I have not

16  encountered that with any schizophrenics that had

17  sudden death or anything else with that.  It's not

18  anything I've ever encountered.

19  **Q.**   So it's your experience that pepper spray disables

20  a suspect in all cases even if the suspect is fighting

21  for his life and for him it's a matter of life and

22  death?

23  **A.**   As far as I know, that's what happens.

24  **Q.**   In all cases?

25  **A.**   I don't know about all cases.  It certainly

1   doesn't happen in Excited Delirium.

2   **Q.**   Okay. But what I'm saying is in an individual who

3   generally believes he's in a fight for life and death,

4   you don't know whether in all such cases pepper spray

5   will disable him, correct?

6   **A.**   That's true.

7   **Q.**   Nor do you know whether baton strikes to the leg

8   will disable him?

9   **A.**   Correct.

10   **Q.**   Doctor, it's your opinion that at the time that

11   the police first pulled into the back lot of Joyal's

12   Liquors and shone their light on Mr. Jackson, he

13   already, in some sense, was experiencing Excited

14   Delirium?

15   **A.**   I can't say that in the case of Mr. Jackson, no.

16   **Q.**   Okay. So it's not your opinion in this case that

17   he was already in Excited Delirium at that point?

18   **A.**   I don't know if he was or not.

19   **Q.**   Okay. So the only evidence you have for behavior

20   indicating Excited Delirium is his behavior in the

21   interaction with the police?

22   **A.**   Correct.

23         MR. SHEEHAN: Nothing further.

24         THE COURT: All right. Thank you. Do you think

25   you'll have a redirect?

1      MR. CLIFFORD:  Your Honor, I just have a couple

2   of questions, just to clear things up, yes.

3      THE COURT:  How many do you think?

4      MR. CLIFFORD:  It shouldn't take very long.  No

5   longer than five to ten minutes, your Honor.

6      THE COURT:  My problem is -- let's go off the

7   record.

8      (Discussion off the record.)

9   **REDIRECT EXAMINATION BY MR. CLIFFORD**

10  **Q.**   Doctor, I just want to review just a couple of

11  things.  What did you rely on in making your

12  determination that Excited Delirium was present in this

13  case?

14  **A.**   Basically, the behavior, inappropriate actions

15  with the police, the unintelligible sounds,

16  inappropriate remarks, being impervious to pain

17  compliance techniques and the subject having to be

18  restrained.  Those are the main criteria.

19  **Q.**   And when it comes to the issue of the ventricular

20  fibrillation versus the asystole, as we know it and the

21  data that you reviewed indicated that he was in

22  asystole at the time the medics arrived?

23  **A.**   Correct.

24  **Q.**   Correct me if I'm wrong, would it be fair to say

25  that any evidence of ventricular fibrillation would be

1    speculative?

2    **A.**    Correct.

3            MR. CLIFFORD:  I have nothing more, your Honor.

4            THE COURT:  Any follow-up on that?

5            MR. SHEEHAN:  No, your Honor.

6            THE COURT:  All right.  I just have one or two

7    very quick -- hopefully, very quick questions.

8            You mentioned that you disagreed with one of the

9    authors that the diagnosis of Excited Delirium was a

10   diagnosis of exclusion.  I'd like you just to expand on

11   that a bit.

12           THE WITNESS:  When we say diagnosis of

13   exclusion, it means you've ruled out absolutely

14   everything else and, therefore, it has to be asphyxia,

15   it has to be Excited Delirium or something that does

16   not leave any markers at the time of the autopsy.

17           What I'm saying is that it is not a diagnosis of

18   exclusion.  It's a diagnosis based on the behavior of

19   the individual and the investigation of the entire

20   case.  Like asphyxia is sometimes referred to as a

21   diagnosis of exclusion because if I put a plastic bag

22   over somebody's head and then take it off, you won't

23   find any markers at autopsy, but you cannot make a

24   diagnosis of asphyxia unless your investigation shows

25   that in the presence of a negative autopsy or other

1     evidence to indicate there was asphyxia.

