UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

KAREN PETRO, as Administratrix of the
Estate of Mark Jackson

                    *Plaintiff,*

        vs.                                          C.A. No. 09-213S

TOWN OF WEST WARWICK, ET AL

                    *Defendants.*

## DEFENDANTS' PRETRIAL MEMORANDUM OF LAW

**I.      PARTIES AND COUNSEL**

> a.      Karen Petro, as Administratrix of the Estate of Mark Jackson represented by Steven Sheehan, Esq.

> b.      Town of West Warwick, by and through its Finance Director, Malcolm A. Moore, Patrick J. Kelly, Sean Lukowicz, and Scott Thornton represented by Marc DeSisto, Esq.

**II.     FACTS EXPECTED TO BE PROVEN IN DEFENSE**

In defense of the instant action, defendants expect to prove that at approximately 11:00 pm on June 27, 2008, Officers Kelley and Lukowicz encountered decedent, Mark Jackson in the rear of Joyal's Liquors on West Warwick Avenue, West Warwick, RI. The officers were responding to a call of a potential vandalism to the store's sign. *Deposition of Patrick Kelley (December 16, 2009) at 21, 44 & 72; Deposition of Sean Lukowicz (December 17, 2009) at 59.* While checking out the area, the officers went around back where they saw Mr. Jackson standing near Joyal's loading dock area. *Id. at 100-101; Lukowicz Depo. at 45.* When the officers exited their cruisers and started to approach Mr. Jackson, Mr. Jackson immediately turned and started to walk away from the officers at a fast pace with his right hand in his pocket. *Id. at 103, 104-105, 107.*

On alert as to his suspicious behavior, the officers identified themselves as police officers and asked Mr. Jackson to stop. *Id. at 106; Lukowicz Depo. at 52-53; 56.* Mr. Jackson did not stop but rather continued walking towards a hole in the fence, with his right hand inside his pocket. *Id. at 108; Lukowicz Depo. at 85.* Further suspicious of his apparent attempt to flee the officers, the officers again told him to stop but Mr. Jackson kept walking saying "you're not the boss of me." *Id. at 108.* Officer Kelley repeated his request for Mr. Jackson to stop and also told him to remove his hand from his pocket. *Id. at 110; Lukowicz Depo. at 86.* Mr. Jackson did not comply but rather simply repeated "you're not the boss of me." *Id. at 111; Lukowicz Depo. at 88.* When the officers got to within a couple of feet of Mr. Jackson, Officer Kelley reached out to take hold of Mr. Jackson's arm. *Id. at 116.* However, before he could touch Mr. Jackson, Mr. Jackson "swatted" at Officer Kelley. *Id. at 117; Lukowicz Depo. 56-57.* Officer Kelley immediately pulled back avoiding the contact and then both officers moved in and took hold of Mr. Jackson's arms. *Id. at 118; Lukowicz Depo. at 95-96.*

Mr. Jackson immediately began to struggle with the officers. Officer Kelley thus executed an arm-bar hold on Mr. Jackson to bring him to the ground. *Id. at 120.* While executing this hold Mr. Jackson continued to struggle thus causing all three (3) to fall to the ground where Mr. Jackson proceeded to kick and grab the officers, ripping their uniforms. *Id. at 127; Lukowicz Depo. at 96-97; 99.*

Before they could place handcuffs on him, Mr. Jackson got back up. *Id. at 122; Lukowicz Depo. at 99.* The officers tried to gain control of him again and the three again ended up on the ground. *Id. at 125-26; Lukowicz Depo. at 103.* Mr. Jackson continued to struggle with the officers and was able to stand up a second time. *Id. at 127; Lukowicz Depo. at 103-104.*

When he got up the second time, Mr. Jackson moved towards Officer Lukowicz, who backed away and pulled out his baton. *Lukowicz Depo. at 105 & 106.* Officer Lukowicz again ordered Mr. Jackson to the ground but Mr. Jackson continued to move towards Officer Lukowicz. *Id. at 108.* Officer Kelley then sprayed Mr. Jackson with OC spray. *Kelley Depo. at 128; Lukowicz Depo. at 108-109.* However, this did not appear to have an effect on Mr. Jackson who was demonstrating "unbelievable strength." *Lukowicz Depo. at 99-100.* Therefore, Officer Lukowicz struck Mr. Jackson in the thigh area twice with his baton. *Id. at 108-109; 115; Kelley Depo. at 152; 155.* The baton likewise had no effect on Mr. Jackson who simply grabbed it from Officer Lukowicz's hand. *Id. at 116 & 118; Kelley Depo. at 156.*

After Officer Lukowicz regained control of his baton, the officers took hold of Mr. Jackson's wrists again and brought him to the ground for a third time. *Id. at 116; Kelley Depo. at 158-59.* At some point three other officers arrived and the officers successfully placed Mr. Jackson into handcuffs. *Id. at 117; Kelley Depo. at 158, 159.* Throughout the struggle, the officers repeatedly instructed Mr. Jackson to stop resisting and lie on the ground. *Deposition of Elaine Beauregard (May 20, 2010) 15 (Exhibit C); Kelley Depo. at 125, 126.*

After he was handcuffed, Mr. Jackson still did not comply with the commands of the officers. Rather, he continued to resist their efforts to place him in the cruiser. *Kelley Depo. at 163, 166; Lukowicz Depo. at 120-21;121.* He was eventually placed in one of the cruisers lying across the rear seat, on his side, facing the front of the cruiser. *Id. at 164; Lukowicz Depo. at 124.*

Officer Lukowicz then drove Mr. Jackson to the rear parking lot of the West Warwick Police Station. *Lukowicz Depo. (December 17, 2009) at 126.* The station was only 9/10 of a

mile away from the scene, and because there was no traffic, this ride took no more than two (2) minutes. *Lukowicz Depo. (December 17, 2009) at 147***.** Approximately halfway to the station, Officer Lukowicz noticed that Mr. Jackson, who had been yelling when they put him in the cruiser, quieted down. *Lukowicz Depo. (December 17, 2009) at 128*. Believing the Mr. Jackson had calmed down, Officer Lukowicz continued the short distance to the station. *Lukowicz Depo. (December 17, 2009) at 131*.

Upon arriving at the station, pursuant to West Warwick's policy, the officers first secured their weapons in the locked security box. *Lukowicz Depo. (December 17, 2009) at 135; Kelley Depo. (December 16, 2009) at 180*. Because of the violent struggle with Mr. Jackson, his prior combativeness as well as being unsure if he had calmed down or was faking it, the officers believed it was safer for all the officers and Mr. Jackson himself for them to follow the department's policy and secure their weapons before they tried to remove him from the cruiser. *Kelley Depo. (December 16, 2009) at 205*.