2         In the case of Excited Delirium, just because a

3     person is acting in a bizarre fashion and drops dead on

4     you does not necessarily mean Excited Delirium.  There

5     could be other factors involved such that involves the

6     investigation.  Excited Delirium, the diagnosis of it

7     is based on the behavior of the individual.  As

8     Mr. Sheehan pointed out, you must have delirium and you

9     must have agitation.  Those are the two basic things,

10     everything else fits into it.

11         The diagnosis of exclusion simply means that you

12     have a negative autopsy with nothing else to explain

13     the death.  A person can have Excited Delirium and die

14     from trauma.  You can have Excited Delirium and die

15     from a ruptured aneurysm in the brain, for example.  So

16     that would mean that you don't have any of these

17     things, then the diagnosis of Excited Delirium in that

18     sense becomes a diagnosis of exclusion.

19         THE COURT:  The differential diagnosis process

20     is generally a process of exclusion, isn't it?

21         THE WITNESS:  Yes.  In clinical medicine and

22     even in forensic pathology, you make a list of all the

23     possible causes of say, in this case, of death of the

24     individual and then you rule them in or rule them out

25     based upon further investigation and testing.

1       THE COURT:  And again, I don't want to put words

2  in your mouth either, but I suppose, is it possible

3  that when one excludes other causes of death, you are

4  reduced down to several possible causes of death, and

5  then it's a question of probability that one is the

6  cause as opposed to another?

7       THE WITNESS:  No.  It's not a matter of

8  probability.  It's a matter of having sufficient

9  evidence to show that this is the likely cause of death

10  or varied degrees of assurances from reasonable medical

11  certainty to probability.  But if you cannot make a

12  determination of say three different things, then you

13  leave the cause of death as undetermined.

14       THE COURT:  But here we have various medical

15  professionals opining that the cause of death is

16  several different --

17       THE WITNESS:  Right.  He either dies from

18  Excited Delirium with heart disease or he dies from

19  heart disease with Excited Delirium.  That's the

20  differential diagnosis in this case.

21       THE COURT:  All right.  I think that covers it

22  very well.  Thank you.

23       MR. SHEEHAN:  Just one question, your Honor.

24       THE COURT:  One question.

25

1    **RECROSS-EXAMINATION BY MR. SHEEHAN**

2    **Q.** So, Doctor, ultimately, your opinion in this case

3    is that either Mr. Jackson died from heart disease with

4    Excited Delirium or died from Excited Delirium with

5    heart disease?

6    **A.** Correct.

7    **Q.** And you can't say which one it was?

8    **A.** No. To me, with a reasonable medical certainty,

9    he died from Excited Delirium with heart disease.

10    **Q.** You just said that if you can't rule out which one

11    it is, you should put down that cause of death is

12    undetermined?

13    **A.** Right.

14    **Q.** You can't rule out in this case that it was heart

15    disease with Excited Delirium?

16    **A.** I disagree. In my opinion, the preponderance of

17    the evidence is that he died from Excited Delirium.

18    **Q.** How can you rule out heart disease?

19    **A.** Because he had Excited Delirium, he died very

20    typically with his cardiac arrest being after he was

21    restrained and his initial rhythm was asystole.

22    THE COURT: Okay. We're not going to go back

23    over everything. I think I've got what I need.

24    MR. SHEEHAN: Thank you.

25    THE COURT: Thank you. Doctor, you can step

down.  Thank you very much.

I'm going to take this under advisement.  I'll give you my ruling, which I think I will -- I don't need a lot of time to do that, but I just can't do it from the bench right now.  Okay?

So you'll hear from me very shortly on that, and then we'll go from there.

We can go off the record now.

(Discussion off the record.)

(Court concluded at 11:55 a.m.)

C E R T I F I C A T I O N

       I, Anne M. Clayton, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.


/s/ Anne M. Clayton

_____
Anne M. Clayton, RPR




July 1, 2011

_____
Date