Sgt. Thornton, the officer in charge, met the officers when they arrived at the station in accordance with departmental practice. *Deposition of Scott Thornton (January 6, 2010) at 16 & 27-30 (Hereinafter "Thornton Depo.(January 6, 2010))*. Immediately upon Sgt. Thornton's arrival**,** Officer Kelly gave Sgt. Thornton a quick update on what had happened with Mr. Jackson. *Kelly Depo. (December 16, 2009) at 179-181; Thornton Depo.(January 6, 2010) at 17-19*. It took Officer Lukowicz only approximately one minute to secure his weapon. After doing so, Officer Lukowicz retrieved a flashlight to get a better look at Mr. Jackson, who was lying quiet across the back seat of the cruiser. *West Warwick Police Department, Videotape Rear Lot (June 27, 2008); Rule 30(b)(6) Deposition of Patrick J. Kelley (July 27, 2010) at 172-173*

*(Hereinafter "Kelley 30(b)(6) Depo. (July 27, 2010); Rule 30(b)(6) Deposition of Sean Lukowicz (July 28, 2010) at 285-286 (Hereinafter "Lukowicz 30(b)(6) Depo. (July 28, 2010)).* Sgt. Thornton also then moved over to look in the rear of the cruiser. Upon discovering that Mr. Jackson was not responsive, Sgt. Thornton immediately directed Officer Palazzo to have dispatch call rescue from next door. *Thornton Depo. (January 6, 2010) at 44 & 46; Deposition of Marcus Palazzo (January 26, 2010) at 52-53 (Hereinafter "Palazzo Depo. (January 26, 2010)).* The call for rescue occurred within two (2) minutes of arriving at the station and within four (4) minutes of departing the scene for the police station. *West Warwick Police Department, Videotape Rear Lot (June 27, 2008); West Warwick Fire Rescue Card (June 27, 2008).*

Officer Palazzo was standing somewhat apart from the other officers near the squad car when he received his instructions to call dispatch. *Palazzo Depo. (January 26, 2010) at 52-53.* Thus, because he had not yet approached Mr. Jackson when he made the call to dispatch, he advised them that they needed rescue for an intoxicated individual, with injuries. *Palazzo Depo. (January 26, 2010) at 53-54.* However, before finishing his call to dispatch, Officer Palazzo was told that Mr. Jackson was unresponsive. *Palazzo Depo. (January 26, 2010) at 54.* Therefore, he instructed dispatch to advise the Fire Department that Mr. Jackson was unresponsive and to expedite rescue. *Palazzo Depo. (January 26, 2010) at 54; Deposition of James Croft, Jr. (March 4, 2010) at 45 (Hereinafter "Croft Depo. (March 4, 2010)").*

While the call for rescue was being made, Sgt. Thornton instructed the officers to remove Mr. Jackson from the cruiser. *West Warwick Police Department, Videotape of Rear Lot (June 27, 2008); Thornton Depo. (January 6, 2010) at 21 & 79; Kelley Depo. (July 27, 2010) at 192.* Approximately two (2) minutes passed from the time the cruiser arrived at the station until Mr.

Jackson was removed from the rear seat. *West Warwick Police Department, Videotape of Rear Lot (June 27, 2008).* After he was removed from the cruiser, Mr. Jackson's handcuffs were removed and he was laid flat on the ground in the parking lot. *West Warwick Police Department, Videotape Rear Lot (June 27, 2008); Kelley Depo. (July 27, 2010) at 192.* Officer Kelley subsequently started chest compressions before the EMTs arrived from next door. *West Warwick Police Department, Videotape Rear Lot (June 27, 2008); Kelley Depo. (July 27, 2010) at 194-195.* These compressions were started by Officer Kelley approximately two (2) minutes after Mr. Jackson was removed from the cruiser and approximately four (4) minutes after Mr. Jackson arrived at the police station. *Warwick Police Department, Videotape Rear Lot (June 27, 2008); Kelley Depo. (July 27, 2010) at 194.*

It is noteworthy that the fire station where rescue is housed is in a building right next door and attached to the police station. *Thorton Depo. (January 6, 2010) at 66.* The two departments share a rear parking lot and their rear doors are approximately 100-150 yards apart. *Deposition of Christopher A. Cahoon (March 4, 2010) at 19 (Hereinafter "Cahoon Depo. (March 4, 2010); Croft Depo. (March 4, 2010) at 46-47.* Thirty seconds after Officer Kelley started chest compressions, EMT personnel arrived at the scene and took over CPR. *West Warwick Police Department, Videotape Rear Lot (June 27, 2008).* Rescue personnel CPR efforts occurred approximately two (2) and one-half minutes after Mr. Jackson was removed from the cruiser and approximately four (4) and one-half minutes after Mr. Jackson arrived at the station. *West Warwick Police Department, Videotape Rear Lot (June 27, 2008).* While one rescue personnel performed CPR, another prepared and attached an AED to Mr. Jackson to determine if Mr. Jackson had a shockable rhythm. *Cahoon Depo. (March 4, 2010) at 41; Croft*

*Depo. (March 4, 2010) at 50.* However, the AED did not register a rhythm indicating that the AED would not have assisted in the rescue effort. *Cahoon Depo. (March 4, 2010) at 41 & 45.* Rescue then transported Mr. Jackson to Kent County Memorial Hospital where he was pronounced dead. *Cahoon Depo. (March 4, 2010) at 46.*

## III.    LEGAL AUTHORITY

Karen Petro (plaintiff), sister of Mr. Jackson and the administratrix of his Estate, brought suit citing a myriad of claims against West Warwick police officers and the Town of West Warwick.[1] Plaintiff first claims that the events leading up to Mr. Jackson being taken into custody and his detainment amounted to false arrest, assault and battery and excessive force, in violation of Mr. Jackson's state and federal rights. Plaintiff also further alleges that the officers grossly, willfully and wantonly failed to promptly render medical aide to plaintiff resulting in his wrongful death.

### A.    FALSE ARREST IN VIOLATION OF FEDERAL AND STATE LAW

Plaintiff first claims that Mr. Jackson was falsely arrested in violation of his state law and Fourth Amendment rights. In support this claim, Plaintiff alleges that when the officers first saw plaintiff, near the loading dock, behind the closed liquor store, at 11:00 at night, after receiving a complaint of the store sign being vandalized, there was no reasonable basis to suspect that Mr. Jackson was engaged in criminal activity and thus, according to plaintiff, there was no reasonable basis to stop and detain him. *Plaintiff's Amended Complaint, at ¶ 15.*

The starting point is the Fourth Amendment which protects against unreasonable searches and seizures by government officials. Thus, in order to make out a claim under § 1983 for a

---

[1] Plaintiff had initially brought federal and state law claims directly against the Town of West Warwick. Plaintiff dismissed all claims against the Town except those based on the doctrine of respondeat superior. *Stipulation of Dismissal (Aug. 12, 2010) (Doc. # 55).*

violation of the Fourth Amendment, a plaintiff must first demonstrate that the defendants' conduct constituted a Fourth Amendment "seizure" and demonstrate that the seizure was unreasonable based upon the totality of the circumstances leading up to the detention. *Bielanski v. County of Kane, 550 F.3d 632, 637 (7th Cir. Ill. 2008); St. Hilaire v. City of Laconia, 71 F.3d 20, 26 (1st Cir. 1995).* According to the Supreme Court, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry, 392 U.S., at 21-22.* While it is undisputed that the officers seized Mr. Jackson, in opposition to Defendants Motion for Partial Summary Judgment, plaintiff challenged the timing of the actual seizure. This Court held, however, that Mr. Jackson was not seized for the purposes of the Fourth Amendment until Officer Kelley effectuated contact with him by placing him in an arm-bar hold. *Petro v. Town of W. Warwick*, 770 F. Supp. 2d 475, 478 (D.R.I. 2011) citing *California v. Hodari D., 499 U.S. 621, 626 (1991).*[2] Thus, the outstanding question becomes whether this seizure was reasonable under the Fourth Amendment.

The determination of whether there was a reasonable basis to detain Mr. Jackson is reviewed from the time of the arm-bar hold. *Id.* at 479; *U.S. V. Bizier, 111 F.3d 214, 216 (1st Cir. 1997) (The inquiry into probable cause to arrest focuses on what the officer knew at the time of arrest).* Defendants submit that because this "seizure" occurred only after Mr. Jackson's suspicious activity, including trying to avoid the officers and swatting at the officers, there are three (3) bases to support the detainment of Mr. Jackson. First, at a minimum, the events leading up to the arm bar hold provided at least reasonable suspicion to detain Mr. Jackson under *Terry*

---

[2] To the extent, if any, this Court determines that this is still an outstanding issue, Defendants adopt and incorporate their previously filed Memorandum of law in Support of their Motion for Partial Summary Judgment, (Sept. 3, 2010) (Doc. # 58).

*v. Ohio,* 392 U.S. 1 (1968).  Defendants alternatively submit that Mr. Jackson's actions gave rise to probable cause to arrest him for assault.  Defendants further submit that even if the initial detainment is found to be unlawful, Mr. Jackson's violent response to the same provided separate independent probable cause to arrest.  Defendants thus submit that the officers' actions were not unreasonable and thus Plaintiff's Fourth Amendment rights were not violated.

1.     Reasonable Suspicion

Under *Terry* and its progeny, a police officer may briefly detain an individual for questioning if there is "reasonable suspicion to believe that criminal activity 'may be afoot.'" *Terry,* 392 U.S. at 30.  *U.S. v. Arvizu,* 534 U.S. 266, 273 (2002) (quoting *U.S. v. Sokolow,* 490 U.S. 1, 7 (1989)*See also R .I. Gen. Laws § 12-7-1 (Officer may detain individual for up to two (2) hours when reason to suspect individual "is committing, has committed or is about to commit a crime"); Vigeant v. United States, 245 Fed. Appx. 23, 24 (1st Cir. R.I. 2007) (probable cause vitiates R. I. state law false arrest claim).*  A "reasonable suspicion" has generally been defined as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Ornelas v. U.S.,* 517 U.S. 690, 696 (1996).  "An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."  Two elements must be satisfied in evaluating whether reasonable particularized suspicion exists to conduct a Terry stop: 1) "the assessment must be based upon [a totality of] the circumstances;" and 2) the circumstances together "raise a suspicion that that particular individual being stopped is engaged in wrongdoing." *U.S. v. Cortez,* 449 U.S. 411, 418 (1981). The basis for an officer's reasonable suspicion "can rest upon the collective knowledge of the police, rather than solely on that of the officer who actually makes the [stop]." *U.S. v. Pitt,* 382

*F.2d 322, 324 (4th Cir. 1967).*

Whether reasonable suspicion exists is a question of law for the Court to determine based on the information available to the officers. *U.S. v. McCoy, 259 Fed. Appx. 264, 268 (4ᵗʰ Cir. 2007).* In addressing this issue the "thought process of the officer is not plumbed." *Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. Mass. 2004) citing Whren v. United States, 517 U.S. 806, 813 (1996).* Rather, as the above cited standard makes clear, determination of whether reasonable suspicion exists is an "objective" determination requiring the court to "focus not on what the officer himself believed but, rather, on what a reasonable officer in his position would have thought." *U.S. v. Espinoza, 490 F.3d 41, 47 (1ˢᵗ Cir. 2007).* According to the Supreme Court, "it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Terry, 392 U.S., at 21-22.* Thus, in measuring an officer's actions under the Fourth Amendment, the Court looks "only at the objective facts, not the officer's state of mind." *U.S. v. Fisher, 597 F.3d 1156, 1159 (10th Cir. Okla. 2010) (citations omitted). See also U.S. v. Goodrich, 450 F.3d 552, 559 (3d Cir. 2006) ("[S]ubjective motive or intent is not relevant for Terry purposes"). See also U.S. v. Pittman, 338 Fed. Appx. 147, 149 (3d Cir. Del. 2009) (although officer expressed intent to search before defendant exited vehicle and bulge in jacket was visible, search conducted after bulge visible, thus objective basis to support reasonable suspicion).*

In the instant case, the objective facts available to the police officers provide ample reasonable suspicion to suspect that "criminal activity was afoot." The facts demonstrate that the police officers were responding to a complaint of possible vandalism at the liquor store. As part

of their investigation, they pulled behind the building and saw Mr. Jackson standing in the dark, near the store's loading dock. It was 11:00 at night and the liquor store was closed. When Mr. Jackson saw the officers, he immediately turned and began to walk away at a fast pace. *Kelley Depo. at 103; 104-105; 107.* Mr. Jackson appeared to be heading towards a hole in a fence in the back of the store that led to small wooded area. During this time, Mr. Jackson also had his hand in his pocket and did not comply with the officer's direction to take it out or to stop. *Id.* Defendants first submit that Mr. Jackson's presence behind the store, at 11:00 at night, coupled with his immediate attempt to avoid the officers, provided ample reasonable suspicion to justify the stop. However, in addition to these suspicious activities, Mr. Jackson added to the reasonable suspicion by attempting to use force to avoid police contact. That is, when the officer reached out to touch Mr. Jackson, he swatted at the officers.

While an "individual has a right to ignore the police and go about his business [and a] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure," the manner in which an individual expresses that refusal to cooperate, including trying to evade the police rather than simply declining to answer questions, are factors to take into consideration in determining if reasonable suspicion exists. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (internal quotation marks and citations omitted); *U.S. v. Haye*, 825 F.2d 32, 34 (4th Cir. 1987) (Thus, where defendants instead of declining to answer questions and walking away, panicked and fled, the officers had "reasonable suspicion for a brief, involuntary, investigative stop"). In fact, "evasive behavior is a pertinent factor in determining reasonable suspicion." *Id. at 124 . See also Watkins v. City of Southfield*, 221 F.3d 883, 889 n.3 (6th Cir. 2000) (noting that the development of reasonable suspicion may take into

*account all events occurring prior to the physical apprehension of a suspect who flees)*.  While Mr. Jackson did not engage in the "headlong" flight referenced in *Wardlow*, his evasive actions are clearly factors to be considered in determining if there was reasonable suspicion.  *U.S. v. Valentine, 232 F.3d 350 (3d Cir. N.J. 2000) (In evaluating the totality of the circumstances, we must also take into account that defendant immediately began walking away from the patrol car when it arrived); U.S. v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000) ("slouching, crouching, or any other arguably evasive movement, when combined with other factors particular to the defendant or his vehicle, can add up to reasonable suspicion"); Haye, 825 F.2d at 34.*

Moreover, as noted, in evaluating whether there was reasonable suspicion, the Court must look at the totality of the circumstances.  In this case, Mr. Jackson's reaction to the officers' commands to stop, including his attempt to hit the officer, from an objective point of view, contributes to the finding of reasonable suspicion.  Specifically, such a reaction to a request to talk adds to the suspicion that criminal activity was "afoot."  *Woodrum, 202 F.3d at 7(evasive action combined with other factors can add up to reasonable suspicion).*

In addition, when determining if there was an objective reasonable basis to stop an individual, the Supreme Court has instructed that the Court  must look to the "'circumstances known to the officer and the specific reasonable inferences which he is entitled to draw from the facts in light of is experience.'"  *U.S. v. Smith, 396 F.3d 579, 583 (4th Cir. 2005) quoting Terry, 392 U.S. at 27.*   A party cannot "engage in a "divide-and-conquer analysis" whereby [it] determine[s] whether each of the facts supporting reasonable suspicion are "susceptible to an innocent explanation."  *U.S. v. Arvizu, 534 U.S. 266, 274 (U.S. 2002).* Thus, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Id. at*

*277.* To the contrary, "[i]n allowing such detentions, *Terry* accepts the risk that officers may stop innocent people." *Illinois v. Wardlow, 528 U.S. 119, 126 (2000).*

      2.    Probable Cause

Defendants alternatively submit that Mr. Jackson's attempt to hit Officer Kelley also provided the officers with probable cause to arrest Mr. Jackson for assault. That is, an officer of "reasonable caution" would believe that Mr. Jackson's seizure was appropriate after he attempted to hit Officer Kelley. In ruling on the Motion for Partial Summary Judgment, this Court adopted the definition of "assault" as contained in *State v. Cardona, 969 A.2d 667, 673 (R.I. 2009),* which includes a finding that the action place an individual in "reasonable fear of imminent bodily harm." *Petro, 770 F.Supp. 2d at 480.* This Court reasoned that this quoted definition was the more recent statement by the Supreme Court and thus should control. *Id.* This Court denied the Motion for Partial Summary judgment based on the perceived question of fact over whether Mr. Jackson's movement was of a threatening nature and also whether the action would place a reasonable person in reasonable fear of imminent bodily harm. *Id.*

Defendants submit that the facts will support a finding that there was probable cause to arrest Mr. Jackson with assault. Even if Rhode Island does require a finding of apprehension by the individual (which defendants submit it does not)[3], in the instant case, the facts will reveal that Mr. Jackson's attempt to hit Officer Kelley, even if Officer Kelley was not placed in fear, provided sufficient probable cause to believe Mr. Jackson had committed an assault. It is

---

[3] The R.I. Supreme Court long ago defined criminal assault as being "any unlawful attempt or offer, with force or violence, to do a corporal hurt to another whether from malice or wantonness. **The offence may consist, also, if putting another in fear of violence.**" *State v. Boudreau, 113 R.I. 497, 501, 322 A.2d 626, 628 (1974) quoting State v. Baker, 20 R.I. 275, 277, 38 A. 653, 654 (1897).* Throughout time, with the help of grammatical changes to the quotation, the definition has evolved to adopt either the civil tort of assault definition or to omit the notice that the crime "may . . . also" involve the act of putting another in fear of violence.

noteworthy that under Rhode Island law the determination of whether a criminal assault has occurred is an objective determination.  Thus, even if apprehension or fear by the victim is an element, that determination is not made by what the actual intended victim experienced.  *State v. Jeremiah, 546 A.2d 183, 186 (R.I. 1988).*  Consistent with it's prior pronouncements that a criminal assault requires a finding that there was "an unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness," *State v. Coningford, 901 A.2d 623, 630 (R.I. 2006) quoting State v. Pope, 414 A.2d 781, 788 (R.I. 1980),* the R.I. Supreme Court has held that "apprehension and fear are not elements which must be shown to sustain a charge of criminal assault." *Jeremiah, 546 A.2d at 186 citing State v. Boudreau, 113 R.I. 497, 322 A.2d 626 (1974).*  In *State v. Boudreau, 113 R.I. 497, 500-01, 322 A.2d 626, 628 (1974),* the Court specifically noted that apprehension by the victim was the one distinction between the tortious and criminal forms of assault.  Relying upon case law from other jurisdictions, the Court noted that the intent of the civil assault laws was to compensate a victim for a loss.  Thus, it followed that if an intended victim was unaware of the attempt to assault or was not otherwise put in fear by the action, then that person suffered no harm and was not entitled to compensation.  *Id.*  "'However, a criminal assault is an offense against the peace and dignity of the state as well as the invasion of private rights.'"  *Id. at 500 quoting McCullers v. State, 206 So.2d 30, 33 (Fla.App. 1968).*  Thus, because criminal laws are designed "primarily to preserve the public peace[ t]he degree of imperturbability or fortitude of a victim, or the unawareness of an intended victim, should not afford a defense to the criminal prosecution of the wrongdoer.  The guilt or innocence of a person charged with assault depends entirely upon what the wrongdoer does and intends and not at all upon what the other apprehends, or does not

apprehend." *Id.* quoting *Commonwealth v. Slaney,* 345 Mass. 135, 138, 185 N.E.2d 919, 922 (1962). *See also State v. Aptt,* 441 A.2d 824, 827 (R.I. 1982) *(trial justice's mention of the victim's apprehension as an element of criminal assault was error).*

Defendants thus submit that in this case, the evidence will demonstrate that Mr. Jackson fully intended to commit an assault on Officer Kelley when he swung at him. The fact that Officer Kelley experienced no fear of bodily harm and was able to avoid the contact does not minimize the probable cause to believe that an assault was committed.

### 3. Probable Cause to Arrest for Mr. Jackson's violent response to officer's attempt to detain him provided separate independent probable cause to arrest

Defendants alternatively submit that even if Mr. Jackson's first attempt to strike the officer did not provide probable cause to support the detainment, Mr. Jackson's violent response to the officer's actions provided separate, independent probable cause to arrest. In opposition to Defendant's Motion for Partial Summary Judgment, plaintiff argued that Mr. Jackson was acting in self-defense and was "provoked" by the officer, thus negating any probable cause to support his detainment.[4] However, whether an individual has the right to resist an unlawful arrest is a question of state law. *Wainwright v. New Orleans,* 392 U.S. 598, 609 (U.S. 1968). Rhode Island General Laws, §12-7-10, specifically requires an individual pursued by police to "submit

---

[4] In its Memorandum and Opinion denying defendants' Motion for Partial Summary Judgment, this Court noted that an intriguing question was raised as to whether "police provocation must be considered in the Fourth Amendment analysis." *Petro,* 770 F. Supp. 2d at 479, n. 8. However, in the first instance, the cases cited by the Court do not lend support for such an intriguing question. Specifically, the section of *United States v. Yang, 345 F.3d 650, 660 (8th Cir. 2003)* relied upon by the Court was actually contained in a dissent. The majority decision in that case never addressed the issue, finding instead that reasonable suspicion of the defendant's action gave rise to probable cause. *Wong Sun v. United States, 371 U.S. 471, 484, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)* likewise fails to add intrigue in light of the Court's subsequent holding on the issue. Specifically, in *Wong* the Court was addressing whether forced, warrantless entry based on a tainted informer, which gave rise to incriminating statements was sufficient to overcome the fruit of the poisonous tree doctrine. The Court held it did not. *Id.* As the cases cited *infra* make clear, an individual who responds to an unlawful act by police by committing their own separate crime, should not be immunized from that subsequent criminal act.

peacefully and, if he has been unlawfully arrested, . . . [to] pursue his remedy in the courts."

*State v. Hurteau*, 810 A.2d 222, 225 (R.I. 2002) (quoting *State v. Gelinas*, 417 A.2d 1381, 1385

*(R.I. 1980))*.  Rhode Island thus does not allow individual to resist even an unlawful arrest.

Plaintiff's claim of provocation and citation to other Federal Court's, therefore, has no bearing

on this case, where state law specifically requires an individual to peacefully submit, irregardless

of the legality of the stop.

It is also nevertheless noteworthy that several circuits, including the First Circuit, have

routinely found that "[i]f a defendant's response to a stop, even an "illegal stop", "is itself a new,

distinct crime, then the police constitutionally may arrest the defendant for that crime." *U.S. v.*

*Bailey*, 691 F.2d 1009, 1016-17 (11th Cir. 1982) *("notwithstanding a strong causal connection*

*in fact between lawless police conduct and a defendant's response, if the defendant's  response is*

*itself a new, distinct crime, then the police constitutionally may arrest the defendant for that*

*crime")*.  *U.S. v. Sledge*, 460 F.3d 963 (8th Cir. 2006 ) *("In our circuit, resistance to an illegal*

*arrest can furnish grounds for a second, legitimate arrest.")*; *U.S. v. Schmidt*, 403 F.3d 1009,

*1016 (8th Cir. 2005) (same)*; *Arpin v. Santa Clara Valley Transp.*, 261 F.3d 912 (9th Cir. 2001)

*("The absence of probable cause does not grant an individual the right to offer resistance")*; *Cf.*

*U.S. v. King*, 724 F.2d 253, 256 (1st Cir. 1984) *(even if police unlawfully detained defendant and*

*his companion and attempted to illegally search defendant, police had probable cause to arrest*

*and search defendant after his companion began firing gun at police and fruits of search were*

*admissible)*.

In <u>U.S. v. King</u>, *724 F.2d 253, 256 (1st Cir. 1984)*[5], the First Circuit addressed a defendant's attempt to suppress evidence based on a perceived illegal search by police. In that case, state troopers approached defendant's vehicle which was parked in a rest area on a cold winter night and asked the occupants for identification and an explanation for why they were parked there. *Id. at 255*. After a warrant check on the occupants came up negative, the officer returned to the vehicle and noticed that a bag that had been on the floor of the passenger side was missing. *Id.* The passenger also held his hand inside his jacket. The officer then asked the passenger to step out of the car. *Id.* When he did, the officer asked him what he had in his jacket. As the officer asked the question he reached out to touch the man's jacket and the man jumped back pushing the officer's hand away. *Id.* Because the officer thought he felt a bullet proof vest, the officer drew his own weapon and again reached for the man's jacket. *Id.* The man again pushed the officer's hand away. *Id.* Meanwhile, the driver of the vehicle jumped out of the van and, after running back and forth on the opposite side of van, began firing a gun in their direction. *Id.* After pulling the defendant to the ground for cover, the officer pulled a weapon from his belt. *Id.* A subsequent search of the van uncovered a semi-automatic weapon, ammunition as well as numerous licenses and identifications belonging to other persons. *Id. at 255-56*.

In seeking to suppress the evidence, including the gun, the defendant claimed that because the officer was in the process of illegally searching him when the shots were fired, the subsequent search was poisoned by the previous illegality, "i.e., that but for the previous illegality, the shooting would never have taken place." *Id. at 256*. The First Circuit however,

---

[5] Appeal after remand, 753 F.2d 1, 1985 U.S. App. LEXIS 28644 (1st Cir. NH 1985).

although noting that it had no doubt that had the shooting not occurred, the officer would have seized the gun from the defendant, and accepting the proposition that the stop and search was illegal, held that the shooting was an independent intervening act which purged the taint of the alleged prior illegality and provided probable cause for the search. *Id.* at 256.

Recently, in *United States v. Mouscardy, 2011 U.S. Dist. LEXIS 69060 (D. Mass. June 28, 2011),* the Federal District Court for the District of Massachusetts likewise rejected a criminal defendant's claim that he was justified in striking an officer in order to protect himself against an illegal search. *Id. at *8-*10.* Applying Massachusetts' law which, like Rhode Island's, makes it unlawful for an individual to resist an arrest by someone the defendant knows is an authorized police officer, regardless of whether the arrest was unlawful, the District Court found that even if the officer did not have a legal basis to conduct the initial search, the defendant's intervening response of striking the officer's hand away provided the officer with probable cause. *Id. See also United States v. Bellamy, 592 F. Supp. 2d 308, 321 (E.D.N.Y. 2009) (even though defendant's "shouldering" of officer and subsequent struggle with the officer were a consequence of the initial illegal stop and attempted seizure, these criminal acts purged any subsequently discovered evidence of the taint from the unlawful stop).*

Although these cases dealt with the suppression of evidence and fruit of the poisonous tree doctrine, the rationale expressed therein applies to the instant case. Specifically, allowing an individual to violate the law by failing to submit peacefully, even to an unlawful arrest, and striking officers would "virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct." *Sledge, 460 F.3d at 966 citing United States v. Bailey, 691 F.2d 1009, 1017 (11th Cir. 1982) (holding "police may*

*legally arrest a defendant for a new, distinct crime, even if the new crime is in response to police misconduct and causally connected thereto").* While there is some support under R.I. common law for the proposition that an individual possesses the right to self-defense from excessive force, *State v. Botelho, 459 A.2d 947 (R.I. 1983),* in this case at the time Mr. Jackson began struggling with the officers, knocking them over, striking and kicking them, the only contact was Officer Kelley's attempt to place Mr. Jackson in an arm-bar hold. Use of an arm-bar hold is an accepted technique and does not amount to excessive force. *Cf. Id. at 951 ("no evidence that Officer used excessive force when he grabbed defendant and pushed him out the door, ripping his shirt in the process).* As noted by the R.I. Supreme Court, "[i]f a citizen protects himself with a force which is greater than necessary, he forfeits his right to self-defense and may be convicted of a simple assault pursuant to § 11-5-3. . . . If his self-defense involves the use of a "dangerous weapon," he runs the risk of a felony conviction under the terms of § 11-5-2." *State v. Ramsdell, 109 R.I. 320, 327 (R.I. 1971).* In this case, because Officer Kelley used "reasonable force, by attempting to place Mr. Jackson into an arm-bar hold, the application of the principle of self-defense is not warranted." *Id.*

Thus, regardless of the legality of the initial stop and attempted seizure, an intervening act by a defendant, which is itself a new and distinct crime, supplies probable cause to support an arrest. In this case, the evidence demonstrates that Mr. Jackson reacted violently to the officer's attempt to detain him. When Officer Kelley took hold of Mr. Jackson's arm, he immediately began struggling with the officers, knocking them to the ground and proceeding to kick and grab the officers, ripping their uniform. *Kelley Depo.. at 127; Lukowicz Depo. at 96-97; 99.*

Thus, even if it were determined that the officers lacked reasonable basis or probable cause during the initial phase of their encounter with Mr. Jackson, Mr. Jackson's subsequent response established probable cause to effectuate the arrest.

###### B.    EXCESSIVE FORCE CLAIM

Plaintiff also seeks to recover against the Defendants for the alleged use of excessive force in effectuating the arrest.   Of course, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor, 490 U.S. 386, 396 (1989)*.  Similar to a claim for unlawful seizure, a claim that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure is analyzed under the Fourth Amendment reasonableness standard.  *Id. at 395*. Thus, the Court must consider the "totality of the circumstances faced by the officer on the scene." *Lennon v. Miller, 66 F.3d 416, 425 (2d Cir. 1995) citing Graham, 490 U.S. at 396*.  The proper inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham, 490 U.S. at 397*.  To determine whether the force used was reasonable, courts balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id. at 396 (citations omitted)*. "While the test for reasonableness is often a question for the jury, this issue may be decided as a matter of law if, in resolving all factual disputes in favor of the plaintiff, the officer's force was "objectively reasonable" under the circumstances." *Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. Wash. 2001)*.

"The 'reasonableness' of a particular use of force must be judged from the perspective of

a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham, 490 U.S. at 396 citing Terry, 392 U.S. at 20-22.* The court's consideration of "reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Id. at 396-97.* "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." *Id. at 396.*

In the instant case, Mr. Jackson was a very large man, standing 6'2" and weighing over 250 lbs. *Autopsy Report (Case. # 08-02691), R.I. Dept. of Health, Office of Medical Examiners (June 30, 2008).* When the officers attempted to detain Mr. Jackson, he reacted by swatting at the officers and violently resisting them. *Kelley Depo. at 117.* In accordance with his training, Officer Kelley used the arm-bar technique in an attempt to bring Mr. Jackson to the ground. *Id. at 120.* However, once on the ground, Mr. Jackson continued to flail and kick at the officers and refused to submit. *Kelley Depo. at 127; Lukowicz Depo. at 96-97.* After Mr. Jackson broke free of their grip and stood up, the officers took hold of him a second time but Mr. Jackson continued to struggle and prevent the officers from placing handcuffs on him. *Id. at 125-26; Lukowicz Depo. at 103.* When Mr. Jackson succeeded in freeing himself and standing a second time, the officers turned to their OC spray and baton. *Kelley Depo. at 128; Lukowicz Depo. at 108-109; 115.* After the OC spray had no effect on Mr. Jackson, Officer Lukowicz used his baton to strike Mr. Jackson in the upper thigh area. *Lukowicz Depo. at 108-109; 115.* However, this likewise had no effect on Mr. Jackson. *Id. at 118; Kelley Depo. at 156.* The officers then grabbed hold of Mr. Jackson again and brought him to the ground a third time. *Id. at 116; Kelley Depo. at 156.*

It was only after backup officers arrived that the officers were able to handcuff Mr. Jackson and take him into custody. *Id.* at 117; *Kelley Depo.* at 158-59.

Defendants submit that the evidence will demonstrate that these actions by the officers were reasonable and did not amount to excessive force. There will be absolutely no credible evidence or testimony that the officers unnecessarily struck or hit the plaintiff. Rather, in response to Mr. Jackson's violent struggle, the officers escalated their level of force from verbal, to physical, to OC spray, to baton. Throughout, the officers continued to order Mr. Jackson to get on the ground and stop resisting. *Beuregard Depo.* at 15; *Kelley Depo.at 125-26.* Mr. Jackson did not respond to these commands, but rather kept fighting the officers and attempting to escape. Defendants thus submit that the evidence will fail to support a finding that the officers either assaulted or battered Mr. Jackson or that they used excessive force in violation of plaintiff's constitutional rights.

## C. DELIBERATE INDIFFERENT OR GROSSLY NEGLIGENT IN RESPONDING TO MR. JACKSON'S MEDICAL NEEDS

Plaintiff also attempts to hold defendants liable under § 1983 and state law for their response to Mr. Jackson's medical needs. Plaintiff specifically claims that Mr. Jackson's Fourteenth Amendment right was violated and that the officers acted with gross or willful negligence in responding his medical needs. *See i.e. Plaintiff's Amended Complaint, at ¶¶ 14, 19(b), & 38.*

In order to recover for the violation of decedent's Fourteenth Amendment right, plaintiff must establish that the defendants were "deliberately indifferent" to plaintiff's serious medical needs. *Ruiz-Rosa v. Rullan*, *485 F.3d 150, 155 (1st Cir. P.R. 2007).* Deliberate indifference is a very high standard, which requires a showing of more than mere negligence or lack of due care

for an individual's interests or safety.  *See Whitley v. Albers*, 475 U.S. 312, 319 (1986); *Estelle v. Gamble*, 429 U.S. 97, 105-06 (1976).  "Deliberate indifference has both an objective and a subjective component.  The objective component requires a plaintiff to demonstrate an objectively serious medical need.  The subjective component requires a plaintiff to show that the defendant actually knew of but deliberately disregarded such need."  *Vaughn v. Gray*, 557 F.3d 904, 908 (8th Cir. 2009) (internal quotations and citations omitted."  As explained by the Supreme Court, "[d]eliberate indifference [is]  . . more than mere negligence."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  "Defendants are deliberately indifferent only if they were 'subjectively aware of [plaintiff's] serious medical needs and disregarded an excessive risk that a lack of treatment posed to [his] health or safety.'"  *Ashworth v. Round Lake Beach Police Dep't.*, 2005 U.S. Dist. Lexis 14844, *20-21 (N.D. Ill 2005) (citations omitted).  It is settled that deliberate indifference "requires a state of mind akin to criminal recklessness[. Thus proof] that the official knew of and consciously disregarded a substantial risk of serious harm [is needed]."  *Figueroa v. Wall*, 2006 U.S. Dist. LEXIS 74106 (D.R.I. Sept. 26, 2006) adopting  2006 U.S. Dist. LEXIS 74188 (D.R.I. Aug. 31, 2006) citing *Farmer*, 511 U.S. at 825 and *Mahan v. Plymouth County House of Corrections*, 64 F.3d 14 (1st Cir. 1995).  *See also Estate of Phillips v. Milwaukee*, 123 F.3d 586, 595 (7th Cir. 1997) (Fact that no one noticed that decedent was not getting enough oxygen cannot transform actions into constitutional deprivation).

"A defendant is not subjectively reckless where, although he is aware of the existence of a general risk, he is unaware that his conduct is inappropriate in light of that risk."  *Rich*, 129 F.3d at 340, n. 2.  As this standard makes clear, "the Constitution is designed to deal with deprivations of rights, not errors in judgment, even though such errors may have unfortunate

consequences.. . . To lower this threshold would thrust federal courts into the daily practices of local police departments." *Grayson v. Peed*, 195 F.3d 692, 695-696 (4th Cir. Va. 1999) writ den., 529 U.S. 1067 (U.S. 2000) ("[A]n officer could hardly be faulted under *Estelle* for believing that [individual found acting irrationally and slurring speech] needed nothing so much as to sleep it off.").

The law is also settled that in a deliberate indifference inquiry the feasibility of additional precautionary measures is rarely probative of the perceived constitutional violation. *Liebe v. Norton*, 157 F.3d 574, 578 (8th Cir. 1998). While plaintiff may point "to all of the actions which [the officers] should have taken[,] [u]nfortunately, [the officers] did not have the benefit of twenty-twenty hindsight, as we do now. Thus, [the Court] must examine those precautionary actions which [actually] were undertaken." *Id. See also Grayson*, 195 F.3d at 695 *(rejecting as "impermissible 20/20 hindsight" the contention that officers should have taken detainee to a medical facility).* The reason is that a Court could almost invariably find additional precautions that an official could have taken in any given situation when looking back with the benefit of 20/20 hindsight. *Parrish v. Cleveland*, 372 F.3d 294, 309 (4th Cir. Va. 2004). However, rather than looking back at the event through the lens of knowing what happened and identifying what could have avoided the injury, the Court must focus on the actions that <u>were</u> taken after discovering that the individual was suffering from a serious medical condition and in need of assistance. From this, it must be determined whether, given the information reasonably available to the officer, the officers deliberately "disregarded an excessive risk to . . . health or safety." *Id.* "Because culpability under the test is personal, the subjective component must be addressed for

each officer individually." _Meier v. County of Presque Isle_, 376 Fed. Appx. 524, 528-529 (6th Cir. Mich. 2010) citing _Garretson v. City of Madison Heights_, 407 F.3d 789, 797 (6th Cir. 2005).

Plaintiff's state law claim for negligence likewise requires plaintiff to meet a high standard by demonstrating more than ordinary negligence on the part of the officers. That is, _§ 9-1-27_ of R.I. General Laws provides immunity from ordinary negligence by on-duty police or fire personnel who render emergency assistance to a person in need. _R.I. Gen. Laws § 9-1-27 (1956)._[6] This statute however does not extend protection for "acts or omissions constituting gross, willful, or wanton negligence." _Id._ Thus, in order to recover for their state law claim against the officers for failure to render medical aid, plaintiff must demonstrate that the officers' actions constituted gross, willful or wanton negligence. _Brandon v. City of Providence,_ 708 A.2d 893, (R.I. 1998) (actions by police of securing the injured and the scene of a shooting pending arrival of rescue personnel are within the ambit of § 9-1-27). Gross negligence has been defined by R.I. Courts as "the intentional failure to perform a manifest duty in a reckless disregard of the consequences as affecting the life or property of another." _Newton v. Seahorse Marina, Inc.,_ 1988 R.I. Super. LEXIS 115 (R.I. Super. Ct. 1988) citing Black's Law Dictionary, 5th Ed. p. 931. Thus, in order to demonstrate that the officers are liable under state law, plaintiff must provide "evidence of near recklessness or shockingly unjustified and unreasonable action." _Id. citing Leite v. City of Providence,_ 463 F. Supp. 585, 591 (D.R.I. 1978).

---

[6] In opposition to Defendants' Motion for Partial Summary Judgment on the failure to respond to Mr. Jackson's medical needs, plaintiff had argued that the immunity from ordinary negligence contained in R.I.G.L § .9-1-27 did not apply. Defendants adopt and incorporate its response to this argument as contained in Defendants' Reply Memorandum in support of Motion for Partial Summary Judgment On Plaintiff's Claim That The Defendants Failed To Render Medical Assistance To Mr. Jackson (Doc. # 103). In summary, contrary to plaintiff's argument, the statute does not limit an officer's entitlement to immunity to situations where there is no pre-existing duty to assist. Not only does the plain language of the statute refute this conclusion but it would create an absurd result given that fire fighters and EMTs are also protected by the statute and by the very definition of their position, they always possess a pre-existing duty to offer medical assistantce.

In the instant case, defendants submit that the evidence will demonstrate that the officers were not deliberately indifferent nor grossly negligent in responding to Mr. Jackson's medical needs. After discovering his medical condition, the officers contacted rescue from next door and took steps to prepare Mr. Jackson to receive care by removing his 250-pound frame from the car, checking for a pulse, and removing handcuffs before starting CPR. All of these actions do not support a finding that the officers were deliberately indifferent by being reckless in the criminal sense by knowingly disregarding a known risk to Mr. Jackson. _Farmer_, 511 U.S. at 837. Cf. _Stogner v. Sturdivant_, _2010 U.S. Dist. LEXIS 109803, 13-15 (M.D. La. Oct. 14, 2010) (deputies did not violate plaintiff's constitutional rights despite waiting roughly two minutes to initiate CPR after noticing he was unconscious)._ Also relevant to the inquiry as whether the officers were deliberately indifferent or grossly negligent is the recognition that rescue personnel were directly next door, only 100-150 feet away, in a building attached to the police station. _Thornton Depo. (January 6, 2010) at 66._

All of these factors combine to lead to the inescapable conclusion that the officers did not violate Mr. Jackson's Fourteenth Amendment rights by being deliberately indifferent to his medical needs. Likewise, these factors would not lead a reasonable juror to conclude that the officers intentionally failed to "perform a manifest duty in a reckless disregard of the consequences as affecting the life or property of another." _Newton v. Seahorse Marina, Inc._, _1988 R.I. Super. LEXIS 115 (R.I. Super. Ct. 1988)._

D.     **QUALIFIED IMMUNITY**

Defendants also rely upon the doctrine of qualified immunity in defense of the instant suit. Specifically, even if it determined that the officers' actions violated Mr. Jackson's right to

be free from unreasonable seizure or amounted to a violation of his right to medical care, the officers are nevertheless entitled to qualified immunity on both the state and federal claims in that a reasonable officer in the shoes of these officials would not believe that their actions infringed upon a clearly established constitutional right.[7]

"To determine whether a particular officer is entitled to qualified immunity, '[a] court must decide: (1) whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." *Maldonado v. Fontanes*, *568 F.3d 263, 269 (1st Cir. 2009).* The second step has two aspects: (1) "the clarity of the law at the time of the alleged civil rights violation" and (2) whether, on the facts of the case, "a reasonable defendant would have understood that his conduct violated the Plaintiffs' constitutional rights." *Id.* *See also* *Anderson v. Creighton, 483 U.S. 635, 640 (1987) ("[To overcome qualified immunity, t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").* "Thus if a reasonable official would not have understood that his conduct violated Plaintiffs' constitutional rights. . . [they] must" be granted qualified immunity. *Estrada v. R.I., 2010 U.S. App. LEXIS 2390, 14-15 (1st Cir. 2010).*

Applying this standard, the First Circuit has noted that "[t]he law does not expect a public official, faced with the need to make an objectively reasonable real-world judgment, to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review." *Savard v. Rhode Island, 338 F.3d 23, 30 (1st Cir. R.I. 2003) citing Wilson, 526 U.S. at 617.* "The question is not what a lawyer would learn or

---

[7] Qualified immunity similar to the qualified immunity afforded officials under *§ 1983* likewise protects officials from state tort claims. *See Hatch v. Town of Middletown*, *311 F.3d 83, 89-90 (1st Cir. 2002) citing Pontbriand v. Sundlun, 699 A.2d 856, 867 (R.I. 1997) and Ensey v. Culhane, 727 A.2d 687, 690 (R.I. 1999).*

intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. The unlawfulness must be apparent."

*McCullough v. Wyandanch Union Free Scho. Dist.*, 187 F.3d 272, 278 (2d Cir. 1999) (citation omitted).

Defendants submit in the first instance that the officers are entitled to qualified immunity from plaintiff's claims that the officers unlawfully seized plaintiff. That is, as more fully outlined above and in their Memorandum in Support of Defendants' Motion for Judgment, the scenario encountered by the officers when they first approached Mr. Jackson, would not lead a reasonable officer to believe that either temporarily detaining Mr. Jackson or subsequently arresting him, violated Mr. Jackson's clearly established rights. In addition, this Court itself has noted a discrepancy in R.I. law as to whether an apprehension of bodily injury is an element of criminal assault. *Petro*, 770 *F. Supp. 2d at 480, n. 10.* In light of this discrepancy, it cannot be said that the officers violated a clearly established right by concluding that Mr. Jackson's actions demonstrated probable cause to suspect that he had committed an assault.

In addition, even if it is clearly established that apprehension of bodily harm is a necessary element of criminal assault, Mr. Jackson's subsequent violent response to the officer's attempt to stop him could lead a reasonable officer to conclude that there was probable cause to arrest based on his subsequent actions. While plaintiff would argue that Mr. Jackson's actions were in response to the unlawful police action and provoked by the same, this Court itself noted that the facts of this case present an "intriguing question" as to whether the perceived police provocation must be considered in the Fourth Amendment analysis. *Petro, 770 F.Supp. 2d at 480, n. 8.* As noted, "[t]he law does not expect a public official, faced with the need to make an

objectively reasonable real-world judgment, to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review." *Savard, 338 F.3d at 30 citing Wilson, 526 U.S. at 617.* Thus, because it presents an "intriguing question" for the Court as to whether the police officer's actions in the instant case could nullify the probable cause because they "provoked" Mr. Jackson's reaction, it cannot be said that the unlawfulness is apparent to the officers. *McCullough, 187 F.3d at 278 ("The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct. The unlawfulness must be apparent").*

Defendants also submit that they are entitled to qualified immunity from plaintiff's claims of assault and battery and excessive force. Specifically, the amount of force exerted by the officers in their attempt to take Mr. Jackson into custody cannot be said to be of such a nature as to give rise to the conclusion that an objectively reasonable officer would believe that they were violating Mr. Jackson's clearly established rights. *See Jackson v. Joliet,198 Fed. Appx. 554,556 (7th Cir. 2006).* Mr. Jackson struggled violently with the officers, kicking and flailing his arms while they tried to handcuff him. Mr. Jackson also ignored the officers' directions to get on the ground and stood up twice after they had succeeded in bringing him to the ground. Mr. Jackson's undisputed size and strength further supports the objective reasonableness in the officers' decision to utilize the degree of force they did in taking Mr. Jackson into custody.

Defendants are also entitled to qualified immunity from plaintiff's claims that the officers were deliberately indifferent and grossly negligent to Mr. Jackson's serious medical needs. For the reasons cited *supra* and in their Memorandum of Law in Support of their Motion for

Judgment, defendants submit in the first instance that plaintiff has failed to satisfy the first prong of this analysis by demonstrating the violation of a constitutional right. That is, the facts fail to establish that the officers' actions amounted to deliberate indifference or gross negligence to Mr. Jackson's serious medical needs. Nevertheless, for the reasons outlined in Defendants' Memorandum of Law in support of their Motion for Judgment, the Court need not address the first prong, *Pearson*, 129 S.Ct. at 818, because even if it could be said that the facts alleged by the Plaintiff make out a violation of a constitutional right, the defendants are still entitled to qualified immunity. That is, given the conflicting case law as to whether an officer owes an affirmative duty to personally perform CPR or whether their obligation is met by summoning medical help, a reasonable officer would not believe that their actions were violating a clearly established right by calling for rescue from next door. The First Circuit has observed that the "qualified immunity standard 'gives ample room for mistaken judgments' by protecting' all but the plainly incompetent or those who knowingly violate the law.'" *Rivera v. Murphy, 979 F.2d 259, 263 (1st Cir. 1992) quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991).* In light of the numerous courts that have held that police officers do not owe an affirmative duty to administer CPR, it is at least arguable that the officers met their constitutional obligation by calling for rescue to respond to the scene when they discovered Mr. Jackson unconscious. The officers were not required or expected "to anticipate precisely the legal conclusions that will be reached by a panel of federal appellate judges after briefing, arguments, and full-fledged review." *Savard*, 338 F.3d at 30.

Moreover, even if the right were clearly established, objective review of the officers actions in this case would not lead a reasonable officer to conclude that they were violating

plaintiff's clearly established right. An officer who discovers a detainee unconscious and proceeds to call for rescue, remove the individual from the cruiser, and otherwise prepare him to receive medical aid, would not believe that they were violating the individuals clearly established rights. *Price v. County of San Diego*, 990 F.Supp. 1230 (S.D.Cal. 1998) (officers were entitled to qualified immunity because not only was the claimed duty by the officers to perform CPR unsupported, but even if there were a constitutional duty, it was not clearly established).[8]

In the final analysis, "a reasonable official would not have understood that his conduct violated Plaintiffs' constitutional rights" by stopping Mr. Jackson, using the level of force they did to take him into custody and calling for rescue when he was discovered unconscious. *Estrada v. R.I.,* 2010 U.S. App. LEXIS 2390, 14-15 (1st Cir. 2010). As such, even if it can be determined that the officers' actions violated plaintiff's rights, the officers are nevertheless entitled to qualified immunity.

## IV. PROPOSED WITNESS LIST

1. Officer Patrick Kelley-officer at scene who will testify as to events starting with initial dispatch to Joyal's Liquor, initial encounter with decedent, attempted assault by decedent, arrest of decedent, putting decedent into the police cruiser, removal of decedent from police cruiser, and care of decedent at police station.

2. Officer Sean Lukowicz-officer at scene who will testify as to events starting with initial dispatch encounter with decedent, assault of Officer Kelley by decedent, arrest of decedent, putting decedent into the police cruiser, transport of decedent, removal of decedent from police cruiser and care of decedent at police station.

---

[8] For the reasons outlined in Defendants' Memorandum of Law in Support of their Motion for Judgment, defendants also submit that they are entitled to qualified immunity from plaintiff's state law negligence claims.

3. <u>Officer Thomas Nye</u>-officer at scene who will testify as to events starting with the arrest of decedent, putting decedent into the police cruiser, removal of decedent from police cruiser, and care of decedent at police station.

4. <u>Officer Marcus Palazzo</u>-officer at scene who will testify as to events starting with after decedent was handcuffed, putting decedent into the police cruiser, removal of decedent from police cruiser and care of decedent at police station.

5. <u>Officer Michael Nye</u>- officer at scene who will testify as to events starting with after decedent was handcuffed, removal of decedent from police cruiser and care of decedent at police station.

6. <u>Sergeant Scott Thornton</u>-Officer in Charge at Police Station. Will testify as to events starting at the Police Station.

7. <u>Dispatcher Rachel Pineda</u>-Dispatcher on duty who will testify as to receipt of initial dispatch.

8. <u>James Croft</u>, Lieutenant West Warwick Fire - testify as to receipt of dispatch for rescue and care of decedent at the police station.

9. <u>Christopher Cahoon</u>, West Warwick Fire- testify as to receipt of dispatch for rescue and care of decedent at the police station.

10. <u>Michael Simko</u>, Dispatcher West Warwick Fire - testify as to receipt of dispatch to police station.

11. <u>Elaine Beuregard</u> - a witness to part of the struggle between decedent and the officers.

12. <u>Charles V. Wetli, MD</u> –will be presented as an expert to offer his opinion to a degree of reasonable medical certainty that Mr. Mark Jackson died from excited delirium which was the result of his untreated schizophrenia.

13. <u>Nicole Frink</u> - a witness to part of the struggle between decedent and the officers.

14. <u>Kimberly Morrison</u> - the building manager at plaintiff's apartment building, who will testify about the federal disability requirement for living in the building and Mr. Jackson's living arrangements and frequency of use and general manner.

15. <u>Gary P. Dias</u> – will be presented as an expert to testify as to the obligations Rhode Island police officers have to render medical aid.

16. <u>Karen Petro</u>-sister of Mark Jackson and plaintiff in the instant suit.

17. <u>Juanita Jackson</u>-mother of Mark Jackson.

## V.  PROPOSED EXHIBITS

1. Document from Social Security Administration dated March 5, 2994 – indicating Mark Jackson is entitled to monthly disability benefits beginning December of 1992 and indicating that he was found to be disabled starting on March 1, 1990.

2. Initial psychiatric evaluation dated December 16, 1993 from Dr. Cok.

3. Medical diagnostic study from Dr. Cok dated December 23, 1993.

4. A letter from Social Security Administration to decedent, Mark Jackson dated March 28, 1997.

5. Documents from RI Department of Human Services, one dated 1/20/84 and another dated 1/20/94.

6. Note from Frederick Evans, MD dated July 25, 2000.

7. June 25, 1997 doctor's note from Dr. J. Steven Clifford, PhD

8. June 11, 1997 consultative exam note from Dr. Bruno Franic.

9. Doctor's note from Dr. Cok dated December 16, 1993 with attached progress notes from Kent County Hospital.

10. Photographs depicting the back lot of Joyal's liquor store.

## VI.   EXPECTED LENGTH OF TRIAL

Defendants expect trial on the instant matter to consume 15 trial days.

## VII.   PROPOSED JURY INSTRUCTIONS

Defendants will be submitting their proposed jury instructions under separate cover.

## VIII.   ADDITIONAL MATTERS

Defendants have filed Motions in Limine in conjunction with the instant Pretrial Memorandum.  Defendants specifically seek pretrial rulings on the admissibility of certain expert testimony, the exclusion of questions surrounding the officers' subjective intent as well as the exclusion of questions surrounding the officer's fear of immediate bodily harm as a result of Mr. Jackson's actions.   Defendants also have filed a Motion in Limine seeking to preclude and/or limit the use of exhibits during opening statements.

Defendants,
By their attorney,

_/s/ Marc Desisto_
Marc DeSisto, Esq.     (#2757)
DESISTO LAW
211 Angell Street
P.O. Box 2563
Providence, RI 02906-2563
Phone: (401) 272-4442
Fax:    (401) 272-9937
Email: marc@desistolaw.com

<u>CERTIFICATION OF SERVICE</u>

I hereby certify that the within document has been electronically filed with the Court on

September 29, 2011, and is available for viewing and downloading from the ECF system.

Stephen P. Sheehan, Esq.  #4030
Wistow & Barylick, Inc.
61 Weybosset Street
Providence, RI  02903
(401) 831-2700
(401) 272-9752-fax
sps@wistbar.com

                                        */s/ Marc DeSisto*