UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

_____
                                        )
KAREN PETRO, as Administratrix of       )
the Estate of Mark Jackson,             )
        Plaintiff,                      )
                                        )
                v.                      )   C.A. No. 09-213 S
                                        )
TOWN OF WEST WARWICK, by and through    )
its Finance Director Malcolm A.         )
Moore; PATRICK J. KELLEY,               )
individually and in his                 )
representative capacity;                )
SEAN LUKOWICZ, individually and in      )
his representative capacity; and        )
SCOTT THORNTON, individually and in     )
his representative capacity,            )
        Defendants.                     )
_____)

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WILLIAM E. SMITH, United States District Judge.

In the wake of Mark Jackson's death while in police custody, Plaintiff Karen Petro, as Administratrix of Mark Jackson's Estate, brought this action against the Town of West Warwick (the "Town") and West Warwick Police Officers Patrick Kelley, Sean Lukowicz, and Scott Thornton, individually and in their representative capacities (collectively, the "Defendants"). The Complaint alleges claims against Officers Kelley, Lukowicz, and Thornton for the violation of Jackson's constitutional rights, assault and battery, and gross negligence; Plaintiff further alleges a respondeat superior

claim, related to the gross negligence and assault and battery claims, against the Town.

Although the facts of this case are seemingly straightforward -- indeed, the pertinent events took place within a relatively short time period and much of it was recorded on video -- the case nonetheless presents numerous novel, important, and difficult issues of law.

The Court presided over a nine-day bench trial, beginning on October 31, 2011. After trial, the Court posed written questions to the parties, which they were invited, but not required, to answer in their post-trial briefs. Thereafter, the parties submitted post-trial briefs and reply briefs. After considering the evidence presented at trial and the pre-trial and post-trial memoranda submitted by the parties, the Court makes the following findings of fact and conclusions of law, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. To the extent that any finding of fact reflects a legal conclusion, it should be, to that extent, deemed a conclusion of law, and vice versa.

Many of the facts found below are based on a video of the back lot of the West Warwick Police Department ("WWPD" or the

"Department"), recorded by the WWPD's own recording system. [1] (See generally Ex. 12.)

I.   Findings of Fact

   A.   Mark Jackson

Mark Jackson was 47 years old when he died on June 27, 2008.  (Ex. 7a.)  At the time of his death, he was a large man, standing 6'2" and weighing over 250 pounds.  (Ex. 5.)

Jackson had suffered from psychiatric or neurological disorders for at least fifteen years prior to his death.  (Ex. 7c.)  His diagnoses over the years included organic delusional disorder, post-traumatic stress disorder, and schizophrenia. (Exs. 7c, 7g, 7j, 7m.)  According to the exhibits and testimony admitted at trial, Jackson had no reported history of any acute phase or acute episode of schizophrenia.  (Trial Tr. vol. 5, 91, Nov. 4, 2011; Exs. 7a–7m.)

Jackson lived a socially isolated and circumscribed life. (Trial Tr. vol. 5, 44-45, 59-60, 93-94.)  For many years leading up to his death, his social contacts consisted of spending the

---

[1] During trial the video was shown more than eighteen times, with various witnesses on the stand.  The Court has watched the video countless additional times in the preparation of this Opinion.  Understanding the facts discussed herein will be assisted by watching the video.  For this reason, the Court will make access to this exhibit available through the Court's website in the week following the issuance of this Findings of Fact and Conclusions of Law.  Interested readers should follow the link provided at the website.  See www.rid.uscourts.gov (follow "Judges;" then follow "Opinion Related Material").

day and evening with his mother. (Id. vol. 5, 44-45; Trial Tr. vol. 6, 228-229, Nov. 8, 2011; Ex. 7m.) He drove his mother around to do her errands and watched television in her apartment at 88 West Warwick Avenue in West Warwick, Rhode Island. (Trial Tr. vol. 5, 44-45; id. vol. 6, 215.) Otherwise, his regular routine, which he followed "like clockwork" according to the testimony of one witness who saw him regularly, consisted of going outdoors to smoke and walking to several businesses within a one-block radius of his mother's home for tobacco products, coffee, and fast food. (Id. vol. 5, 44-45; id. vol. 6, 228-229.)

According to Social Security assessments and the testimony of Debra Pinals, M.D., a psychiatrist who provided expert testimony on behalf of Plaintiff, Jackson had severe difficulties communicating with and understanding others as a result of his disability. (Id. vol. 5, 33-34, 37-38, 45, 93-94; Exs. 7g, 7m.)

Jackson's condition had remained relatively constant, and he had not taken medication for his condition for many years. (Trial Tr. vol. 4, 68, Nov. 3, 2011; id. vol. 5, 77-78; Exs. 7g, 7m.) He relied on routines that minimized social contacts to compensate for his difficulties in social interaction and communicating with others. (Trial Tr. vol. 4, 68-70; id. vol. 5, 45.)

4

With the exception of his mother, Jackson kept to himself and limited his communications with others to what was required to make his purchases. (Id. vol. 2, 70, 73, Nov. 1, 2011; id. vol. 5, 108-09.)  A shop owner and a neighbor testified that they never saw Jackson do anything inappropriate. (Id. vol. 2, 54-55; id. vol. 5, 112.)

In the center of the oddly-configured block in which Jackson's mother's apartment is situated, there is a parking lot immediately adjacent to his mother's apartment building. (Id. vol. 6, 222-24; Ex. 30.)  This parking lot is shared by Joyal's Liquors ("Joyal's"), a liquor and tobacco store located at 90 West Warwick Avenue, and the residents of a multi-family house that is located in the middle of the parking lot, with the street address of 241 Brookside Avenue. (Trial Tr. vol. 2, 50-51.)

The parking lot is open to the street and partially fenced in back.  (Ex. 30.)  This parking lot is also used as a short-cut in the neighborhood with access to 88 West Warwick Avenue via a short path. (Trial Tr. vol. 2, 56-57; id. vol. 5, 103-04; Ex. 30.)

Jackson purchased tobacco products daily from Joyal's. (Trial Tr. vol. 5, 111.)  His mother did not allow him to smoke in her apartment, so he typically went out to smoke many times a day.  (Id. vol. 6, 214; id. vol. 5, 44-45.)  He regularly used

Joyal's back parking lot as a place to smoke, both during the day and in the evening. (Id. vol. 2, 54, 62.) The owner and employees of Joyal's and the tenants of the apartment building located at 241 Brookside Avenue were aware of Jackson's habit. (Id. vol. 2, 54, 62; id. vol. 5, 106, 108.)

Jackson was not a violent person. (Id. vol. 2, 70; id. vol. 5, 43-44, 112.) His medical and psychiatric records and the records of the Rhode Island Attorney General's Office reflect no prior involvement with law enforcement and no history of violent behavior. (Id. vol. 5, 34-36; id. vol. 7, 174, Nov. 9, 2011; Exs. 7j, 18.) Indeed, the only reported instances of Jackson acting out or losing his temper were an instance when he saw children throwing rocks and shouted at them to stop and another instance when he became agitated because he believed his mother was driving too fast. (Trial Tr. vol. 5, 43-44.)

B.   The Encounter

On the morning of June 27, 2008, following his usual practice, Jackson drove to his mother's apartment and spent the day there. (Id. vol. 6, 216-17.) As she did from time to time, Jackson's mother gave him permission to spend the night. (Id. vol. 6, 214-15.) Jackson was in his normal, calm, baseline condition when he went outside to Joyal's back parking lot to smoke at approximately 11:00 p.m. that evening. (Id. vol. 4, 68; id. vol. 5, 29-30; id. vol. 6, 215.)

6

Also at approximately 11:00 p.m. that night, a WWPD dispatcher contacted Officers Sean Lukowicz and Patrick Kelley, who were on patrol that evening, and provided them with the following dispatch: "In front of Brookside at West Warwick of Joyal Liquors.  Subjects vandalizing the Joyal Liquor sign." (Ex. 8b.)  Lukowicz and Kelley heard this dispatch.  (Trial Tr. vol. 1, 6, 131, Oct. 31, 2011; id. vol. 2, 76, 79-80.)

When they received the call, Lukowicz and Kelley were in their respective patrol cars.  They were parked in the parking lot of a closed business up the street, having a conversation. (Id. vol. 1, 6; id. vol. 2, 76.)  It was a warm Friday evening, and there were many people out and about on the streets.  (Id. vol. 1, 7; id. vol. 2, 78.)  Joyal's was not located in a high-crime area.  (Id. vol. 7, 197-98.)

Lukowicz and Kelley immediately proceeded in their separate patrol cars to Joyal's.  They were both familiar with the signs located one above the other in front of Joyal's, near the curb on the corner of West Warwick Avenue and Brookside Avenue, each having driven by the signs hundreds of times.  (Id. vol. 1, 8; id. vol. 2, 80; Ex. 50.)  The officers approached Joyal's from the west and were able to see the signs from West Warwick Avenue.  (Trial Tr. vol. 1, 8-9; id. vol. 2, 83-84.)  Kelley pulled his patrol car into the front parking lot at Joyal's, which gave him another vantage point to observe the signs.

Lukowicz pulled his patrol car onto Brookside Avenue, giving him a vantage point to observe the signs from that side. (Id. vol. 2, 84-85.)  Kelley observed the signs and saw no damage.  While Lukowicz testified that he did not recall whether he observed the signs, he did recall that he saw no damage or anything suspicious in the front parking lot. (Id. vol. 1, 9; id. vol. 2, 84-85, 94.)[2]  Joyal's was closed at that time of night. (Id. vol. 1, 14.)

Kelley then drove his patrol car out of the front parking lot of Joyal's onto Brookside Avenue, proceeded a short distance, and pulled into the parking lot behind the store. (Id. vol. 2, 85-86; Ex. 2 at 3.)  That parking lot is illuminated by three large halogen lights such that it is fairly well-lit at night. (Trial Tr. vol. 5, 98; Exs. 51, 52.) Lukowicz followed Kelley to the parking lot and parked to the right of Kelley's patrol car; they both had their headlights illuminating the loading dock at Joyal's. (Trial Tr. vol. 1, 20-22; id. vol. 2, 86.)  Kelley, in particular, was quite familiar with this back parking lot, having patrolled the area and passed through the parking lot regularly for the previous two-and-a-half years. (Id. vol. 1, 14-15.)

---

[2] While the reason for the original call to the police is not clear, the sign was not damaged. (See Stipulation, July 30, 2010, ECF No. 52 ("On June 27, 2008, there was no damage or other vandalism to any signs located at Joyal's Liquor store.")).

Both Kelley and Lukowicz were aware that the parking lot was shared by the occupants and guests of the multi-family home located in the middle of the parking lot at 241 Brookside Avenue, as well as by the customers and staff of Joyal's. (Id. vol. 1, 16; id. vol. 2, 88.)   They were also aware that immediately adjacent to the parking lot behind Joyal's was the apartment building at 88 West Warwick Avenue. (Id. vol. 2, 89.)

When Kelley and Lukowicz pulled into the back parking lot, their headlights illuminated Jackson standing facing them and smoking near one of the loading docks for Joyal's. (Id. vol. 1, 134, 183; Ex. 2 at 3.)   He was standing in the area of the parking lot near his mother's apartment building at 88 West Warwick Avenue.   (See Ex. 53a (marking the spot where Jackson was standing when Kelley and Lukowicz first encountered him).)

As Kelley and Lukowicz observed Jackson, they saw that the loading door was down as it should be, and they saw no damage to the loading docks or anything suspicious in the parking lot or the back of the Joyal's building. (Trial Tr. vol. 1, 28-29; id. vol. 2, 90.)

Lukowicz testified at his deposition that, at the time he first observed Jackson, there was not a reasonable basis to suspect that Jackson had committed, was committing, or was about to commit the crime of vandalism or any other crime because the signs in front of Joyal's did not appear to be damaged and there

9

was no report of any other criminal activity. (Id. vol. 2, 97.)
At trial, he acknowledged that this deposition testimony was
true testimony when he gave it, but he proceeded to provide
contradictory trial testimony. (Id. vol. 2, 96-97.) Lukowicz
also testified that he had no reason to suspect that Jackson had
vandalized any sign. (Id. vol. 2, 96.)

Richard Silva, the Chief of the West Warwick Police
Department,[3] testified at his deposition that he was familiar
with this location and that, in his professional opinion,[4]
neither Lukowicz nor Kelley had a reasonable basis to suspect
that Jackson had committed, was committing, or was about to
commit a crime at the point in time that they first saw him
because they observed no damage to the signs. (Id. vol. 7, 208-
09, 211-12.) Kelley testified that from the first moment he saw
Jackson from his cruiser, Kelley was determined to question him
and, if necessary, physically detain him for questioning. (Id.
vol. 1, 30-31, 208-09.)

---

[3] Chief Silva was a sergeant for the WWPD in June 2008, but
he since has been elevated within the Department to his current
position.

[4] When he was a patrol officer, Chief Silva had patrolled
the area that included this parking lot. (Trial Tr. vol. 7,
193-94.) Moreover, Silva was designated by the Town of West
Warwick to address this issue pursuant to Rule 30(b)(6) of the
Federal Rules of Civil Procedure, and he had familiarized
himself with all of the information bearing on the issue of
reasonable suspicion prior to his deposition. (Id. vol. 7, 199,
221-23.)

When Kelley and Lukowicz saw Jackson illuminated in their headlights, Lukowicz turned on his search light and directed it at Jackson. (Id. vol. 2, 86-87.) Apparently having seen the patrol cars, Jackson immediately turned 180 degrees to his left and started walking away from the officers and toward the opening in the fence on the other side of the parking lot. (Id. vol. 1, 26; id. vol. 2, 98.) Both officers then exited their patrol cars and started walking toward Jackson. (Id. vol. 1, 135; id. vol. 2, 98.)

Testimony about the speed at which Jackson walked away from the officers varied. Both Kelley and Lukowicz, in their interviews with the Rhode Island State Police, which were conducted a few hours after the incident, stated only that Jackson walked away from them; they did not mention that he was walking at any accelerated speed. (Ex. 1 at 5; Ex. 2 at 4.) Kelley testified at trial that Jackson walked at a swift pace but was definitely walking, not running. (Trial Tr. vol. 1, 31.) Lukowicz recalled only that Jackson was walking "not slow, not fast, that he was just walking." (Id. vol. 2, 98.)

When they observed Jackson walking away from them, Kelley and Lukowicz ordered him to stop. (Id. vol. 1, 36, 38; id. vol. 2, 98.) Jackson responded with words to the effect of "you're not the boss of me." (Id. vol. 1, 38.) The officers saw that he had his right hand in his pocket. (Id. vol. 1, 31.)

Lukowicz testified that he did not feel threatened by Jackson having his hand in his pocket. (Id. vol. 2, 106.) Kelley testified that he was not sure why Jackson had his hand in his pocket; he stated, "I wasn't certain if he had a weapon in his pocket or any other type of contraband." (Id. vol. 1, 138.) Lukowicz and Kelley then ordered Jackson to remove his hand from his pocket. (Id. vol. 1, 40; Ex. 1 at 5.) Jackson again responded by stating "you're not the boss of me," and he continued walking away from the officers. (Trial Tr. vol. 1, 40.)

Lukowicz and Kelley acknowledged at trial that they understood Jackson's statement "you're not the boss of me" to be a refusal to follow their commands. (Id. vol. 1, 40; id. vol. 2, 102.) Kelley testified that "you're not the boss of me" was something an average adult would say to him and that Kelley "just assumed he was a non-compliant person." (Id. vol. 2, 5.) The officers testified that they decided to stop Jackson based on the following facts: the dispatch call regarding possible vandalism; the fact that the business was closed; the time of night; and Jackson's response to the officers, i.e., he turned away from them as they pulled into the parking lot, with his hand in his pocket. (Id. vol. 1, 31, 134, 209-10; id. vol. 2, 38, 101.)

12

Kelley then hastened his pace to catch up with Jackson. (Id. vol. 1, 47.) Kelley reached out to take hold of Jackson's right arm, but before he could touch him, Jackson removed his right hand from his pocket and "swatted" or "flailed" his right arm at Kelley. (Id. vol. 1, 49-50, 139; id. vol. 1, 140 ("Mr. Jackson removed his hand from his right pocket and swung his arm in a back-hand motion, swatted his arm towards [Kelley]. Pretty good full arm swat at [Kelley]."); id. vol. 2, 109-10; Ex. 1 at 6; Ex. 2 at 6 ("And he took his hand out of his pocket and he, and he slapped at me and tried to slap me in the way like a backhand.").) Kelley testified that, when he reached out for Jackson, it was his intention to physically restrain him from walking away. (Trial Tr. vol. 1, 49.)[5]

The parties dispute whether Jackson's "swatting" gesture was purely defensive or overtly aggressive and threatening. Kelley demonstrated the gesture at trial in a manner that appeared very aggressive and capable of causing injury to

---

[5] Chief Silva testified at deposition that reasonable suspicion was still lacking when Jackson started walking away and refused to stop, up until the point when Jackson "swatted" his arm in Kelley's direction. (Id. vol. 7, 215-16, 220-21.) At trial, however, Chief Silva testified that, since his deposition, he has changed his opinion regarding reasonable suspicion, based upon further reflection and the fact that, when they confronted Jackson, Kelley and Lukowicz had not conclusively determined that the signs were undamaged. (Id. vol. 7, 220-21; id. vol. 8, 107-08, Nov. 10, 2011.) The Court credits Silva's deposition testimony as representing his and the Town's considered opinion.

Kelley.   Indeed, he testified at trial that he believed the gesture would have injured him if it had landed.  (Id. vol. 1, 57-58.)   However, at his deposition, he testified that it appeared that Jackson was merely attempting to swat his arm away.  (Id. vol. 1, 55, 61.)  Kelley testified at his deposition that the gesture did not cause him fear and that he could not speculate as to whether it would have hurt him.  (Id. vol. 1, 58-59; Kelley Dep. 207-08.)  Kelley stepped back, and Jackson's gesture did not result in any physical contact whatsoever. (Trial Tr. vol. 1, 61-62.)

In light of the circumstances surrounding the swat, the Court finds that Jackson swatted or flailed in a reactionary manner in response to Kelley's attempt to reach out and make contact with him.  The Court further finds that this swat or flail was a defensive reaction, consistent with what any grown, larger male would do if a person was reaching out to make unwanted contact with him and that it was not especially aggressive or violent in nature.  Moreover, it was not an attempt to strike or injure Kelley, but rather a defensive maneuver to prevent Kelley from making contact with him.  In light of the fact that Kelley had just reached out to touch Jackson, the Court also finds that Kelley reasonably should have perceived the flail/swat to be a defensive, rather than an offensive, move on Jackson's part.   The Court finds that

14

Jackson's flail/swat was not made in a threatening manner and would not place a reasonable person in fear of imminent bodily harm.  Likewise, the Court finds that Kelley was not reasonably in fear of being injured and that he would not have been injured if Jackson had made contact with his arm or hand.

Within seconds of Jackson swatting at Kelley, Kelley made the decision to arrest Jackson for assault.  (Id. vol. 1, 62, 144; id. vol. 2, 111.)[6]

C.   The Struggle

After the instantaneous decision to detain him, Kelley, with Lukowicz, immediately moved in and seized Jackson by his shoulders, attempting to put him to the ground using an arm-bar maneuver.[7]  Jackson physically resisted Kelley's and Lukowicz's

---

[6] Lou Reiter, an expert offered by Plaintiff, testified that if Jackson's arm movement was done in the manner that Kelley demonstrated at trial, it "would have been an aggressive move on the part of Mr. Jackson that would have warranted probable cause for resisting arrest, interfering with a police investigation, yes."  (Trial Tr. vol. 3, 63, Nov. 2, 2011.)  He further testified that, "[i]t could be an assault, which is kind of an incomplete battery, sure.  It could be interference."  (Id. vol. 3, 64.)  Reiter testified that, if the swat was done in the manner demonstrated by Kelley at trial, while Jackson was walking away, then the officers had a right to seize him and arrest him for it.  (Id. vol. 3, 64.)  The Court is not bound, of course, by Mr. Reiter's legal opinion, and in any event, the Court believes that Jackson's flail occurred differently (i.e., considerably less aggressively) than it was portrayed at trial by Kelley.

[7] Kelley testified that an arm-bar hold is a maneuver in which an officer puts his or her hands on the suspect to get the suspect to the ground.  (Trial Tr. vol 1, 66.)

efforts to subdue him. (Id. vol. 1, 64-66.) Lukowicz attempted to take control of Jackson's wrist. Jackson was aggressive and fought back vigorously with the officers. He pulled at their uniforms and actively wrestled with them. (Id. vol. 2, 139.) Jackson flailed his arms and kicked at the officers, making contact with one of Kelley's legs. (Id. vol. 1, 144.) While the officers were struggling to put him on the ground, Jackson asked them several times, "why are you doing this to me?" (Id. vol. 1, 67; Ex. 2 at 10-11.)

Despite the officers' efforts to hold him to the ground, Jackson was able to get to his feet. (Trial Tr. vol. 2, 139-40.) Kelley then made the decision to use pepper spray "because we had him on the ground and it appeared as though he was very, very strong. I felt as though that if we sprayed him it might give us an advantage to get him secured and back to the station . . . ." (Id. vol. 1, 146-47.) But Jackson wiped the pepper spray off of his face and the struggle continued. (Id. vol. 1, 69.)

The officers took Jackson to the ground again; Jackson became more combative and violent on this second takedown. He kicked them while he screamed and grunted. (Id. vol. 1, 148.) Jackson wrestled his arms free from the officers' grasp and got up again. (Id. vol. 1, 67-68.) On two occasions, Kelley administered pepper spray directly to Jackson's face. (Id. vol.

16

2, 141-42.)  Kelley and Lukowicz each struck Jackson's legs with their batons on at least two occasions.  (Ex. 1 at 14-15; Ex. 2 at 17.)

Jackson was brought to the ground a third time, and as Kelley and Lukowicz secured handcuffs on Jackson, a third officer, Officer Thomas Nye, arrived.  Thomas Nye held one of Jackson's arms to enable him to be fully handcuffed.  (Trial Tr. vol. 8, 172-73.)  At that point, two more officers, Officers Michael Nye [8] and Marcus Palazzo, arrived; a total of five officers were in the back parking lot at Joyal's around Jackson, who was handcuffed and kneeling.  (Id. vol. 1, 72-73; id. vol. 9, 5-6, Nov. 14, 2011.)  Kelley and Lukowicz had minor injuries (e.g., scratches and abrasions) from the struggle.  (Id. vol. 1, 160-61; id. vol. 2, 145.)

One witness, who overheard the altercation from her window, testified that Jackson on several occasions said to the officers "I love you guys" or words to that effect.  (Id. vol. 2, 52.)  Several officers also testified that Jackson said words to the effect of "I love you guys" during the altercation.  (Id. vol. 1, 73; id. vol. 4, 203-04; Ex. 1 at 17; Ex. 2 at 18.)

The officers pulled Jackson to his feet and attempted to walk him over to a patrol car, but Jackson would not or could

---

[8] Because Officers Michael Nye and Thomas Nye share the same surname, the Court refers to them by their full names, as to foreclose the possibility of any confusion.

not stand up.  (Trial Tr. vol. 1, 73; id. vol. 4, 183; Ex. 1 at 18; Ex. 2 at 19.)   Lukowicz and Kelley then physically placed him in the back of Lukowicz's cruiser and laid him across the back seat.  (Trial Tr. vol. 4, 143-45; Ex. 1 at 18-19.)

At trial, Dr. Pinals testified that Jackson's resistance and statements to the officers prior to and during the altercation were consistent with his normal limitations, lack of understanding, and consequent severe fright.  (Trial Tr. vol. 5, 31, 33-34, 37-39.)   Dr. Pinals has extensive experience with schizophrenic patients both in psychiatric hospitals and in the community and testified that individuals such as Jackson sometimes become frightened and strongly resist restraint even by several persons in situations that they do not understand and with which they are unfamiliar.  (Id. vol. 5, 5-6, 79-81.) Defendants offered no opposing expert testimony on this issue except the testimony of their expert, Charles Wetli, M.D., a forensic pathologist, who suggested that Jackson acted abnormally during the altercation but acknowledged that he was not qualified to opine whether this behavior was consistent with Jackson's normal limitations and level of functioning under the stress of the situation.  (Id. vol. 7, 175-77, 179-183.)   The Court accepts Dr. Pinals's testimony on this issue.   From Jackson's perspective, he was alone, quietly smoking in a very familiar and customary location next to his mother's apartment

at 11:00 p.m. when two patrol cars pulled into the parking lot with their headlights and a spotlight on him, and two uniformed and armed police officers walked toward him.  That situation was inherently frightening for an individual with Jackson's limitations.

D.  The Trip to the Police Station

Lukowicz and the other officers departed from the parking lot at Joyal's to drive to the stationhouse of the West Warwick Police Department.  Lukowicz's vehicle contained only Lukowicz and Jackson.  (Id. vol. 1, 73, 157; id. vol. 2, 112.)

Chief Silva testified at trial that, since at least December 2006 and perhaps as early as 2000, the West Warwick Police Department provided literature to its officers directing them to be vigilant for four categories of warning signs that indicate that suspects may be at risk for sudden, in-custody death.[9]  (Id. vol. 8, 145-46, 148-49; Ex. 15.)  Each of these four categories of indicators was present during the officers' altercation with Jackson.  (Trial Tr. vol. 8, 150-51.) Moreover, since 2001, a written general order of the West Warwick Police Department also instructed officers to be

---

[9] The four categories of warning signs are: (1) bizarre behaviors; (2) bizarre communications; (3) physical symptoms including hyperthermia, profuse sweating, seizures, foaming at the mouth, dilated pupils, uncontrollable shaking, inability to breath, and extraordinary strength; and (4) several officers are required during the encounter.  (Ex. 15.)

vigilant that individuals who had been pepper sprayed were at risk of positional asphyxia and, if possible, to transport them in an upright position to reduce that risk. (Id. vol. 4, 171-73; Ex. 4f.) Transporting officers were trained that, if the prisoner was not upright, they were required to monitor him to make sure that he was still breathing and did not lose consciousness. (Trial Tr. vol. 4, 178-79.)

The trip from the parking lot at Joyal's to the West Warwick Police Station is less than one mile, and it took the officers about one minute. (Id. vol. 1, 158; id. vol. 2, 112; id. vol. 8, 176.) When Jackson was initially placed in Lukowicz's back seat and Lukowicz started the drive to the station, Lukowicz heard noises from the back seat, indicating that Jackson was moving around and making sounds. (Id. vol. 2, 113.) When they were approximately halfway up Brookside Avenue, however, all sound from the back seat ceased. (Id. vol. 2, 146; id. vol. 4, 155.) Although Lukowicz acknowledged that Jackson had stopped making any noise, he did not notice that Jackson had become unresponsive during the ride to the police station. (Id. vol. 4, 143.) Lukowicz could not see Jackson because of the way he had been placed in the back seat. (Id. vol. 4, 143-44.)

The Court accepts the opinion of Plaintiff's expert, Kevin Brown, M.D., a Board-certified emergency medicine doctor, with which Defendants' expert Dr. Wetli agreed, that Jackson probably

stopped breathing en route to the station, based on Lukowicz's testimony as to when all sounds of movement or other noises stopped while he was transporting Jackson.  (Id. vol. 4, 93; id. vol. 7, 73-74.)  Given the testimony of the officers that the trip at that time of night took them approximately one minute, the Court finds that Jackson suffered a sudden cardiac arrest thirty seconds prior to his arrival at the station.

While they were en route to the station, Kelley radioed ahead and told the dispatcher to notify the officer in command that he was returning to the station with a "very large EDP," meaning emotionally disturbed person, and to ask the officer in command to meet them downstairs at the station.[10]  (Id. vol. 2, 118; Ex. 8b at 5.)

E.    The Back Lot

When Lukowicz arrived at the police station, he exited his patrol car without checking on Jackson in the back seat.  (Trial Tr. vol. 4, 130; Ex. 1 at 21.)  The WWPD standing orders at that

---

[10] Kelley testified that, to his knowledge, "EDP" means "emotionally depressed person."  (Trial Tr. vol. 2, 42-44 (emphasis added).)  However, Kelley's fellow officers all understand "EDP" to mean "emotionally disturbed person," and it is clear to the Court that that is what it is commonly understood to denote.  (See id. vol. 2, 118-19; id. vol. 4, 164; id. vol. 8, 167.)  Kelley's misstatement is revealing in that it may reflect a lack of real understanding as to the risks attendant to an EDP, a topic he and other officers were trained about in their academy.  (See id. vol. 2, 45, 118; id. vol. 4, 203.)  As more thoroughly discussed below, this apparent lack of awareness and understanding is arguably at the heart of the officers' misguided decision making.

time required the officer in command at the station, together
with the arresting officer, to assess the condition of an
intoxicated or mentally impaired arrestee upon arrival at the
station. (Ex. 4e at 3.) Sergeant Scott Thornton was the
officer in command at the station that night. (Ex. 85 at 10.)
Thornton testified that he did not assess Jackson upon his
arrival at the station. (Id. at 23-24, 39.) Instead, Thornton
waited at the stationhouse door and initially relied upon
Kelley's description of Jackson as "completely out of control."
(Ex. 3 at 6.) Thornton testified that he did not evaluate
Jackson immediately because he was not aware at the time of this
general order, though he acknowledged that he had read it
before. (Ex. 85 at 34, 38, 43-44.) Thornton had been promoted
from patrolman to sergeant about one month prior to this
incident and had been acting in that supervisory capacity for
approximately two weeks. (Id. at 30-31.) As members of the
WWPD, the officers were required to be familiar with and follow
all general orders. (Ex. 4c.)

The arrival of Kelley and Lukowicz at the WWPD stationhouse
is depicted in a video that was recorded by a camera posted on
the back door of the stationhouse; the camera is routinely
recording. (See Ex. 12.) [11]   The video is critical to

---

[11] For ease of reading, the Court refers to the "time after
arrival" throughout this decision. The Court finds that the

establishing many of the facts concerning what occurred outside of the stationhouse that night.

The video depicts Kelley, six seconds after arrival (00:06), getting out of his patrol car and glancing in the rear, passenger-side window of Lukowicz's vehicle. (Trial Tr. vol. 1, 88-90, 197; Ex. 12.) Kelley testified at trial, and informed the State Police shortly after Jackson's death in the early morning hours of June 28, 2008, that when he looked through the window, he observed that Jackson was not moving or making any noise. (Trial Tr. vol. 1, 88-90, 195-98; id. vol. 2, 12; Ex. 2 at 23.) He testified that Jackson appeared to be unconscious. (Trial Tr. vol. 1, 90.) However, Kelley did not open the doors to the patrol car to assess Jackson. (Ex. 12.) Instead, Kelley and Lukowicz went into the stationhouse to secure their service weapons. (Ex. 1 at 21-22; Ex. 2 at 24.) Kelley testified that they put their weapons away because Jackson was "so combative on scene." (Trial Tr. vol. 1, 165.) At the time, the standing orders of the West Warwick Police Department required officers to secure their firearms in the locked box inside the station prior to removing combative prisoners from their vehicles. (Ex. 4e.) Officer Lukowicz testified that he secured his firearm

_____

patrol cars arrived in the back parking lot at 23:10:30 on the back lot video timer, which the Court pins to the time of 0:00 from arrival. The video recording that was admitted into evidence at trial also has a time stamp reflecting the "time after arrival." (See Ex. 12.)

inside the station before attending to Jackson due to this policy. (Trial Tr. vol. 4, 138-39.)

The officers then returned to the vehicle, with other officers accompanying them, at 00:44 after arrival. (Ex. 12.) At approximately 00:53 after arrival, Thomas Nye opened the rear, driver-side door and Kelley opened the rear, passenger-side door of the vehicle transporting Jackson. (Ex. 1 at 22; Ex. 2 at 25; Ex. 12.) Thomas Nye ordered Jackson to get up, to which there was no response, at approximately 00:56 after arrival. (Trial Tr. vol. 8, 191; Ex. 12.)

On the video, the officers appear to be further assessing Jackson from 01:00 to 01:11. (Ex. 12.) When they opened the door, Kelley and Thomas Nye leaned into the back seat, while Lukowicz leaned into the driver's seat to retrieve his flashlight. (Trial Tr. vol. 2, 151.)

Lukowicz used his flashlight to check on Jackson at 01:20 after arrival. (Ex. 12.) Between 01:27 and 01:43, the video depicts officers leaning into the patrol car from either side of the vehicle. (Ex. 12.) Kelley shook Jackson's legs, and Lukowicz shook Jackson's head and shoulders. (Trial Tr. vol. 1, 105; Ex. 1 at 22; Ex. 2 at 25.) They both called out to Jackson. (Trial Tr. vol. 1, 105; Ex. 2 at 25.)

At trial and during his formal questioning by the Rhode Island State Police immediately after the incident, Kelley

stated that when they determined that Jackson was unresponsive in the back seat of Lukowicz's patrol car, he saw Lukowicz check Jackson's neck for a pulse and Lukowicz informed Kelley there was no pulse. (Id. vol. 1, 105-07; Ex. 2 at 25.)  At trial, Lukowicz did not recall whether he checked Jackson's pulse at this time. (Trial Tr. vol. 2, 125.)  The Court credits Kelley's statement to the Rhode Island State Police.

The parties dispute when the officers first contacted the police department dispatcher to request rescue, and when the fire department dispatcher, in turn, contacted fire department personnel.  There are timed audio recordings of the exchanges between the police officers and the police department dispatcher, and a separate timed audio recording of the exchanges between the fire department dispatcher and fire department personnel.  (See Ex. U; Ex. V.)  The video of the back lot, as discussed above, also has a timer.  However, the timers on these three recordings are not synchronized.  Moreover, the WWPD dispatcher has a dedicated line to the dispatcher for the West Warwick Fire Department ("WWFD") that is not recorded by either the police department or the fire department.  (Trial Tr. vol. 9, 48.)  Accordingly, there is no recording, timed or otherwise, of the exchanges between the police department dispatcher and the fire department dispatcher.

The parties stipulated that the police dispatcher contacted the fire dispatcher immediately after the officers attending to Jackson contacted the dispatcher and informed the fire dispatcher of what the officers at the scene were reporting. (See Stipulation, Dec. 1, 2011, ECF No. 137.)  The fire dispatcher testified that his custom and practice was to immediately dispatch calls and that he was not aware of anything that interfered with that here.  (Trial Tr. vol. 9, 82-84.) However, as the synchronized times demonstrate (and irrespective of the parties' stipulation), the Court has determined that there was a lag by one or both of the dispatchers in relaying the pertinent information.

After considering all of the testimony on the subject and scrutinizing Plaintiff's and Defendants' proposed chronologies, the Court concludes that the video and the two audio recordings must be synchronized as follows and finds the following facts with respect to the timing of events as revealed by the recordings.  The reader may be guided by referring to the appendix at the end of this decision, which sets forth a timeline of selected key events.

The video depicts Officer Kelley beginning chest compressions on Jackson at 23:14:50 on the video timer, which is 04:20 after the officers arrived at the station with Jackson. (Ex. 12.)  Officer Kelley performed chest compressions for three

26

seconds, at which point WWFD Private Cahoon[12] appears on the video screen, checking Jackson's pulse at 23:14:54, which is 04:24 after arrival.  (Trial Tr. vol. 6, 172; Ex. 12.)  Private Cahoon and Lieutenant Croft both testified that when they saw the officer doing chest compressions, Cahoon called the fire department dispatcher and said "Engine 1 to rescue.  It appears to be a code."  (Trial Tr. vol. 6, 190; id. vol. 9, 101.) Cahoon's call is recorded on the fire department audio recordings as occurring from 1:54 to 1:57 on the fire department audio timer.  (Ex. V.)  Based on this testimony, the visual depiction of Kelley performing chest compressions (23:14:50 to 23:14:53 on the video timer) and the audio recording of Cahoon telling rescue dispatch that it appeared to be a code (1:54 to 1:57 on the fire department audio timer) occurred simultaneously, between 04:20 and 04:23 after arrival.  This serves as a common point of reference to correlate earlier events depicted on the video with events recorded on the audio of the fire department dispatcher.

The events on the video can also be correlated to the audio recording of the West Warwick Police Department dispatch calls that evening.  On the video, it is clear that Palazzo speaks

---

[12]  WWFD Private Cahoon and Lieutenant Croft responded to this call on foot because the fire station and the police station are part of one large facility with the West Warwick Town Hall standing between the two.  (Trial Tr. vol. 5, 117.)

into the radio on his lapel at 02:22 after arrival. As explained below, the only conclusion consistent with both the substance of the calls and the testimony at trial is that Palazzo was in the midst of the second call he made to the police dispatcher about Jackson, which occurred at 23:14:53 on the WWPD audio timer.

Palazzo testified that he made the initial call for rescue on Thornton's order. (Trial Tr. vol. 4, 179-80.) Palazzo and Thornton were standing inside the stationhouse near the gun lockers when Thornton told Palazzo to call the dispatcher and have rescue respond to the back lot. (Id. vol. 4, 186; Ex. 3 at 7-8; Ex. 85 at 46.) The amount of time that elapsed between the time Jackson arrived at the West Warwick Police Station and the time that Palazzo first called the police dispatcher requesting medical assistance was one minute and fourteen seconds. Palazzo's first transmission was "seventy-five to headquarters." Palazzo next asked the police department dispatcher, "Can you start another rescue downstairs for this male?" (Ex. 8b at 6.)[13] Over the next seventeen seconds, the police dispatcher contacted the fire department dispatcher with this information, the fire department dispatcher asked the police dispatcher for the reason

---

[13] The reference to "another" rescue was because the police had asked rescue to send an ambulance for another person, who was intoxicated, shortly before calling rescue for Jackson. (Trial Tr. vol. 5, 125.)

rescue was needed, and the police dispatcher conveyed that inquiry to Palazzo. (Id.) Palazzo responded: "Possible . . . minor injuries and intoxicated male, unconscious male."[14] (Trial Tr. vol. 4, 187.) Palazzo was still inside the stationhouse during this transmission. (Id. vol. 4, 188.) The entire call between Palazzo and the police dispatcher took thirty-four seconds. (Ex. U.)

The fire dispatcher and engine company personnel testified that a call to respond to an intoxicated and passed-out or unconscious individual behind the police station was a routine call, which would require no particular urgency, in response to which an ambulance would transport the individual to the local hospital for detoxification. (Trial Tr. vol. 5, 125; id. vol. 9, 66-67, 76.) Captain Alfred Peterson, a member of the North Providence Fire Department and Plaintiff's expert, agreed that from the point of view of rescue personnel, there was no difference between being told that a subject was intoxicated and unconscious and being told that he was intoxicated and passed-out. (Id. vol. 8, 69-70.) Accordingly, the initial dispatch from the fire dispatcher was directed solely to rescue (the ambulance), which was out on another call at the time. (Id. vol. 6, 160.)

---

[14] At trial, Kelley and Palazzo denied that Jackson smelled of alcohol. (Trial Tr. vol. 2, 7; id. vol. 4, 204.) Lab work on autopsy showed no alcohol in his system. (Ex. 5.)

Back outside in the back lot of the station, at 01:51 after arrival, Thornton ordered Jackson's removal from the vehicle. (Ex. 12.)  It took the officers eight seconds to remove Jackson from the cruiser (from 01:55 to 02:03 after arrival), and he was placed on the ground, initially in a sitting position leaning against the patrol car.  (Id.)  From the first moment he is visible on the video, it is obvious that Jackson was unconscious.  (Id.)

Palazzo walked outside after his initial transmissions and arrived just as the other officers were pulling Jackson from the rear of the vehicle.  (Trial Tr. vol. 4, 188.)  Palazzo appears on the video screen at approximately 01:46 after arrival and shortly thereafter assists the other officers in removing Jackson from the cruiser.  (Ex. 12.)  As noted above, the video depicts Palazzo speaking into the radio clipped to his collar lapel 02:22 after arrival.  (Id.)  Palazzo testified that this depicts him contacting the police dispatcher concerning Jackson. (Trial Tr. vol. 4, 181-82.)[15]

---

[15]    The Court rejects Plaintiff's proffered sequence of events, which has Palazzo saying, "Possible . . . minor injuries and intoxicated male, unconscious male" at 02:22.  If this were true, then, once the three recordings are synchronized, under Plaintiff's theory, the fire dispatcher would have expedited rescue at 02:55 after arrival, which was before the time at which Plaintiff contends that Palazzo told the police dispatcher that rescue needed to "step it up," at 03:03.  Plaintiff ignores this anachronism, urging that it is not plausible that the police and fire dispatchers took so long to relay their

30

Palazzo radioed to dispatch: "Seventy-five can you have rescue step it up." (Id. vol. 4, 191.) This call occurred at 02:22 after arrival, or approximately one minute and eight seconds after Palazzo's initial call to rescue. It was not until then that the fire department engine company personnel, who were in the fire station, had reason to think that there was a potentially life-threatening emergency occurring in the parking lot behind the West Warwick Police Station. (Id. vol. 5, 129-30; id. vol. 6, 162.)

The video further depicts Kelley attempting to take Jackson's pulse at 02:32 after arrival; the officers rolling Jackson onto his side at 03:16 after arrival; the officers removing Jackson's handcuffs at 03:21 after arrival; and the officers again rolling Jackson onto his back 03:48 after arrival. (Ex. 12.)

---

messages. However, the audio tapes demonstrate that there must have been such a delay in dispatch; the fire dispatcher's initial transmission occurred at approximately 02:39 after arrival, whereas his second transmission, directing rescue to expedite, occurred only sixteen seconds later, at 02:55. In the interim, the ringing of a telephone can be heard in the background of the recording (at 02:44 after arrival), which is, presumably, the police dispatcher calling on the dedicated line between the two dispatchers. Compare Palazzo's request for rescue, which began at 01:19 ("Can you start another rescue downstairs for this male [?]"), and his request to "step it up" one minute and three seconds later, at 02:22 after arrival. The only thing that could possibly account for the disparity in the time between transmissions is a delay in dispatching by either the police or fire department dispatcher or, perhaps, both.

The video lacks audio recording. However, it clearly depicts Kelley, Lukowicz, Thornton, Palazzo, Thomas Nye, and Michael Nye speaking among themselves as they circle around Jackson or stand over him. (Ex. 12.) In addition, the video depicts that, at one point (03:48 after arrival), Michael Nye appears on screen holding a barrier mask, which is used in giving mouth-to-mouth resuscitation. (Trial Tr. vol. 4, 189; Ex. 12.) During the next thirty-two seconds on the video, Michael Nye holds the mask, then squats down next to Jackson with the mask in hand, and then stands up and walks around, before Kelley starts chest compressions. (Ex. 12.) Michael Nye testified that he was waiting for instruction. (Trial Tr. vol. 9, 20.)

Both from what is depicted on the video and from common understanding of such urgent circumstances, it is obvious that Defendants and the other officers were discussing whether to perform cardiopulmonary resuscitation ("CPR") over the seconds and minutes leading up to Kelley's perfunctory administration of chest compressions just as he saw rescue arrive. Nevertheless, Kelley, Lukowicz, Palazzo, Michael Nye, and Thomas Nye all testified at trial that that they could not recall any discussion, comments, or statements by anyone regarding when or whether CPR should be performed or by whom, up until the moment immediately before Kelley actually started CPR. (Id. vol. 2,

32

21-22; id. vol. 4, 197; id. vol. 8, 202-04; id. vol. 9, 39.)
Thornton did testify that, "obviously, we're talking amongst
ourselves while we're trying to get Mark Jackson out of the
vehicle." (Ex. 85 at 20.)

The Court finds this collective lack of recollection not
credible and that it reflects a probable "code of silence" as to
what the officers were discussing.[16]  These Defendants and their
fellow officers had little difficulty recalling other events and
statements that tended to support Defendants' position.  Failing
to recall even the general nature of any conversation or
discussion (let alone the specifics) regarding CPR where the
video clearly shows they were talking and exchanging a barrier
mask, under circumstances that begged for a discussion of that
topic, is simply not believable.  These officers' collective
failure to recall the conversations that were obviously taking
place on this subject supports the inference that such
discussions would have shown that Defendants were, at that
point, considering whether they should administer CPR.

At approximately 04:20 after arrival at the station, Kelley
made the first attempt by any officer to perform CPR on Jackson.

---

[16] This Court has listened to dozens, if not hundreds, of
law enforcement officers give detailed testimony recalling
conversations in the context of civil and criminal proceedings.
This is the first time in the Court's experience that virtually
every officer has a complete and total lack of recall of a
critical conversation that lasted over several minutes.

(Ex. 12.)  That attempt consisted of five or six quick chest compressions over a period of approximately three seconds, at which point fire department personnel took over.  (Id.)  Kelley saw the fire department personnel arriving before he started chest compressions.  (Trial Tr. vol. 1, 176.)  It appears from the timing of Kelley's action, and the Court so finds, that Kelley was motivated to perform CPR by guilty recognition that he, or one of the other officers, should be seen performing CPR when fire department personnel arrived.

WWFD firefighters Lieutenant Croft and Private Cahoon arrived on scene 04:20 after arrival; because of the angle of the camera, however, Private Cahoon does not appear on the video until 04:24 after arrival.  (Id. vol. 9, 101; Ex. 12.) Lieutenant Croft took over chest compressions, and Private Cahoon set up an automatic external defibrillator ("AED"), which was activated at 05:28 after Jackson's arrival at the station. (Trial Tr. vol. 9, 97; Ex. 12.)  The engine company was on the scene with the AED approximately two minutes after Palazzo's call to expedite and activated the AED within another minute. At that point, however, the device registered that Jackson's heart had no shockable rhythm, meaning that his heart rhythm was asystole.  (Trial Tr. vol. 5, 132; id. vol. 6, 163; Ex. 12.)

Jackson was transported to the hospital by ambulance. During the trip, the paramedics attempted to resuscitate him.

(Ex. 88.)  Their efforts briefly took his heart from asystole into ventricular fibrillation, but the AED could not shock his heart into normal rhythm, and he quickly lapsed back into asystole.  (Ex. 88.)  Jackson arrived at the emergency department at 11:41 p.m., according to hospital records; this was approximately thirty minutes after Jackson and the officers arrived by car in the back lot.  (Ex. 89.)  Records further reflect that Jackson was pronounced dead at the hospital at 11:44 p.m.  (Id.)  His death certificate states 11:44 p.m. as the "hour of death."  (Ex. 87.)

For the benefit of the discussion and analysis found infra at Part II (Conclusions of Law), the Court makes the following findings regarding what reasonable officers in Thornton's, Lukowicz's, and Kelley's positions would have done in the circumstances presented, correlated to the timing sequence depicted above.

The Court finds that reasonable officers in Kelley and Lukowicz's position would have hurriedly secured their guns[17] in the stationhouse; returned to Lukowicz's patrol car with Thornton; and assessed Jackson within 01:00 of arrival.

---

[17] Of course, every situation is different, and one could reasonably argue that in this situation the officers would have been reasonable in disregarding the general order to secure their weapons having observed Jackson in distress and knowing his high risk status.  On this point, the Court gives the benefit of the doubt to the officers, however, as qualified immunity so dictates.

Moreover, within this same time period, a reasonable officer in Thornton's position would have approached Jackson and assessed him independently, not merely relied upon the other officers' representations.[18]   The video confirms that this is more than a reasonable amount of time to accomplish these tasks, although (as the video further confirms) these actions ideally would have occurred even more quickly in light of the gravity of Jackson's situation and the knowledge the officers had about Jackson's high risk for cardiac arrest.   Within about fourteen seconds of that time, and corresponding to Palazzo's first call to rescue at 01:14 after arrival, reasonable officers trained in CPR would have called rescue with a message to respond expeditiously, because they had a detainee who was blue and pulseless, and they would have begun taking steps to remove Jackson from the vehicle in order to perform CPR themselves.   Within the seconds leading up to 01:14, Thornton, if he was acting like a reasonable and

---

[18]   WWPD General Order GO 97-24, in place at the time of these events, provides that, "upon arrival at headquarters, the OIC [officer in command] will assess the persons [sic] condition in conjunction with the arresting officer."  (Ex. 4e at 3.)   The general order further directs the arresting officer to secure his or her duty weapon prior to removing the arrestee from the police vehicle.   (Id.)   Once the arrestee is removed from the vehicle, the officers are charged with assessing the arrestee's mental capacity.   (Id.)

   The Court does not suggest that the fact that this general order was in place automatically triggers a duty of constitutional dimension on behalf of the officers to follow the order.   However, this general order does provide the Court with some guidance as to how reasonable officers would behave when found in circumstances addressed by the order.

competent officer, would have both ordered an officer to start
CPR (or prepared to administer it himself) and called rescue to
convey the seriousness of the situation.   With respect to the
call to rescue, Palazzo did make his first call to rescue at
01:14, on Thornton's order; however, the failure of Thornton,
Lukowicz, and Kelley to competently assess Jackson and
communicate to Palazzo the gravity of the situation prevented
Palazzo from communicating to rescue at 01:14 that Jackson was
not breathing and unconscious, but that this was not due to
intoxication.

     From there, reasonable officers would have ensured that
Jackson was out of the car and CPR was started by 01:45.   On the
video, it is clear that thirty seconds is a reasonable amount of
time in which this could have occurred.[19]   This reasonable
timeline eliminates the twenty seconds of inaction the officers
wasted before removing Jackson from the patrol car.

     To this, Defendants argue that

> [t]he evidence adduced at trial shows that Defendants,
> while still unaware that Mr. Jackson was under any
> sort of distress, summoned medical aid.   Once
> Defendants became aware that Mr. Jackson's condition
> was serious, they instantly took steps to expedite
> medical assistance.   And when they realized that Mr.

---

[19]   This is generous to the officers.   The video reflects
that it took the officers about twelve seconds to remove Jackson
from the patrol car.   While they also removed his handcuffs,
this was clearly pointless, because the video reveals that
Jackson's hands remained under the trunk of his body for the
duration of the administration of CPR.

> Jackson's condition was perilous, they themselves rendered, first-hand, what medical treatment they could.

(Defs.' Post Trial Mem. 56-57, ECF No. 152.) But the video speaks for itself and belies this generous rendition. The video reflects that over the four minutes and twenty seconds that Jackson was unconscious, appeared blue, and was without a pulse in the rear parking lot of the West Warwick Police Station before rescue arrived, Kelley, Lukowicz, and the other officers on scene acted without urgency or focus. (Ex. 12.) Although they took various actions such as removing Jackson from the cruiser, eventually placing Jackson on his back, later turning him over to remove his handcuffs, and turning him again onto his back, none of these actions addressed Jackson's fundamental, and obvious, need for CPR and AED.

As discussed in more detail below, see infra Part II.E.3.a, had these officers acted reasonably, CPR would have started 01:45 after arrival (or 02:15 after Jackson suffered cardiac arrest); this accounts for a proper call to rescue at 01:14 to respond expeditiously and the application of the AED at 04:20 after arrival (or 04:50 after he suffered cardiac arrest). Moreover, the evidence adduced at trial, as outlined below, demonstrates that it is more likely than not that Jackson's life would have been prolonged if he had received a shock from the AED at 04:20 after arrival.

F.   CPR Training

Kelley, Lukowicz, and Thornton were each trained and certified at the Rhode Island Municipal Police Academy in first aid, including CPR, under the HeartSaver Program of the American Heart Association, and they were recertified six months prior to the incident, in December 2007.  (Trial Tr. vol. 1, 78-80; id. vol. 2, 120-21; Exs. 13, 14, 20, 23, 24, 25, 27.)   Their training taught them how to promptly assess an individual to determine if that individual needed CPR and the necessity of and technique for promptly beginning CPR if CPR was needed.  (Trial Tr. vol. 1, 86-87; id. vol. 2, 10, 122-23, 128; id. vol. 4, 141-42, 154.)   The General Orders of the West Warwick Police Department state that, "[t]he West Warwick Police Department recognizes the fact that when CPR and defibrillation are administered to a person who had been stricken with cardiac arrest during the early stages of the attack, the survival rate of the victim greatly increases."  (Ex. 4g at 1.)   Accordingly, WWPD's written policy was "to train its police officers in CPR and the proper use of AEDs . . . ."  (Id.)

The Department did not have AED equipment on June 27, 2008, and there were no defibrillators in the cruisers used by the officers involved.  (Trial Tr. vol. 1, 175-76.)   Lukowicz acknowledged at trial that he and Kelley, at all times, had the right to commence CPR on Jackson if they felt that it was

necessary, notwithstanding that the officer in command, Thornton, was present at the scene. (Id. vol. 4, 209.) Moreover, both Kelley and Lukowicz admitted that they understood that they were obligated to provide CPR if Jackson needed it. (Trial Tr. vol. 1, 121; id. vol. 2, 129-30.) They acknowledged that CPR should be started as soon as possible once it is clear that a person in custody needs it. (Id. vol. 1, 87; id. vol. 4, 141-42.) Lukowicz also testified, at his deposition and again at trial when he was called as an adverse witness, that there was "no reason" why he did not perform CPR on Jackson. (Id. vol. 2, 130.) In response to his counsel's question on cross-examination at trial, however, Lukowicz inconsistently testified that he did not commence CPR because he knew that rescue had been called. (Id. vol. 4, 130.) But, he also testified that he did not know who called rescue or when rescue was called. (Id. vol. 4, 142.)

At trial, Kelley testified that the reason he did not perform CPR prior to when he did was that he feared Jackson was feigning unconsciousness and was still combative, he was not sure if it was needed, and he believed it would not take rescue long to arrive because they were nearby (approximately one hundred feet away). (Id. vol. 1, 121, 170-74, 206.) This is inconsistent with Kelley's trial testimony that he and Lukowicz had determined that Jackson was unresponsive and pulseless in

the back seat of the patrol car.  (Id. vol. 1, 105.)  Kelley acknowledged that he knew the absence of a pulse meant the heart was not circulating blood.  (Id. vol. 2, 45.)  Moreover, in his formal questioning by the State Police immediately after the incident, Kelley stated that, upon the determination in the back seat that Jackson was unresponsive and pulseless, Jackson was promptly removed from the vehicle, his handcuffs were taken off, and CPR was started. (Ex. 2 at 25-26.)  During that interview, Kelley did not mention any delay or fear that Jackson was feigning unconsciousness.  (See generally id.)

    It was only after Kelley viewed the video, which shows a substantial delay in starting CPR, that he sought to explain this delay by contending it was due to fear that Jackson was feigning unconsciousness.  The Court rejects Kelley's claim that he believed Jackson was feigning and was still combative even after he and Lukowicz determined that Jackson was unresponsive and pulseless in the back seat of the cruiser.  Accordingly, the Court rejects Kelley's trial testimony explaining why he delayed in performing CPR.

G.   The Cause of Jackson's Death

1.   Excited Delirium

Defendants contend that Jackson died from "excited delirium syndrome," rather than from sudden cardiac arrest due to primary cardiac disease.   Plaintiff's experts, Peter Gillespie, M.D., the Assistant Medical Examiner who performed the autopsy and issued the initial Autopsy Report and Death Certificate for Jackson, and Dr. Brown both testified that the cause of death was sudden cardiac arrest due to primary cardiac disease, not excited delirium syndrome.   This dispute goes directly to the issue of whether the officers' failure to render emergency assistance in a timely fashion was a proximate cause of Jackson's death.

Excited delirium syndrome has at least two diagnostic criteria:   a high level of agitation and delirium consisting of an altered state of consciousness.   (Trial Tr. vol. 6, 57; id. vol. 7, 172-73.)   Dr. Pinals testified that excited delirium syndrome involves an altered state of consciousness and agitation over a period ranging from hours to days, which, in this case, would necessarily precede the involvement of the police.   (Id. vol. 5, 29.)   Jackson, although clearly agitated during the altercation with the police, was not agitated before they arrived.   To the contrary, he was merely smoking a cigarette in accordance with his usual routine on a day when he

42

appeared to be functioning within his normal limits.   Jackson
also did not have an altered state of consciousness before the
altercation with police.   Moreover, once the altercation began,
Jackson started walking away from the police toward his mother's
apartment, indicating that he was oriented to time and space.
(Id. vol. 7, 179.)   He questioned Lukowicz and Kelley "why are
you guys doing this to me," which indicates that he was not
delirious.   (Id. vol. 6, 70.)   Dr. Pinals opined that Jackson's
behavior that night was normal for a chronic schizophrenic with
Jackson's limitations; Dr. Wetli testified that he was not an
expert on schizophrenia and could not form an opinion on the
matter.   (Id. vol. 5, 31-32, 37-39; id. vol. 7, 175, 177.)   The
Court accepts Dr. Pinals's opinion that Jackson was not
delirious either prior to or during the altercation with the
police.   (Id. vol. 5, 31-32.)

     Dr. Wetli testified that excited delirium syndrome can
arise instantly in response to police involvement and that it
did so in this case.   (Id. vol. 7, 143, 155.)   However, all of
the published literature admitted into evidence at trial,
including several articles Dr. Wetli authored or co-authored,
involved cases where the agitated behavior preceded police
involvement.   (Id. vol. 7, 144, 150; Exs. 76-78.)   The Court
rejects Dr. Wetli's testimony that excited delirium syndrome
arose instantly in the circumstances of this case, or that

Jackson's behavior during the altercation with police tends to prove he had excited delirium syndrome.

Dr. Wetli further testified that death by excited delirium syndrome does not create any findings discernible upon autopsy. (Trial Tr. vol. 7, 22.)  Instead, the pathological diagnosis is based primarily upon accounts of the decedent's behavior. (Id. vol. 7, 22-23.)  Dr. Gillespie testified that excited delirium syndrome as a cause of death can only be used as a diagnosis of exclusion, meaning that it can only be made if there are no positive signs at autopsy of conditions sufficient to cause death independent of excited delirium syndrome. (Id. vol. 6, 29-30, 40.)  An excerpt from a treatise by Vincent DiMaio, M.D., on excited delirium syndrome also expresses this opinion, and Dr. Wetli agreed that Dr. DiMaio is an expert on this subject. (Ex. 65; Trial Tr. vol. 7, 97.)  If this opinion is correct, then it is highly likely that Jackson's cause of death was sudden cardiac arrest from primary cardiac disease, and excited delirium syndrome should be ruled out as the cause of death, because the autopsy was positive for sudden cardiac arrest due to primary cardiac disease.

Dr. Wetli testified to the contrary, however, stating that he disagreed "100%" with the contention that excited delirium syndrome is a diagnosis of exclusion. (Trial Tr. vol. 7, 90.) He claimed never to have used the term "diagnosis of exclusion."

44

(Id. vol. 7, 96.)   However, during cross-examination, Dr. Wetli admitted that on several occasions in other cases in which he testified in defense of police officers, he testified that the diagnosis of death by excited delirium syndrome requires a negative autopsy.  (Id. vol. 7, 110, 115, 118.)   In these cases, he testified that a negative autopsy was one of the diagnostic criteria for diagnosing excited delirium syndrome as a cause of death.   (Id. vol. 7, 118.)   The Court rejects Dr. Wetli's testimony that excited delirium syndrome is not a diagnosis of exclusion and concludes that it is a diagnosis of exclusion; here, death from sudden cardiac arrest due to primary cardiac disease has not been excluded, and therefore, the diagnostic criteria for excited delirium are not present.[20]

For the reasons above and those that follow, the Court finds that Jackson died of sudden cardiac arrest due to primary cardiac disease and that he did not experience excited delirium syndrome.  The Court does not find that Jackson necessarily died when Plaintiff suggests, i.e., at the time of death indicated in the emergency room records and the death certificate.  However,

---

[20]   It is worth further noting that death from excited delirium syndrome is very rare compared to death from sudden cardiac arrest due to primary cardiac disease.  (Trial Tr. vol. 7, 60.)  The statistics offered at trial on this issue reported that, in 2004, the constellation of signs and symptoms associated with excited delirium syndrome were associated with approximately one hundred deaths in custody over a twelve-month period in the United States.  (Id. vol. 7, 57-59; Ex. 63.)

the Court does conclude that the ambulance run report establishes that Jackson was alive in the ambulance because his heart briefly went into ventricular fibrillation on the way to the hospital. (Ex. 88.)

## 2. Sudden Cardiac Arrest

The testimony at trial was that there are, on average, several hundred thousand deaths per year in the United States due to sudden cardiac death from primary cardiac disease. (Trial Tr. vol. 4, 61.) Dr. Wetli agreed that Jackson was at a greatly elevated risk for sudden cardiac death due to his cardiac abnormalities. (Id. vol. 7, 63-67.) He also agreed that the altercation with the police was sufficient to precipitate such a death. (Id. vol. 7, 66.) Nevertheless, Dr. Wetli concluded that Jackson died from excited delirium syndrome rather than sudden cardiac arrest due to primary cardiac disease. Dr. Wetli's Rule 26 report and his testimony before this Court at a pre-trial Daubert hearing was that this opinion was based in large part upon his conclusion that Jackson's initial rhythm after his sudden cardiac arrest was asystole rather than the ventricular fibrillation that is usually involved in sudden cardiac death from primary cardiac disease. (Id. vol. 7, 72.) For example, Dr. Wetli's report stated his opinion that the scenario involving Jackson had "all of the ingredients for a sudden unexpected cardiac death" except for

46

the fact that "the expected heart rhythm for a sudden cardiac death is ventricular fibrillation, not asystole as seen in this case." (Id. vol. 7, 62-63, 69.)

However, Dr. Wetli issued his report before he saw the video. (Id. vol. 7, 74.)  At trial, Dr. Wetli conceded during cross-examination that the absence of any shockable rhythm at the time the AED was activated showed "nothing" with respect to Jackson's initial presenting rhythm, because that occurred more than six minutes after Jackson's cardiac arrest.  Therefore, even if Jackson's heart rhythm initially had been ventricular fibrillation, that rhythm would have deteriorated to asystole by the time the AED was activated six minutes later. (Id. vol. 7, 127.)  The Court accepts Dr. Wetli's testimony upon cross-examination and the testimony of Plaintiff's experts that the absence of a shockable rhythm when the AED was activated in this case is not a conclusive indicator of Jackson's initial heart rhythm when he suffered the cardiac arrest, and it does not tend to rule out sudden cardiac arrest due to primary cardiac disease as the cause of death.

Dr. Gillespie testified that Jackson died from sudden cardiac arrest due to cardiac ischemia, precipitated by the altercation with the police. (Id. vol. 6, 23.)  The report was also signed by the Medical Examiner, Charles Gilson, M.D., on behalf of Dr. Gillespie (who had left the Medical Examiner's

47

Office by the time the report was issued), and the report, according to Dr. Gillespie, therefore represents the opinion[21] of Dr. Gilson as well. (Id. vol. 6, 22-23; Ex. 5.)

The autopsy and supporting records show several cardiac abnormalities, including an enlarged heart, a seventy-five percent stenosed coronary artery, and focal fibrosis to the ventricle, which all experts agreed increased Jackson's chances of ischemia and cardiac arrest if he physically exerted himself. (Trial Tr. vol. 4, 55-56; id. vol. 6, 25-27; id. vol. 7, 62-65; Ex. 5.) In addition, Jackson smoked tobacco products and was overweight, both of which increased the risk of sudden cardiac arrest, especially upon exertion. (Id. vol. 4, 56.)

Dr. Gillespie and Dr. Brown both testified that if Jackson had not been in an altercation with the police, he would not have died. (Id. vol. 4, 57; id. vol. 6, 34-35.) They explained that such physical exertion placed demands upon the heart that Jackson's heart was unable to withstand. (Id. vol. 4, 55-56; id. vol. 6, 33.) While Dr. Wetli did not go that far, he agreed that the altercation was sufficient to provoke a sudden cardiac arrest in Jackson. (Id. vol. 7, 66.) The Court finds that Jackson's physical altercation with the police was a substantial contributing factor of his suffering a sudden cardiac arrest.

---

[21] That opinion was set forth in the autopsy report before Dr. Gillespie was contacted and asked to serve as an expert in this case. (Trial Tr. vol. 6, 31; Ex. 5.)

H.    The Life-Saving Potential of AED and CPR

Expert testimony was presented at trial on the critical issue of what impact, if any, earlier deployment of CPR and AED would have had on the likelihood that Jackson would have survived.[22] Much of this testimony, however, struck the Court as overly general and vague. Moreover, as discussed below, very little, if any, information was provided to place the expert testimony into a meaningful context.

Plaintiff's expert, Dr. Brown, testified that if the AED had been activated within a "five minute window" after Jackson stopped breathing, it is more likely than not that Jackson would have survived his cardiac arrest. (Id. vol. 4, 52-54.) Because thirty seconds elapsed between Jackson's cardiac arrest and his arrival at the station, that window must be curtailed to 04:30 after arrival at the station. Plaintiff's experts Dr. Brown and

---

[22]    As noted above, Defendants' excited delirium syndrome hypothesis goes to this issue. Defendants argue that any delay in calling rescue or providing CPR is irrelevant because neither it nor the AED would have been effective against sudden cardiac arrest due to excited delirium syndrome. Dr. Wetli testified that both CPR and the AED would have been ineffective to resuscitate Jackson, or, if it had been effective, Jackson would have survived only three to five days in the hospital. (Id. vol. 7, 25-26, 29-30, 36.) According to Dr. Wetli, if a person experiences excited delirium and becomes unconscious and loses vital signs, even if there are paramedics on the scene and the person is resuscitated immediately, the person will generally die within three to five days in the hospital as a result of multiple organ failure. (Id. vol. 7, 26.) Because the Court rejects the excited delirium syndrome theory, this testimony is inapposite to the analysis here.

Captain Alfred Peterson agreed that Jackson's chance of survival if the AED was activated during the first five minutes was greater than fifty percent.[23]   (Id. vol. 4, 52-54; id. vol. 8, 86.)   They each further testified that prompt administration of CPR increases the window of time within which AED is effective. (Id. vol. 4, 107; id. vol. 8, 84-85.)   Captain Peterson testified that, thus, if Defendants had promptly begun CPR, this window would have been "dramatically" expanded beyond five minutes.   (Id. vol. 8, 94-95.)   This testimony was based upon the assumption that Jackson's heart rhythm went into ventricular fibrillation, which Plaintiff's experts and Defendants' expert all agreed is the usual course for sudden cardiac arrest due to primary cardiac disease. (Id. vol. 4, 104-05; id. vol. 6, 35;

---

[23] The Court is troubled by the fact that readily available data suggests that Jackson had a lower chance of survival to hospital discharge than that presented at trial.  See, e.g., Amy L. Valderrama, Ph.D., Centers for Disease Control and Prevention, Out-of-Hospital Cardiac Arrest Surveillance — Cardiac Arrest Registry to Enhance Survival (CARES), United States, October 1, 2005 — December 31, 2010 (July 29, 2011), available at http://www.cdc.gov/mmwr/preview/mmwrhtml/ ss6008a1.htm (last visited Aug. 10, 2012).   Such evidence suggests that 44.5% of people who suffer cardiac arrest witnessed by a 911 responder with an initial rhythm of ventricular fibrillation survive to discharge and 58.3% survive to hospital admission.  (Id. fig.9 at 3.)   That being said, of cardiac arrest victims whose cardiac arrest is witnessed by a 911 responder with any initial heart rhythm, 18.6% survive to discharge and 38.5% survive to admission to the hospital.  These data, clearly readily available and apparently reliable, were not introduced into the record and the Court may not rely on it. And while it is not necessarily outcome changing, for the reasons explained below, it likely would have assisted the Court on this critical issue.

id. vol. 7, 69.)  Dr. Brown testified that Jackson's heart was probably in ventricular fibrillation and "shockable" for that five-minute period.  (Id. vol. 4, 123.)  Dr. Wetli offered no opinion concerning Jackson's prognosis if he experienced sudden cardiac arrest rather than excited delirium syndrome, other than the opinion in his Rule 26 report that if Jackson "were in v-fib or ventricular fibrillation, the AED would have delivered essentially life-saving electrical shock . . . ."  (Id. vol. 7, 71.)  While Dr. Wetli did not agree that Jackson experienced sudden cardiac arrest due to primary cardiac disease, Dr. Wetli did not take issue with Plaintiff's experts' testimony regarding the five-minute window if indeed primary cardiac disease was the cause of his sudden cardiac arrest.  Indeed, he acknowledged that Dr. Brown's testimony that after sudden cardiac arrest the heart usually goes from ventricular fibrillation to asystole after five minutes "sounds reasonable."  (Id. vol. 7, 89-90.)

Dr. Brown could not say whether Jackson would have survived to hospital discharge nor what his quality of life would have been like had he survived.  (Id. vol. 4, 84.)

At trial, Dr. Brown testified that his opinion concerning the five-minute window was based upon data that estimates the times within which administration of an AED restores normal heart rhythm and ensures survival in patients with sudden cardiac arrest due to primary cardiac disease, at least to

discharge from the hospital, although the source of this data is not entirely clear to the Court. (Id. vol. 4, 108.) Captain Peterson agreed that the data was based on restoring normal heart rhythm and survival through discharge from the hospital. (Id. vol. 8, 94.) No evidence was offered by either side concerning Jackson's prognosis after discharge from the hospital.

I.   Injuries Sustained by Jackson

In connection with the autopsy, Dr. Gillespie prepared body diagrams identifying all of the cuts, bruises, abrasions, or other signs of trauma on Jackson's body from the altercation with the police. (Id. vol. 6, 72-74; Exs. 28, 29.) In addition, numerous autopsy photos show multiple areas of bruising and abrasions. (Exs. 31-47.) These diagrams and photographs identify areas of injury all over Jackson's body, including his head, hands, arms, legs, feet, chest, and back, that Jackson sustained during the altercation. (Exs. 28, 29, 31-47.) The Court finds that these injuries were caused by Jackson's altercation with Kelley and Lukowicz.

In addition to the physical injuries and physical pain and suffering he sustained, Jackson was frightened and traumatized from the outset of the altercation with Kelley and Lukowicz, including the period of time when he was handcuffed and handled

52

by the officers, up until he ultimately lost consciousness in the back seat of Lukowicz's patrol car en route to the station.

II.  Conclusions of Law

    A.  Are the Officers Entitled to Qualified Immunity for Any Fourth Amendment Violation?

Qualified immunity insulates defendant-officers from "liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010) (quoting Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 526 (1st Cir. 2009)). In deciding whether qualified immunity is appropriate, "[a] court must decide: (1) whether the facts alleged or shown by the Plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Estrada, 594 F.3d at 62-63 (quoting Maldonado v. Fontánes, 568 F.3d 263, 269 (1st Cir. 2009)). The second prong requires "that both (1) the legal contours of the right in question and (2) the particular factual violation in question would have been clear to a reasonable official." Lopera v. Town of Coventry, 640 F.3d 388, 396 (1st Cir. 2011). "Together, these two factors ask whether a reasonable officer, similarly situated, would have believed that his conduct did not violate

the Constitution." Id.  For a right to be clearly established, there does not need to be "a case directly on point, but existing precedent must have placed the . . . constitutional question beyond debate." Glik v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011) (quoting Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011)).  The inquiry focuses on "whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional." Id. (quoting Maldonado, 568 F.3d at 269).  This is an objective test.  Lopera, 640 F.3d at 396.  Moreover, "[i]f an officer is found to be deserving of qualified immunity under federal law, he will also be granted qualified immunity for the same claim under Rhode Island law." Estrada, 594 F.3d at 63.  The Court addresses Plaintiff's constitutional claims in turn.

1.  Were Jackson's Fourth Amendment Rights Violated?

Pursuant to 42 U.S.C. § 1983, Plaintiff alleges that Jackson was unlawfully seized in violation of his Fourth Amendment rights.  Plaintiff also asserts a related state law claim of assault and battery.

For purposes of the Fourth Amendment, the officers first seized Jackson when Kelley executed an arm-bar hold on him.  See California v. Hodari D., 499 U.S. 621, 626 (1991) (holding that a "seizure," for purposes of the Fourth Amendment, has occurred when there has been either application of physical force or

54

submission to authority and that police pursuit alone does not constitute a seizure). Defendants argue that this seizure was lawful for four reasons: (1) the events leading up to Jackson's detention, excluding Jackson's flail, provided the officers with reasonable suspicion to detain him; (2) once Jackson flailed at the officers, they had reasonable suspicion to detain him; (3) Jackson's flail provided the officers with probable cause to arrest him for assault; and (4) the struggle that ensued once Jackson was seized gave the officers probable cause to arrest. Emphasizing the pre-seizure actions of the officers, Plaintiff argues that the officers had neither reasonable suspicion nor probable cause to justify their seizure of Jackson.

a. Did the Officers have Reasonable Suspicion to Detain Jackson?

Law enforcement officers may detain an individual for questioning on the basis that they have a "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" Klaucke v. Daly, 595 F.3d 20, 24 (1st Cir. 2010) (quoting Schubert v. City of Springfield, 589 F.3d 496, 501 (1st Cir. 2009)). A two-part inquiry is employed in the First Circuit to evaluate the reasonableness of such an investigatory stop. The Court must assess first, "whether the officer's action was justified at its inception," and second, "whether the action taken was reasonably related in scope to the

circumstances which justified the interference in the first place." Foley v. Kiely, 602 F.3d 28, 32 (1st Cir. 2010). The first step requires that there was "a particularized and objective basis for suspecting the person stopped of criminal activity." Id. (quoting United States v. Wright, 582 F.3d 199, 205 (1st Cir. 2009)) (citations and quotations omitted). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch' linking an individual to criminal activity." United States v. Woodrum, 202 F.3d 1, 6-7 (1st Cir. 2000) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). Accordingly, "some of the facts on which the officer relies must be particular, that is, specific to the individual." Id.

In undertaking this inquiry, the Court evaluates "the objective significance of the particular facts under all the circumstances," id. (citing Reid v. Georgia, 448 U.S. 438, 441 (1980) (per curiam)), thereby evaluating what a reasonable officer in the defendant-officer's position would have concluded. United States v. Espinoza, 490 F.3d 41, 47 (1st Cir. 2007). While the reasonable-suspicion inquiry is an objective one, "inferences made by police officers based on their 'experience and expertise'" should be afforded "due weight." Wright, 582 F.3d at 207 (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). Accordingly, a court affords deference

to "the experienced perceptions of the officers." Woodrum, 202 F.3d at 7 (citing Ornelas, 517 U.S. at 699-700).

In assessing whether there was reasonable suspicion to detain Jackson, the Court must consider the "totality of the circumstances," including the events leading up to the seizure. See Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 22 (1st Cir. 2005) ("The rule in this circuit is that once it is clear that a seizure has occurred, the court should examine the actions of the government officials leading up to the seizure." (citing St. Hilaire v. City of Laconia, 71 F.3d 20, 26 (1st Cir. 1995)); see also St. Hilaire, 71 F.3d at 26 n.4 (noting that, "once it is established that there has been a seizure," courts may consider the facts leading up to the seizure (emphasis omitted)).

The following facts were known to the officers leading up to the point at which Kelley reached for Jackson:  there was a report that subjects (plural) were vandalizing the Joyal's sign; the officers did not observe damage on the sign; it was 11 p.m. on a summer night in a mixed-use residential/commercial area; Jackson was alone in the parking lot behind a closed store, smoking a cigarette; Jackson turned away upon seeing the officers; Jackson had his right hand in his pocket; Jackson walked toward a hole in the fence, which led to a wooded area

and an apartment complex; and Jackson stated "you're not the boss of me" in response to commands to stop walking away.

On these facts, there was no particularized basis on which to ground reasonable suspicion. While, at best, the officers would have been reasonable in concluding that Jackson generally looked suspicious or was behaving oddly, there was no particularized suspicion "grounded in specific and articulable facts" connecting him to any criminal activity. See Schubert, 589 F.3d at 501 (quoting Espinoza, 490 F.3d at 47). Other than his physical proximity to the reportedly-vandalized sign, there was no reason for the officers to believe that Jackson had participated in the reported vandalism, or any other offense. Indeed, not only was the sign not actually vandalized, but Jackson did not fit the description of the suspected vandals. Cf. United States v. Pontoo, 666 F.3d 20, 28-29 (1st Cir. 2011) (finding reasonable suspicion where the suspect fit the description of a murder suspect in the area).

It may be true that most adults would stop and talk to police officers when approached, but it is firmly established that a person has the right to walk away from police questioning.[24]  See Illinois v. Wardlow, 528 U.S. 119, 125 (2000)

---

[24] The Court is aware that it may be that what would be perceived as normal behavior created an expectation by these officers (who were not very experienced) that Jackson should have stopped when told to do so; but police officers are trained

("[A] refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991) (recognizing that a suspect's refusal to submit to police questioning, without more, is not sufficient to furnish grounds for reasonable suspicion). If the right to walk away is to mean anything, it must mean that a person may walk away from law enforcement officers when the officers have initiated verbal contact and otherwise lack reasonable suspicion or probable cause to detain him or her, and that walking away cannot alone support a finding of reasonable suspicion. <u>See</u> <u>United States v. Fuentes</u>, 105 F.3d 487, 490 (9th Cir. 1997) ("People do not have to voluntarily give up their privacy or freedom of movement, on pain of justifying forcible deprivations of those same liberties if they refuse."); <u>see also</u> <u>United States v. Beauchamp</u>, 659 F.3d 560, 570-71 (6th Cir. 2011) ("The fifth fact -- hurriedly walking away from an officer without making eye contact -- similarly does not rise to the level of independent suspicion. . . . In those cases in which we have found that walking away from police does contribute to reasonable suspicion, specific facts have shown that the defendant's

to deal not only with the common and expected, but the uncommon and abnormal. Thus, this expectation of a lay person can give no cover to a properly trained law enforcement officer; and the failure of an officer to accept this principle is a failure of training or deliberate disregard of it.

behavior was otherwise suspicious."). Walking away from police questioning, of course, must be distinguished from evading the police; as the First Circuit has explained, "unprovoked running upon noticing the police" constitutes flight, which is "the consummate act of evasion," Wright, 582 F.3d at 210 (quoting Wardlow, 528 U.S. at 124) (internal quotation marks omitted)), and may "permit a rational inference of guilt." United States v. Harris, 660 F.3d 47, 52 (1st Cir. 2011).[25] But the cases highlighting evasive behavior in the reasonable-suspicion analysis generally concern suspects who "slouch, crouch" or who engage in "other arguably evasive movement" that, combined "with other factors particular to the defendant," amount to reasonable suspicion. Woodrum, 202 F.3d at 7.

Here, Jackson was not evasive, and the articulable and particularized facts were not sufficient to amount to reasonable suspicion when the officers first approached him. Jackson did not bolt or flee from the scene; he communicated to the officers clearly and directly that he did not wish to speak with them by

---

[25] Plaintiff argues vigorously that a court may not consider the act of walking away in the reasonable-suspicion calculus. However, the Court does not need to reach this issue because it concludes that the officers did not have reasonable suspicion to detain Jackson even when his walking away is considered. Implicit in this determination, perhaps, is that, in light of a person's right to walk away, walking away from officers at a regular pace is not all that suspicious in the absence of other factors that might make it so, and therefore, it does not add much to the reasonable-suspicion calculus.

stating "You're not the boss of me;" he made no furtive movements; and there was no testimony suggesting that he appeared nervous or apprehensive. In sum, prior to the flail, all of the typical indicia of suspicious behavior were missing. Though Jackson did ignore commands to remove his hand from his pocket, in the whole, Jackson defiantly, but directly, exercised his right to walk away from the officers; he did not objectively appear elusive or evasive.

Moreover, while the officers' subjective thoughts are not dispositive in this objective inquiry, it is telling that both Chief Silva and Officer Lukowicz testified during their respective depositions that there was no reasonable basis to suspect that Jackson had committed, was committing, or was about to commit the crime of vandalism or any other crime, when the officers first approached Jackson. (Trial Tr. vol. 2, 97; id. vol. 7, 215-16, 220-21.)

Even adding the "flail" to the mix, there was no reasonable suspicion to detain Jackson. When Kelley reached out to grab Jackson, he defensively flailed at the officers in a clear attempt to intercept Kelley's unlawful seizure. Particularized suspicion did not attach here as Jackson clearly expressed his desire to decline to respond to police questioning and reacted by flailing or swatting his arm to prevent the officer from effecting what clearly would have been an illegal contact with

61

his person.  Cf. 4 Wayne R. LaFave, Search and Seizure § 9.5(f),
at 531 (4th ed. 2004) (stating that, though police pursuit prior
to seizure "is not subject to Fourth Amendment limits . . .
[s]urely it does not follow that such provocative activity [by
the police] may be deemed to provide the reasonable suspicion
police will need once they catch up with the suspect and take
control of him").

In sum, the Court concludes Kelley and Lukowicz did not
have "a particularized and objective basis for suspecting
[Jackson] of criminal activity," either prior to Jackson's
flail, or after Jackson flailed in reaction to Kelley's attempt
to make contact.  It is further worth noting that, even if the
officers' stop was justified by reasonable suspicion at the
outset, the officers could not succeed on the second prong of
the reasonable suspicion analysis; the arm-bar hold employed by
Kelley was not "related in scope to the circumstances which
justified the interference in the first place." Foley, 602 F.3d
at 32.  It is doubtful that an officer approaching the suspect
of a completed misdemeanor (let alone one that appeared not to
have taken place), which suspect is not believed to be armed or
dangerous and who exhibited signs of emotional disturbance,

would ever be justified in applying an arm-bar hold to effect a temporary detention.[26]

> ### b.   Did the Officers have Probable Cause to Arrest Jackson?

Under the Fourth Amendment, probable cause is necessary to justify an arrest.   Glik, 655 F.3d at 85.   An officer has probable cause to arrest where, at the time of the arrest, the "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."   Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979)).   This is an objective test, and the circumstances should be viewed through the eyes of "a reasonable person in the position of the officer."   Holder, 585 F.3d at 504.

Defendants contend that the officers had probable cause to arrest Jackson for assault and resisting arrest and, therefore, that the seizure was justified.   Defendants first argue that the officers had probable cause to arrest Jackson for assault.   The

---

[26] Moreover, because the Court concludes that Jackson was unlawfully seized and, accordingly, that his Fourth Amendment rights were violated, it does not need to reach Plaintiff's arguments that Defendants violated Jackson's rights before seizing him by (1) ordering him to stop without reasonable suspicion, and (2) attempting to unlawfully seize him.   (See Pl.'s Proposed Findings of Fact and Conclusions of Law 48, ECF No. 154.)

parties disagree over the definition of assault under Rhode Island law, and indeed, the controlling definition is not crystal clear. The Rhode Island Supreme Court has varyingly defined criminal assault as "a physical act of a threatening nature or an offer of corporal injury which puts an individual in reasonable fear of imminent bodily harm," State v. Cardona, 969 A.2d 667, 673 (R.I. 2009) (internal quotations and citations omitted); "an apparent attempt to inflict a battery, or bodily contact, or harm upon another," State v. Boudreau, 322 A.2d 626, 628 (R.I. 1974); and "an unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness," State v. Coningford, 901 A.2d 623, 630 (R.I. 2006) (quoting State v. Pope, 414 A.2d 781, 788 (R.I. 1980)). The latter two definitions are advanced by Defendants. In a decision on a motion for summary judgment in this case issued last year, this Court adopted the Rhode Island Supreme Court's formulation as set forth in Cardona because it was "the most recent statement by the Rhode Island Supreme Court on the issue." Petro v. Town of West Warwick ex rel. Moore, 770 F. Supp. 2d 475, 480 n.10 (D.R.I. 2011). Here, the Court concludes that, under any of the three definitions, Defendants did not have probable cause to arrest Jackson for assault.

In the context of the events that took place leading up to Jackson's flail/swat, a reasonable officer in Kelley's position

would not have been placed in reasonable fear of imminent bodily harm by Jackson's arm movement.  Kelley and Lukowicz ordered Jackson to stop walking, to which Jackson clearly and directly expressed his unwillingness to do so.  Kelley then reached out to grab a hold of Jackson.  Jackson plainly swatted at Kelley in a defensive manner in order to avoid physical contact.[27]  (See Trial Tr. vol. 1, 55, 61.)

The result is no different under Defendants' preferred definitions of assault; under any of these three definitions, assault requires that the act in question be an apparent or an actual attempt to physically harm another.  Jackson's defensive movement was not "an apparent attempt to inflict a battery, or bodily contact, or harm upon another," Boudreau, 322 A.2d at 628, nor "an unlawful attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness," Coningford, 901 A.2d at 630 (internal citation and quotation marks omitted).  The Court concludes that, from the

---

[27] Plaintiff asks the Court to consider Jackson's peaceable character and his reputation for being peaceable in determining whether Kelley's demonstration at trial (which was quite aggressive) or during his deposition (which suggested a defensive movement) was the more accurate portrayal of Jackson's flail/swat.  The evidence does reflect that it would have been out of character for Jackson to attempt to injure another person in the absence of provocation.  However, regardless of whether the Court considers Jackson's peaceable character, the Court has concluded that Jackson's flail was a defensive swat in response to Kelley's attempt to grab a hold of him, making evidence of his character immaterial.

standpoint of a reasonable officer in Lukowicz's or Kelley's shoes, it was clear that Jackson had no intent of inflicting harm or "corporal hurt" on Kelley.  Indeed, Jackson was plainly trying to avoid making physical contact of any kind with the officers.  Jackson's swat was an attempt to protect himself from unwanted touching by a police officer, not an attempt to harm, or even to make contact with, the officer.  Accordingly, the Court concludes that the officers did not have probable cause to arrest Jackson for assault.

Defendants argue, in the alternative, that there was probable cause to arrest Jackson for resisting arrest when Jackson took "a full arm swing at the officer when [Kelley] attempted to touch Mr. Jackson . . . ." (Defs.' Post Trial Mem. 29, ECF No. 152.)[28]  Plaintiff does not dispute that Jackson's struggle with the officers would have provided probable cause to arrest Jackson for the distinct crime of resisting arrest. However, where the parties part company is on the issue of

---

[28] Defendants' position appears to be grounded, at least in part, on Plaintiff's expert, Lou Reiter's testimony to the effect that, if Jackson had swung at the officers in the manner demonstrated by Kelley at trial, the officers would have had probable cause to arrest Jackson for resisting arrest or interfering with a police investigation. (See Trial Tr. vol. 3, 63.)  Defendants also argue that the flail/swat gave rise to probable cause to arrest for "other criminal charges." Defendants do not specify what "other criminal charges" for which there may have been probable cause under Rhode Island law, and so the Court does not attempt to speculate as to what offenses Defendants may refer.

whether this new, distinct crime (and the probable cause that it creates) cures any liability for the initial unlawful seizure by the officers.

The Rhode Island statute criminalizing resisting arrest provides that: "It shall be unlawful for any person to use force or any weapon in resisting a legal or an illegal arrest by a peace officer, if the person has reasonable ground to believe that he or she is being arrested and that the arrest is being made by a peace officer." R.I. Gen. Laws § 12-7-10(a).

Defendants' arguments with respect to resisting arrest are unpersuasive. Under Rhode Island law, a person cannot resist an arrest unless he or she "has reasonable ground to believe that he or she is being arrested." Id. Thus, at the point of Jackson's flail, there could be no probable cause for resisting arrest because there was no reasonable ground upon which Jackson could have believed the officers were attempting to arrest him. At the earliest, Jackson would have believed he was under arrest once Kelley placed him in the arm-bar hold. Accordingly, Jackson could not have resisted arrest, and the officers could not have had probable cause to arrest Jackson for resisting arrest, when Jackson flailed his arm.

Defendants next argue that the officers had probable cause to arrest Jackson for resisting arrest because, "regardless of the legality of the initial stop and attempted seizure[,] . . .

67

the intervening act by Mr. Jackson of striking and kicking the officers was a new and distinct crime thus supplying the probable cause necessary to support the arrest," and accordingly, that Jackson's Fourth Amendment right to be free from unlawful seizure was not violated.

A defendant's resistance to an unlawful arrest provides probable cause for a second, lawful arrest for resisting the initial, unlawful arrest. United States v. Camacho, 661 F.3d 718, 730 (1st Cir. 2011). Moreover, in the criminal context, courts do not suppress evidence that is uncovered incident to a second, lawful arrest just because it follows after an initial, unlawful arrest. See United States v. Schmidt, 403 F.3d 1009, 1016 (8th Cir. 2005); United States v. Bailey, 691 F.2d 1009, 1015 (11th Cir. 1982).

Although the officers had probable cause to arrest Jackson upon his resisting, they are still liable for the precipitating Fourth Amendment violation. The Court finds that officers maintain liability for an initial unlawful seizure, regardless of whether an arrestee commits a crime thereafter that provides probable cause for a new and distinct crime. See Green v. Missouri, 734 F. Supp. 2d 814, 836 (E.D. Mo. 2010) (explaining that there must exist probable cause at the time of arrest for the arrest to be lawful and that it is irrelevant whether the officers later developed probable cause on the basis of the

68

suspect's resisting arrest). In support of their argument, Defendants cite several rulings on motions to suppress in criminal prosecutions that apply the attenuation exception to the exclusionary rule. See generally Schmidt, 403 F.3d 1009; Bailey, 691 F.2d 1009. These cases are clearly inapposite to § 1983 claims; the policy behind their reasoning hews closely to that justifying the exclusionary rule, that is, whether exclusion of evidence would achieve the goal of deterring police conduct violative of a suspect's constitutional rights. See Davis v. United States, 131 S. Ct. 2419, 2426-27 (2011) (stating that the "sole function" of the exclusionary rule is "to deter future Fourth Amendment violations").

Indeed, if Defendants prevailed on this point, the rule would encourage police misconduct, while having no effect (positive or negative) on the investigation and prosecution of crime. Whenever an unlawfully-seized suspect put up a modest fight, the officer would be effectively immunized for his or her initial unlawful seizure. While the law prohibiting resistance to unlawful arrests makes good sense for safety's sake, adopting Defendants' view does nothing to further safety and provides unjustified (and unprecedented) impunity to defendant-officers.

Accordingly, the Court concludes that Jackson was unlawfully seized without reasonable suspicion or probable cause and that his Fourth Amendment right to be free from unlawful

seizure was therefore violated.   Plaintiff also prevails on her claim for assault and battery because, for the same reasons, Jackson was detained without legal justification.   <u>Proffit v. Ricci</u>, 463 A.2d 514, 517 (R.I. 1983).

### 2.   Was Jackson's Fourth Amendment Right Clearly Established?

The Court must next determine whether the right to be free from seizure under these facts was "clearly established" when the officers seized Jackson.   <u>Estrada</u>, 594 F.3d at 62-63 (quoting <u>Maldonado</u>, 568 F.3d at 269).   The right to be free from an investigatory stop in the absence of reasonable suspicion, to be free from arrest in the absence of probable cause, and to walk away from police questioning each had been long clearly established at the time of the incident.   <u>See generally</u> <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) (holding that an investigatory stop requires reasonable suspicion); <u>Bostick</u>, 501 U.S. 429 (stating that a refusal to speak to police, without more, does not create reasonable suspicion); <u>DeFillippo</u>, 443 U.S. 31 (holding that an arrest requires probable cause).

While Defendants strain to highlight several other cases, arguing their factual similarities to the instant case, any reasonable police officer in Kelley's or Lukowicz's position would have understood his or her conduct to violate Jackson's rights.   In each of the cases in which a court found the

officers had reasonable suspicion, the suspect appeared nervous,
acted evasively, made movements consistent with hiding a gun,
bore a resemblance to a murder suspect, or a combination of
these.  See, e.g., Woodrum, 202 F.3d at 7 (attaching weight, in
dicta, to the fact that the suspect slouched to avoid detection
by law enforcement officers); Pontoo, 666 F.3d at 28-29 (finding
reasonable suspicion where the suspect fit the description of a
murder suspect in the area).  In short, no reasonable officer in
Kelley's or Lukowicz's position would have believed he or she
had "a particularized and objective basis for suspecting
[Jackson] of criminal activity."  Id. (quoting United States v.
Cortez, 449 U.S 411, 417-18 (1981)).  Although officers'
subjective opinions on the matter are not dispositive in this
objective inquiry, Chief Silva's and Officer Lukowicz's
testimony at their depositions that they did not believe there
was reasonable suspicion further illuminates what the beliefs of
reasonable officers in those circumstances would be.

With respect to probable cause, Defendants are correct that
a number of definitions for assault exist under current Rhode
Island law.  However, Defendants still find themselves at a loss
because the murkiness of the law cannot shield them where their
conduct was plainly unjustified under any definition of the
offense.  As discussed above, the law of Rhode Island is clear
that assault requires that the act in question be sufficiently

71

threatening so as to put a reasonable officer in Kelley's position in reasonable fear of imminent bodily harm.  See Cardona, 969 A.2d at 673; Coningford, 901 A.2d at 630; Boudreau, 322 A.2d at 627-28.

Officers undertaking the type of aggressive investigatory tactics used here must be prepared to handle appropriately the reactions of citizens who wish to be left alone.  That is, if an officer does not allow a citizen to proceed on his or her way when commanded to stop without justification, the officer may not later argue fear of imminent harm from that citizen's defensive, reactionary gestures.  This conclusion is further supported by Kelley's testimony that he was not subjectively in fear of imminent bodily harm from Jackson's arm movement. (Trial Tr. vol. 1, 58-59.)

Accordingly, the Court concludes that Kelley and Lukowicz are not entitled to qualified immunity on Plaintiff's claims alleging a violation of Jackson's Fourth Amendment rights and her attendant state law claims of assault and battery.

B.   Are the Officers Entitled to Qualified Immunity for Any Excessive Force Employed?

It is well settled that the "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham v. Connor, 490 U.S. 386, 396 (1989).  However,

where an officer uses greater than reasonable force during an arrest or investigatory stop, the Fourth Amendment is implicated. Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010) (citing Graham, 490 U.S. at 394-95). To determine whether force was reasonable under the circumstances, a court should consider "three non-exclusive factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." Raiche, 623 F.3d at 36 (quoting Graham, 490 U.S. at 396).

Plaintiff asserts that she only presses her claim for excessive force if the Court concludes that Defendants had grounds to temporarily detain Jackson, but did not have probable cause to arrest him. Defendants do not appear to argue that the officers would have been justified in using an arm-bar hold to effectuate his temporary detention. In light of the conclusion in the preceding discussions of reasonable suspicion and probable cause, the Court does not need to reach Plaintiff's claim for excessive force because the Court has concluded that Defendants did not have grounds to temporarily detain Jackson.

In an argument closely aligned to her excessive force argument, Plaintiff also argues that Jackson was justified in self-defense when he struggled with the officers. However, once

73

the arm-bar hold was executed, Jackson had reason to believe that he was under arrest, and he should have complied with that arrest.  See R.I. Gen. Laws § 12-7-10(a) ("It shall be unlawful for any person to use force or any weapon in resisting a legal or an illegal arrest by a peace officer, if the person has reasonable ground to believe that he or she is being arrested and that the arrest is being made by a peace officer.").  Instead, Jackson struggled to free himself from the officers' grip.

Under Rhode Island law, a person must submit to the authority of a police officer so long as that officer employs reasonable force.  State v. Botelho, 459 A.2d 947, 950 (R.I. 1983).  Where an officer employs excessive force, a citizen has the right to defend himself or herself against that force.  Id.; see also State v. Ramsdell, 285 A.2d 399, 404 (R.I. 1971) ("The abolition of the common-law right to resist an unlawful arrest, therefore, is in no way related to the citizen's right to protect himself from the excessive force of what might be described as an overzealous police officer.").  But, "[i]f a citizen protects himself with a force which is greater than necessary, he forfeits his right to self-defense and may be convicted of a simple assault pursuant to § 11-5-3." Ramsdell, 285 A.2d 404.  The Rhode Island Supreme Court has summarized this rule as a prescription "that the citizen's conduct be

reasonable in light of all the circumstances apparent to him at the moment." Botelho, 459 A.2d at 951. Further, this rule applies equally to those individuals subject to detention and those subject to arrest by law enforcement officers. Id.

Defendants acknowledge that in Rhode Island, under Botelho, a citizen retains the right to self-defense when an officer employs excessive force. But, Defendants argue that Kelley's attempt to place Jackson in an arm-bar hold did not amount to excessive force. The Court concurs. Once the officers effectuated the arm-bar hold, Jackson should have had a reasonable belief that he was under arrest, and he should have peacefully submitted, regardless of the arrest's propriety. Because an arm-bar hold constitutes a reasonable amount of force with which to effectuate an arrest (albeit, an unlawful one), Jackson was not justified in fighting back, particularly with the force he applied. In the absence of excessive force, Jackson was required by law to submit to the unlawful arrest.

Accordingly, Defendants successfully fend off Plaintiff's allegations of excessive force. Because the Court finds no constitutional violation on the basis of excessive force, it does not need to reach the second prong of the qualified immunity analysis.

C.   Are the Officers Entitled to Qualified Immunity on the Deliberate Indifference Count?[29]

Under the Fourteenth Amendment, pre-trial detainees have a right to be free from deliberate indifference by government officials.  Surprenant v. Rivas, 424 F.3d 5, 13 (1st Cir. 2005). The Fourteenth Amendment affords detainees at least as much protection as the Eighth Amendment affords convicted inmates. See Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir. 2007) ("Generally, the standard applied under the Fourteenth Amendment is the same as the Eighth Amendment standard.").

A failure to deliver medical care provides the basis of such a claim if the "acts or omissions [are] sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).  The First Circuit has said that "substandard care, malpractice, negligence, inadvertent failure to provide care, and disagreement as to the appropriate course of treatment" all do not constitute deliberate indifference.  Ruiz-Rosa, 485 F.3d at 156.  Rather, the medical care provided, or lack thereof, must be so inadequate so as to "constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of

---

[29] The discussion on deliberate indifference that follows is closely related to the discussion of gross negligence in the next section.  The Court takes on deliberate indifference first because it arises in connection with the qualified immunity defense.

mankind.'"   Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (quoting Estelle, 429 U.S. at 105-06).   "The Supreme Court has also made clear that, by 'deliberate indifference,' it means more than ordinary negligence, and probably more than gross negligence."   Manarite ex rel. Manarite v. City of Springfield, 957 F.2d 953, 956 (1st Cir. 1992).

To establish deliberate indifference based on "inadequate or delayed medical care" a plaintiff must demonstrate that (1) the "officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's [or detainee's] health or safety," and (2) "the deprivation alleged was 'objectively, sufficiently serious.'"   Leavitt, 645 F.3d at 497 (quoting Burrell, 307 F.3d at 8).   With respect to the subjective prong of the inquiry, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."   Id. at 497 (quoting Farmer, 511 U.S. at 837). A plaintiff demonstrates deliberate indifference where "decisions about medical care [were] made recklessly with 'actual knowledge of impending harm, easily preventable.'"   Id. (quoting Ruiz-Rosa, 485 F.3d at 156).   Because it is of constitutional dimension, deliberate indifference, unlike gross negligence, requires this intentional aspect; "[n]egligence, in contrast -- no matter how 'gross' it may be -- exemplifies lack

of care, rather than the abuse of power." Germany v. Vance, 868 F.2d 9, 18 (1st Cir. 1989).

With respect to the objective prong, "[a] medical need is 'serious' if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Leavitt, 645 F.3d at 497 (quoting Gaudreault v. Municipality of Salem, 923 F.2d 203, 208 (1st Cir. 1990)).

It is plain that the officers were responsible for Jackson's safety and well-being. See DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs., 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."). The issue is whether, under these facts, the subjective culpability required for deliberate indifference is correctly imputed to Lukowicz, Kelley, and Thornton when they failed to perform CPR themselves until seeing rescue arrive, but did call for rescue and take several other half-hearted actions to facilitate Jackson's care. See Leavitt, 645 F.3d at 503-04 ("Where the dispute concerns not the absence of help, but the choice of a certain course of treatment, deliberate indifference may be found [only if] the attention received is so clearly inadequate as to amount to a refusal to

78

provide essential care." (quoting Torraco v. Maloney, 923 F.2d 231, 234 (1st Cir. 1991) (internal quotation marks omitted)).

Defendants argue that the officers did not exhibit deliberate indifference because they called rescue and that there is no constitutional mandate to perform CPR on an injured detainee. See Rich v. City of Mayfield Heights, 955 F.2d 1092, 1098 (6th Cir. 1992) (holding that, under the specific facts of that case, calling rescue was sufficient to defeat any claim of deliberate indifference and officer had no duty to perform CPR on detainee). The Court rejects that general principle and holds that a call to rescue by a CPR-trained police officer does not per se defeat a claim of deliberate indifference.

As an initial point, while several courts have cited City of Revere v. Massachusetts General Hospital, 463 U.S. 239, 244-45 (1983), for the proposition that law enforcement satisfies any duty to provide medical care by bringing a detainee to medical or rescue personnel for treatment, see, e.g., Tatum v. City and Cnty. of San Francisco, 441 F.3d 1090 (9th Cir. 2006); Maddox v. City of Los Angeles, 792 F.2d 1408, 1415 (9th Cir. 1986); Stogner v. Sturdivant, Civil Action No. 10-125-JJB-CN, 2010 WL 4056217, at *4 (M.D. La. Oct. 14, 2010), the Court takes issue with these courts' reliance on City of Revere; that case does not hold that, as a matter of law, law enforcement officers satisfy their duty of care so easily.

In City of Revere, the Supreme Court held that the Due Process Clause "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by the police." City of Revere, 463 U.S. at 244.   The Court noted that, under the facts of that case, this constitutional obligation was satisfied by seeing that the injured arrestee was "taken promptly to a hospital that provided the treatment necessary for his injury." Id. at 245.   However, the issue before the Court concerned payment for medical care, and the Court concluded that "as long as the governmental entity ensures that the medical care needed is in fact provided," the Constitution does not allocate costs between the entity and the care provider.   Id.   The question before the Court was not whether an officer's medical care (or emergency assistance) duty was always satisfied by bringing a detainee to the hospital, let alone by placing a call to rescue personnel.   And, in fact, City of Revere clearly stated that the Court "need not define, in this case, [the city's] due process obligation to pre-trial detainees or to other persons in its care who require medical attention." Id. at 244.   Therefore, there can be no question that City of Revere is not dispositive of the issue presented here.

The cases relied upon by Plaintiff on this point are far more persuasive on the question.   See, e.g., McRaven v. Sanders,

577 F.3d 974, 983 (8th Cir. 2009) ("An officer trained in CPR, who fails to perform it on a prisoner manifestly in need of such assistance, is liable under § 1983 for deliberate indifference." (citing Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001))); Jones v. City of Cincinnati, 521 F.3d 555, 560 (6th Cir. 2008) (holding that officers were not entitled to qualified immunity on deliberate indifference claim rooted in their failure to provide CPR where they knew the arrestee was handcuffed and not breathing) (citing Estate of Owensby v. City of Cincinnati, 414 F.3d 596, 602 (6th Cir. 2005)); Tlamka, 244 F.3d at 633 (holding that corrections officers were not entitled to qualified immunity on deliberate indifference claim where they failed to provide CPR or to approach prisoner for ten minutes, even though the officers were trained in CPR and the prisoner's condition was obviously life threatening); Sparks v. Susquehanna Cnty., No. 3:05cv2274, 2009 WL 922489, at *10 (M.D. Pa. Apr. 3, 2009) (concluding that a jury could find that correctional officer was deliberately indifferent when she was delayed in calling for assistance and was unwilling to perform CPR despite having been trained); Ashworth v. Round Lake Beach Police Dep't., No. 03 C 7011, 2005 WL 1785314, at *7 (N.D. Ill. July 21, 2005) (holding that the failure of officers to perform CPR after calling an ambulance raises jury question of deliberate indifference).

Yet, despite the grave shortfalls of these Defendants, which, as discussed below, clearly amount to gross negligence, the evidence does not convince the Court that the officers "possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to [Jackson's] health or safety." Leavitt, 645 F.3d at 497. The officers took several affirmative steps, and while the steps were not sufficient to save Jackson's life, nor to shield the officers from liability for gross negligence, they do tend to show that the officers' actions were not deliberately and intentionally designed to hurt or kill Jackson. Indeed, Defendants did summon rescue. And while this act is insufficient by itself to defeat the deliberate indifference allegation, it is relevant conduct:  it evinces a desire or intention to help, not to hurt Jackson. Moreover, the four minutes and twenty seconds that passed simply was not of such an extended duration that the Court, as fact-finder, could infer from the timeline that their efforts were mere subterfuge, designed to hide their real intent to do harm.

This is the sort of case in which the line between gross negligence and deliberate indifference is clarified -- the officers' actions amount to "near recklessness" and "shockingly unjustified and unreasonable action," see Leite v. City of Providence, 463 F. Supp. 585, 591 (D.R.I. 1978), but the reality of their deliberative thought process, as reflected by their

actions, is simply that they were <u>not</u> thinking and <u>not</u> acting. They were young, inexperienced police officers (Thornton was more experienced, but new to his leadership role) who completely failed to draw the inferences and conclusions that are painfully obvious in hindsight.  The evidence suggests that the officers believed that rescue was on its way and that rescue would be coming the short distance from the fire station next door. There is no evidence to suggest that they knew that, by not acting, they would cause Jackson substantial harm or death.

The bottom line is that, with respect to deliberate indifference, the objective prong readily could be satisfied (<u>see generally</u> <u>infra</u> Part II.E), but the subjective prong -- the requirement that Defendants acted with a sufficiently culpable state of mind -- has not been met.  The Court readily concedes that this is a close call and that a reasonable person could conclude that Defendants acted with intent to harm Jackson.  On balance, however, the Court believes that Defendants' actions (and inactions) here were more likely the result of inexperience, lack of training, insensitivity, and perhaps ignorance, but not abject malice.  If there is to be a distinction in the law between grossly negligent behavior and deliberate indifference, then it must be in what was at the root of the behavior.  And here, the Court finds Defendants were many things, but not evil.  So while the fact that these officers may

not have intended affirmatively to harm Jackson does not excuse their behavior, it does deflect Plaintiff's deliberate indifference allegations.

Accordingly, Plaintiff's claim for deliberate indifference fails. Because the Court concludes that there was no constitutional violation, there is no need to proceed to the second prong of the qualified immunity analysis for deliberate indifference.

D. Are the Officers Immune from Liability for Ordinary Negligence?[30]

Prior to trial, Defendants moved for partial summary judgment on Plaintiff's negligence and gross negligence claims, arguing, inter alia, that R.I. Gen. Laws § 9-1-27 grants Defendants immunity from suit for ordinary negligence for any failure to render emergency assistance. Plaintiff opposed the motion, arguing that § 9-1-27 only provides immunity to police officers who do not have a pre-existing duty to provide first aid and who, therefore, perform it "voluntarily and gratuitously." On October 27, 2011, the Court granted in part and denied in part Defendants' motion. In this ruling, the

---

[30] The Court directs the Clerk of the Court to deliver this decision to the Rhode Island General Assembly so that it may consider the quandary posed in this section. The Court respectfully suggests that the General Assembly consider revising § 9-1-27 to clarify its intention with respect to the breadth of immunity for on duty officers and fire department personnel for negligence in rendering emergency aid.

Court concluded that § 9-1-27 immunizes Defendants from ordinary negligence but denied summary judgment in favor of Defendants on the gross negligence claim.  In the interest of proceeding to trial as quickly as possible, the Court reserved discussion of that ruling to this post-trial decision.

As will be discussed below, the Court concludes that the officers had a common-law duty to render emergency assistance to Jackson because Jackson was in the officers' custody, which created a special relationship.  See Restatement (Second) of Torts § 314A (1965) (explaining duty arising out of special relationship).  Defendants contend that, regardless of such a duty, they are immune from suit for ordinary negligence under R.I. Gen. Laws § 9-1-27.  Section 9-1-27 provides as follows:

> No member of any police force or fire department of the state or any city or town, investigators of the department of attorney general appointed pursuant to § 42-9-8.1, inspectors and agents of the Rhode Island state fugitive task force appointed pursuant to § 12-6-7.2, or any person acting in the capacity of a rescue attendant or member of a rescue squad, and no officer or member in active service in any incorporated protective department cooperating with fire departments, and no person performing the duties of a firefighter in a town or city, and no member of any volunteer fire company or volunteer rescue squad or member of any voluntary ambulance association, whether the company or squad is incorporated or not, who while on duty and in the performance of that duty voluntarily and gratuitously renders emergency assistance to a person in need thereof, and no person properly certified by the American heart association or the American national red cross in basic or advanced life support [as defined by those organizations] who voluntarily and gratuitously

renders emergency assistance to a person in need
thereof shall be liable for civil damages for any
personal injuries or property damage which result from
acts or omissions by the persons rendering the
emergency care, which may constitute ordinary
negligence. <u>This immunity does not apply to acts or
omissions constituting gross, willful, or wanton
negligence</u>.

R.I. Gen. Laws § 9-1-27 (emphasis added).

This statute, as a whole, clearly reflects the General
Assembly's intent to immunize <u>all</u> on-duty police officers who
render emergency assistance from liability for ordinary
negligence, regardless of whether they have a common-law duty to
render aid. <u>Cf. Brandon v. City of Providence</u>, 708 A.2d 893,
894 (R.I. 1998) (holding that § 9-1-27 immunized police officers
who called rescue to obtain medical assistance for victim of
drive-by shooting at crime scene to which officers were called
and prevented victim's brother from taking victim to nearby
hospital).[31] By listing rescue personnel among those immunized,

---

[31] There is a good argument to be made, although it has not
been raised, that the officers in <u>Brandon</u> had a pre-existing,
common-law duty to provide assistance to the victim, like the
officers in the instant case, because they prevented the
victim's brother from taking him to a nearby hospital. <u>See
Restatement (Second) of Torts</u> § 326 (1965) ("One who
intentionally prevents a third person from giving to another aid
necessary to prevent physical harm to him, is subject to
liability for physical harm caused to the other by the absence
of the aid which he has prevented the third person from
giving."). The Supreme Court of Rhode Island's grant of
immunity pursuant to § 9-1-27 to the <u>Brandon</u> officers in the
face of this common-law duty further buttresses the conclusion
here that the officers are entitled to immunity from liability

the General Assembly made pellucid its intent to immunize <u>all</u> on-duty personnel from ordinary negligence.

It is true, as Plaintiff suggests, that it is somewhat incongruous for the statute to provide immunity to fire, rescue, and police personnel who render aid "while on duty and in the performance of that duty," but also "voluntarily and gratuitously." She offers the explanation that this latter wording is used to exempt from immunity those personnel who had a pre-existing, common-law duty to provide care, and therefore, do not render such aid "voluntarily and gratuitously."

Reading the statute as a whole, the Court cannot agree. Under Plaintiff's view, firefighters and rescue personnel would never be immune from suit for ordinary negligence under § 9-1-27 because the General Assembly must have been aware when enacting this statute that, owing to the duties inherent in their roles, fire and rescue personnel have a pre-existing duty to render assistance when on duty. <u>See</u> <u>Tatum v. Gigliotti</u>, 583 A.2d 1062, 1065 (Md. 1991) (noting that members of ambulance or rescue squad have pre-existing duty to provide medical care and finding that a statute similar to R.I. Gen. Laws § 9-1-27 provides immunity to them). The Court cannot accept a construction that renders the inclusion of firefighters and rescue personnel in

---

for ordinary negligence under § 9-1-27, regardless of any pre-existing common-law duty they may have had.

this statute "mere surplusage."   See In re Proposed Town of New Shoreham Project, 25 A.3d 482, 508 (R.I. 2011) (quoting In re Harrison, 992 A.2d 990, 994 (R.I. 2010)).

But, Plaintiff has a point.   What is the Court to make of the inclusion of the term "voluntarily and gratuitously" in granting on-duty public officials immunity from negligence for acts done in the performance of their duty?   The Court chalks this up to it being a vestige of the authority upon which this statute was likely modeled.   Section 9-1-27 appears to borrow its "voluntarily and gratuitously" language from the statute granting immunity to licensed medical doctors for negligence occurring in rendering emergency assistance, see R.I. Gen. Laws § 5-37-14.[32]

Where a statute's language is ambiguous as to meaning, the Court will not construe the statute to reach a result "that is

---

[32] R.I. Gen. Laws § 5-37-14 provides in pertinent part:

No person licensed under this chapter [Board of Medical Licensure and Discipline], or members of the same professions licensed to practice in other states of the United States, who voluntarily and gratuitously and other than in the ordinary course of his or her employment or practice renders emergency medical assistance to a person in need of it, shall be liable for civil damages for any personal injuries which result from acts or omissions by these persons in rendering emergency care, which may constitute ordinary negligence.   This immunity does not apply to acts or omissions constituting gross, willful, or wanton negligence, or when rendered at any hospital, doctors' offices, or clinic where these services are normally rendered.

contradictory to or inconsistent with the evident purposes of the [enactment]." New Engl. Dev., LLC v. Berg, 913 A.2d 363, 375 (R.I. 2007) (quoting Carrillo v. Rohrer, 448 A.2d 1282, 1284 (R.I. 1982)). As addressed above, the Court does not read "voluntarily and gratuitously" to undercut the officers' immunity here, because to do so would read out of the statute all on-duty firefighters and rescue personnel, and while plain meaning generally controls in statutory interpretation, "statutes should not be construed to achieve meaningless or absurd results." McCain v. Town of N. Providence ex rel. Lombardi, 41 A.3d 239, 244-45 (R.I. 2012) (quoting Ryan v. City of Providence, 11 A.3d 68, 71 (R.I. 2011)).

Accordingly, the Court reaffirms that Defendants enjoy immunity from any ordinary negligence claim arising from their failure to provide Jackson with CPR while he was in their custody.

E.   Did the Officers Exhibit Gross Negligence?

Gross negligence, under Rhode Island law, "demands evidence of near recklessness or shockingly unjustified and unreasonable action." Leite, 463 F. Supp. at 591. This Court has explained that, "[t]o distinguish between negligence and 'gross negligence' is not to indulge in technicalities. There is a clear and significant difference between these two standards; one requires only a showing of unreasonableness while the other

demands evidence of <u>near recklessness or shockingly unjustified</u> <u>and unreasonable action</u>." <u>Id.</u> (emphasis added).  To make out a negligence claim in Rhode Island, a plaintiff must demonstrate the familiar elements of duty, breach, causation, and damages, i.e., "a legally cognizable duty owed by a defendant to a plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and the actual loss or damage." <u>Habershaw v. Michaels Stores, Inc.</u>, 42 A.3d 1273, 1276 (R.I. 2012) (quoting <u>Holley v. Argonaut Holdings, Inc.</u>, 968 A.2d 271, 274 (R.I. 2009)).

> ### 1.   Duty for CPR-Trained Police Officers to Render CPR to Individuals in Their Custody

First, Defendants argue that, as a matter of law, they cannot be held liable for gross negligence because, in their view, Rhode Island law imposes no duty on police officers to administer CPR under these circumstances.  Defendants stress that there is no authority setting forth such an affirmative duty and that the language of R.I. Gen. Laws § 9-1-27 suggests that the General Assembly believed that any attempt on the part of an on-duty police officer to render medical assistance is an entirely "gratuitous" and "voluntary" act.  For her part, Plaintiff argues that a duty arose in the circumstances at bar because (1) Defendants precipitated Jackson's cardiac arrest; and (2) Defendants' taking custody of Jackson prevented him from

seeking aid independently, which established a special relationship between the officers and Jackson.

Under Rhode Island common law, there is generally no duty to render aid; however, Rhode Island common law imposes a duty to aid "if the defendant created the plaintiff's peril or if a special relationship exists[.]" Kuzniar v. Keach, 709 A.2d 1050, 1055 (R.I. 1998) (summarizing State v. McLaughlin, 621 A.2d 170, 175 (R.I. 1993)). Among other circumstances, a special relationship giving rise to a duty to aid or protect exists where "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection . . . ." Restatement (Second) of Torts § 314A; see also Martin v. Marciano, 871 A.2d 911, 917 (R.I. 2005) (citing favorably § 314A). Comment f to § 314A explains that a defendant

> is not required to take any action until he knows or
> has reason to know that the plaintiff is endangered,
> or is ill or injured. He is not required to take any
> action beyond that which is reasonable under the
> circumstances. In the case of an ill or injured
> person, he will seldom be required to do more than
> give such first aid as he reasonably can, and take
> reasonable steps to turn the sick man over to a
> physician, or to those who will look after him and see
> that medical assistance is obtained. He is not
> required to give any aid to one who is in the hands of
> apparently competent persons who have taken charge of
> him, or whose friends are present and apparently in a
> position to give him all necessary assistance.

Restatement (Second) of Torts § 314A cmt. f (emphasis added).

Here, the officers were either "required by law" to take Jackson into custody (in light of his resisting arrest) or voluntarily did so -- either way, the officers acted "such as to deprive [him] of his normal opportunities for protection," and, therefore, a special relationship arose that created a duty on the part of all three officers to aid and protect. See Restatement (Second) of Torts § 314A. Once the officers saw that Jackson was blue and pulseless, they plainly knew that he was endangered, ill, and/or injured. Comment f prescribes that the officers needed only to provide first aid insofar as it was "reasonable under the circumstances." Accordingly, the Court holds that, under Rhode Island law, when an officer is trained in CPR and/or first aid, he has a duty to render CPR and/or first aid in circumstances where he knows, or has reason to know, that his detainee has been seriously harmed or is in a life-threatening condition and his rendering of assistance is likely to aid the detainee. Calling rescue is not sufficient to satisfy this duty where the officer knows or has reason to know that his failure to provide CPR and/or first aid while awaiting rescue's arrival may place the detainee in risk of grave physical harm.

While it is uncontroversial that the public does not want officers providing medical assistance or first aid to

individuals when they do not have the proper training and/or they lack the necessary tools to provide such aid, where an officer has isolated a detainee from receiving help from others and is trained to render aid, it follows that the officer has the duty to make reasonable efforts to assist the detainee, particularly where the officers precipitated the events that created the emergency situation in the first place. Furthermore, the fact that police officers are immune from suit under R.I. Gen. Laws § 9-1-27, as discussed above, only bolsters this duty; because officers shoulder no risk of liability in administering CPR, the officers' duty is heightened. Accordingly, the Court concludes that Defendants had a duty to call rescue <u>and</u> to administer CPR to Jackson as soon as practicable and while they waited for rescue to arrive.

### 2. Breach

In light of the foregoing outline of the applicable duty and the facts established herein, the Court holds that Lukowicz, Kelley, and Thornton were grossly negligent in breaching their duty to Jackson.

The Court finds that Jackson objectively had serious and life-threatening medical needs when Kelley and Lukowicz found him unresponsive and pulseless in the back seat of Lukowicz's cruiser. Based upon Kelley's and Lukowicz's testimony and training, common knowledge, and Jackson's obvious need for

93

medical attention, the Court concludes that Kelley and Lukowicz were subjectively aware of Jackson's serious medical need from the moment they assessed him in the back seat of Lukowicz's cruiser and found that he was unresponsive and pulseless (01:43 after arrival).  The Court further finds, based upon Thornton's training, deposition testimony, and statement to the Rhode Island State Police, that Thornton was subjectively aware of Jackson's serious medical needs from the moment Jackson was removed from the cruiser (02:03 after arrival).  Defendants' subjective understanding is further demonstrated by the WWPD general order, of which each Defendant was aware, that instructs all officers that early CPR and AED greatly increase the survival rate for cardiac arrest.

In light of these conclusions, and the Court's conclusions above (see supra Part I.E) with respect to what reasonable officers would have done in these circumstances, the Court further concludes that the totality of the officers' (Lukowicz, Kelley, and Thornton) conduct, from the time of arrival at the stationhouse to the point at which rescue arrived, constituted gross negligence with respect to each officer.  Indeed, there is a staggering disconnect between the appearance of Jackson, obviously in critical distress, and the officers' casual pace and apparent carelessness.  Defendants acted more like observers than police officers and first responders responsible for their

94

detainee.  Depending upon the context, a period of four minutes and twenty seconds may be long or short.  When viewed on the video, in the context in which it occurred, it is an unreasonable and intolerable period of time.

    3.    Causation

        a.    Cause-in-Fact

Under Rhode Island law, to prevail on a claim for gross negligence, as with an ordinary negligence claim, a plaintiff must "not only prove that a defendant is the cause-in-fact of an injury, but also must prove that a defendant proximately caused the injury." Almonte v. Kurl, 46 A.3d 1, 18 (R.I. 2012) (citing State v. Lead Indus. Ass'n, Inc., 951 A.2d 428, 451 (R.I. 2008)).  As discussed further below, the Court concludes that the confluence of several actions and inactions, in addition to Jackson's preexisting health condition, caused Jackson's death. At the outset, Jackson was predisposed to suffering from cardiac arrest due to his weight, smoking habit, and preexisting heart condition.  Moreover, both the officers' unlawful seizure and Jackson's unlawful attempt to resist arrest at Joyal's were contributing factors of his cardiac arrest.  Indeed, Jackson likely would not have suffered cardiac arrest that night if he had not been in the altercation with Lukowicz and Kelley.  (See Trial Tr. vol. 4, 57; id. vol. 6, 34.)  Furthermore, it is clear

that the officers' actions precipitated Jackson's struggle, even if Jackson's failure to comply was unlawful.

Once Jackson suffered cardiac arrest, it was the cardiac arrest, coupled with the officers' failure to timely administer CPR and to properly alert rescue that ultimately caused Jackson's death.  Thus, for purposes of causation, Lukowicz and Kelley's unlawful seizure, Jackson's resisting arrest, and the officers' failure to properly facilitate emergency assistance are all causes-in-fact of Jackson's death.  But for any of these things, Plaintiff has demonstrated that it is more probable than not that Jackson would not have died that night.

The Supreme Court of Rhode Island has not directly addressed whether, in a case like this one, it is sufficient for a plaintiff to show that the defendant hastened the decedent's death by a mere moment in order to prevail in a wrongful death suit, or whether a plaintiff must prove that the decedent would have lived for some specified period of time, e.g., to survival to discharge from the hospital.  However, case law from other jurisdictions suggests that the Supreme Court of Rhode Island would hold that a plaintiff's burden to prove causation in a negligence suit is satisfied upon proving that the defendant hastened the decedent's death by only a moment.

Applying Massachusetts law, the First Circuit has explained that, in a medical malpractice suit, where an ill person was on

course to die from disease prior to the purported negligence, a
jury may award damages if a medical professional's negligent
procedure accelerated the decedent's death.    See Heinrich v.
Sweet, 308 F.3d 48, 60 (1st Cir. 2002).    The First Circuit held,
that, under Massachusetts law,

> [t]o make out a claim for wrongful death on a
> negligence theory, a plaintiff must show that the
> defendant's negligence caused the plaintiff to die
> prematurely.  Harlow v. Chin, 405 Mass. 697, 545
> N.E.2d 602, 605 (1989) ("A plaintiff in a medical
> malpractice action has the burden of proving that the
> physician's negligence was the proximate cause of the
> plaintiff's injuries.").  Defendants dispute their
> liability for wrongful death by focusing on this
> causation element. . . . [W]here the plaintiffs were
> terminally ill and death was imminent, plaintiffs must
> show that the defendant's actions hastened death "even
> though it would have occurred at no very remote date
> from other causes."  Edwards v. Warwick, 317 Mass.
> 573, 59 N.E.2d 194, 196 (1945); see also Coburn v.
> Moore, 320 Mass. 116, 68 N.E.2d 5, 10 (1946) (holding
> that there was "enough to show a causal relation
> between the negligence of the defendant and the death
> of the intestate" where the defendant's actions
> "accelerated [intestate's] death"); Walker v. Gage,
> 223 Mass. 179, 111 N.E. 776, 767 (1916) (holding that
> evidence that the accident hastened intestate's death
> was "enough legally to constitute the accident the
> proximate cause of his death").

Heinrich, 308 F.3d at 60.

This rule also has been adopted in jurisdictions across the
country.  See In re Estate of Eliasen, 668 P.2d 110, 120 (Idaho
1983) ("Thus, an act which accelerates death, causes death,
according to both civil and criminal law."); Collins v.
Hertenstein, 90 S.W.3d 87, 96 (Mo. Ct. App. 2002) ("An act which

accelerates death . . . causes death.  This is true even if the act hastens death by merely a moment.") (internal citation and quotation marks omitted); McCahill v. N.Y. Transp. Co., 94 N.E. 616, 617 (N.Y. 1911) ("The principle is also true, although less familiar, that one who has negligently forwarded a diseased condition, and thereby hastened and prematurely caused death, cannot escape responsibility, even though the disease probably would have resulted in death at a later time without his agency. It is easily seen that the probability of later death from existing causes for which a defendant was not responsible would probably be an important element in fixing damages, but it is not a defense."); Louisville & N.R. Co. v. Northington, 17 S.W. 880, 882 (Tenn. 1891) ("A man might be suffering from an incurable disease, or a mortal wound, with only two days to live, when a negligent wrong-doer inflicted upon him an injury which in his condition of debility took his life, or developed agencies which destroyed him in one day, and yet the latter wrong be in a legal sense the cause of his death, though it only hastened that which on the next day would have inevitably happened."); Cunningham v. Dills, 145 P.2d 273, 284 (Wash. 1944) ("[A] person who by his wrongful or negligent act or omission accelerates a diseased condition, thereby hastening and prematurely causing the death of the diseased person may be held liable even though that disease would probably have resulted in

98

death at a later time without any wrongful or negligent act having been committed."). Indeed, Defendants have not come forward with any authority to suggest that another rule should be adopted. Accordingly, the Court looks to see whether Plaintiff has established that the gross negligence of Lukowicz, Kelley, and Thornton hastened Jackson's death, if only by a short period.

As previously discussed, the Court finds that reasonable officers in the positions of Lukowicz, Kelley, and Thornton would have called rescue at 01:14 after arrival and clearly communicated that Jackson was not breathing and was unconscious, and they would have ensured that CPR was started by 01:45 after arrival.

To determine whether the officers' failure to act reasonably and competently caused Jackson's death, the Court must determine what effect a proper call to the police dispatcher at 01:14 would have had on rescue's response time. Once Palazzo put in the call to rescue to expedite at 02:22 after arrival, it took thirty-three seconds for the police dispatcher to contact the fire dispatcher and, then, for the fire dispatcher to dispatch the call to rescue at 02:55 after arrival. This amount of time acts as a fair approximation of how long it would have taken the dispatchers to relay a call accurately conveying the gravity of Jackson's condition at 01:14

after arrival.  Therefore, if the call had been made properly at 01:14, rescue personnel would have heard the call from the fire department dispatcher at 01:47 after arrival.[33]

Once Private Cahoon and other rescue personnel heard the dispatch, it took Cahoon one minute and twenty-five seconds to arrive on scene and to take over CPR from the officers. Therefore, if Cahoon had heard the dispatch at 01:47 after arrival, the Court finds that he would have arrived on scene at 03:12 after arrival, or one minute and twenty-five seconds after the 01:47 dispatch call.  From arrival on scene, it took Cahoon another one minute and eight seconds to activate the AED.  If he had arrived on scene at 03:12 after arrival, he would have, therefore, activated and discharged the AED at 04:20 after arrival.  In light of the conclusion that Jackson suffered his cardiac arrest thirty seconds prior to arrival (or at -00:30

---

[33] The testimony of Private Cahoon is instructive on this point.  According to his testimony, Private Cahoon heard the first call to Rescue 2 for an intoxicated male.  In response, he proceeded downstairs to walk over to the police station in case they needed back up.  As he was walking down the stairs, he heard another transmission -- the call saying that the male was unconscious and to expedite.  Cahoon quickened his pace as a result of the second transmission, grabbed the AED and medical bag, and proceeded outside to the scene.  Cahoon testified that, when the second call came to expedite, it was the first point at which he understood that he was the primary responder to the call.  (Trial Tr. vol. 9, 100.)  He testified that it took him between one and two minutes to get to Jackson after hearing the second transmission.  (Id. vol. 9, 95.)  During cross-examination, he further testified that there was nothing that prevented him from getting to the scene in about one minute from the time he heard the second transmission.  (Id. vol. 9, 100.)

after arrival), the Court concludes that, in the absence of the officers' gross negligence, Cahoon would have discharged the AED four minutes and fifty seconds after Jackson suffered his cardiac arrest in the patrol car.

The evidence presented at trial suggests that Jackson had a greater than fifty percent chance of survival if Lukowicz, Kelley, and Thornton had not been grossly negligent. Dr. Brown testified that Jackson would have survived his cardiac arrest if the officers had not failed to start CPR and summon rescue to activate the AED within the five-minute window, because his heart was likely in ventricular fibrillation during the five-minute period after he stopped breathing. (Trial Tr. vol. 4, 51-53, 123.) This was undisputed at trial. Dr. Wetli agreed that if Jackson's heart had been "in V-fib or ventricular fibrillation, the AED would have delivered essentially life-saving electrical shock, but such was not the case" by the time the AED actually was applied. (Id. vol. 7, 71.) While Defendants make much of the fact that Plaintiff never proved that Jackson was in ventricular fibrillation at any point after his cardiac arrest, the evidence presented suggests that approximately eighty percent of people who suffer cardiac arrest go into ventricular fibrillation.[34] (Id. vol. 4, 123-24.)

_____

[34] There is evidence in the record that, at some point in the ambulance, Jackson briefly went into ventricular

Because four minutes and fifty seconds is within the five-minute window, the sum of these expert opinions, and the Court's findings above, establish that it was more likely than not that Jackson was alive at the time the officers were grossly negligent, that he was in ventricular fibrillation, and that their gross negligence was a cause-in-fact of his death, even if Jackson may not have lived much longer after sustaining such a heart attack.[35]  See Heinrich, 308 F.3d at 60 ("[P]laintiffs must show that the defendant's actions hastened death 'even though it would have occurred at no very remote date from other causes.'" (quoting Edwards, 59 N.E.2d at 196)).

   b.   Proximate Cause

In order to establish proximate causation, a plaintiff must establish "that the harm would not have occurred but for the [act] and that the harm [was a] natural and probable consequence of the [act]."  Almonte, 46 A.3d at 18 (quoting Pierce v.

---

fibrillation, with the aid of epinephrine and atropine, on the way to the hospital.  (Trial Tr. vol. 9, 102; Ex. 88.)

[35] Plaintiff further relies on the so-called presumption of life and the ambulance run report, the emergency room records, and the death certificate to satisfy her burden to prove that Jackson was alive when the officers exhibited gross negligence and that his death was hastened by their gross negligence. Because the Court determines that other record evidence supports these points, it does not need to determine whether Plaintiff is entitled to a presumption of life or whether the ambulance and hospital records prove that Jackson was alive until he reached the hospital.   These factors do, however, support the Court's conclusions.

Providence Ret. Bd., 15 A.3d 957, 964 (R.I. 2011)). Notably, a "proximate cause 'need not be the sole and only cause. It need not be the last or latter cause. It's a proximate cause if it concurs and unites with some other cause which, acting at the same time, produces the injury of which complaint is made.'" Pierce, 15 A.3d at 966 (quoting Hueston v. Narragansett Tennis Club, Inc., 502 A.2d 827, 830 (R.I. 1986)).

When the proximate cause of an injury is beyond the ken of laypeople, expert testimony is required. See Mills v. State Sales, Inc., 824 A.2d 461, 468 (R.I. 2003). For a plaintiff's verdict, the expert must demonstrate to the fact-finder that the injury "most probably" was the result of the grossly negligent act or omission. See Almonte, 46 A.3d at 18. While "proximate cause may not be established by conjecture or speculation," it is also true that "proximate cause can be established by circumstantial evidence, and specific direct evidence of . . . proximate cause is not always necessary." Seide v. State, 875 A.2d 1259, 1268-69 (R.I. 2005) (quoting Martinelli v. Hopkins, 787 A.2d 1158, 1169 (R.I. 2001) (internal quotation marks omitted)).

The Rhode Island Supreme Court has further recognized that,

[t]he proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct.

> Accordingly, [l]iability cannot be predicated on a prior and remote cause which merely furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, even though the injury would not have resulted but for such a condition or occasion . . . . A plaintiff need not exclude every other possible cause, but a plaintiff must demonstrate proximate cause by reasonable inferences drawn from the facts in evidence.

Lead Indus. Ass'n, 951 A.2d at 451 (internal citations and quotation marks omitted) (alterations in original).

It is against this legal backdrop that the Court must determine whether the actions of Lukowicz, Kelley, and Thornton were the proximate cause of Jackson's death. As discussed above, the failure to administer CPR and call rescue in a timely fashion was a "but for" cause of Jackson's death. Moreover, it is clear that his death was the "natural and probable consequence of" their actions. Almonte, 46 A.3d at 18 (quoting Pierce v. Providence Ret. Bd., 15 A.3d 957, 964 (R.I. 2011)). Indeed, the knowledge obtained from CPR training makes it foreseeable that the failure to administer or properly retrieve emergency aid for a person who is unconscious and not breathing may cause that person's death.

There can be no question that the officers' gross negligence was not the sole cause of Jackson's death. Rather, it was the confluence of a number of events, including the officers' unlawful seizure, Jackson's resisting arrest, and the officers' gross negligence that "produce[d] the injury of which

complaint is made." Pierce, 15 A.3d at 966 (quoting Hueston, 502 A.2d at 830). Defendants are responsible for the unlawful seizure and their gross negligence; Jackson's intervening resistance, while a contributing factor to be sure, does nothing to reduce the chain of responsibility that hooks Defendants.

Accordingly, the Court concludes that the gross negligence of Kelley, Lukowicz, and Thornton was a proximate cause of Jackson's death, and Plaintiff therefore prevails on her claim of gross negligence against Defendants Thornton, Kelley, and Lukowicz.[36]

F.   Damages and Attorney's Fees

Plaintiff, as Administratrix of Jackson's estate, seeks the statutory minimum damages for which Rhode Island's wrongful death statute, R.I. Gen. Laws § 10-7-2, provides; damages for the pain and suffering Jackson endured as a result of his unlawful seizure by Lukowicz and Kelley; punitive damages; and reasonable attorney's fees.

---

[36] As a matter of law, the officers are not entitled to qualified immunity for gross negligence because the immunity that existed at common law for the rendering of first aid and emergency assistance by public officials was abrogated by R.I. Gen. Laws § 9-1-27, which sets forth the circumstances under which immunity is afforded for ordinary negligence but offers no immunity whatsoever for gross negligence. Indeed, the Supreme Court of Rhode Island has applied this statute to determine the liability of police officers for first aid, rather than invoking any common-law immunity. See Brandon v. City of Providence, 708 A.2d 893, 894 (R.I. 1998).

1.   Damages for the Fourth Amendment Violation

Plaintiff asserts that she is entitled to damages under the Rhode Island wrongful death statute because Lukowicz and Kelley's unlawful seizure of Jackson was a proximate cause of his death.   While the Court also concludes that Defendants are liable for damages under the wrongful death statute because their gross negligence caused Jackson's death, for purposes of completeness, the Court will also address this argument.

Section 1983 liability "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions," and accordingly, courts employ "traditional tort principles for making intervening cause determinations in the § 1983 milieu."   Burke v. McDonald, 572 F.3d 51, 60 (1st Cir. 2009) (internal citations omitted); see also Sanchez v. Pereira-Castillo, 590 F.3d 31, 50 (1st Cir. 2009) ("We employ common law tort principles when conducting 'inquiries into causation under § 1983.'" (quoting Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 561 (1st Cir. 1989))).

For purposes of § 1983 liability, an actor is "responsible for 'those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties.'"   Id. at 51 (quoting Springer v. Seaman, 821 F.2d 871, 876 (1st Cir. 1987)).   "[A] plaintiff who suffers a constitutional deprivation

106

early-on may, under § 1983, recover for his later injuries, even during later constitutional stages of the process, if the injuries are reasonably foreseeable consequences of the earlier deprivation of rights." Reich v. Minnicus, 886 F. Supp. 674, 685 (S.D. Ind. 1993) (citations omitted).   A defendant-actor will be held liable for harm caused by intervening acts if those later acts are foreseeable consequences of his earlier action. Compare Contois v. Town of West Warwick, 865 A.2d 1019, 1027 (R.I. 2004) ("Intervening cause exists when an independent and unforeseeable intervening or secondary act of negligence occurs, after the alleged tortfeasor's negligence, and that secondary act becomes the sole proximate cause of the plaintiff's injuries.") (emphasis added), with Almeida v. Town of N. Providence, 468 A.2d 915, 917 (R.I. 1983) ("If the independent or intervening cause is reasonably foreseeable, the causal connection remains unbroken.") (internal citation and quotation marks omitted), and Testa v. Winquist, 451 F. Supp. 388, 392 (D.R.I. 1978) (holding that "a negligent act continues to be a proximate, concurring cause of the injury if the intervening act was a reasonably foreseeable result of the original negligence . . . even if the intervening cause involved negligence or an intentional tort").

As discussed in more detail above, it is clear that the officers' illegal seizure of Jackson in the Joyal's parking lot

set into action a series of reasonably foreseeable events that ultimately led to Jackson's death. It was reasonably foreseeable that Jackson would resist the officers' arrest, regardless of the legality of his doing so; the officers recognized Jackson as an emotionally disturbed person who had directly expressed his desire not to speak with the officers, but the officers proceeded to unlawfully seize him. In light of Jackson's size, his status as an emotionally disturbed person, and the struggle that ensued, it was also reasonably foreseeable that he would suffer cardiac arrest. At the station, the officers' gross negligence prevented Jackson from receiving life-saving access to CPR and/or an AED. Because this gross negligence was of the officers' own doing, the gross negligence was clearly a reasonably foreseeable result of their unlawful seizure.

Accordingly, Lukowicz and Kelley's violation of Jackson's Fourth Amendment right to be free from unreasonable seizure was a proximate cause of his death. Therefore, even if Lukowicz and Kelley's gross negligence had not been a proximate cause of Jackson's death, which the Court finds it was, Lukowicz and Kelley would still be liable for wrongful death damages.[37]

---

[37] It bears emphasis that this would be so even if the Court had accepted Defendants' argument that Jackson died of excited delirium, because Dr. Wetli agreed that the struggle was

2.   The Rhode Island Wrongful Death Statute

Rhode   Island   law   dictates   that,   if   "any   person   or corporation"   is   found   liable   under   the   Rhode   Island   Wrongful Death   Statute,   R.I.   Gen.   Laws   §§   10-7-1   through   10-7-4,   "he or she or it shall be liable in damages in the sum of not less than two hundred fifty thousand dollars ($250,000)."   R.I. Gen. Laws § 10-7-2.   Plaintiff   argues   that,   given   the   plain   language   of the   statute   and   its   purported   punitive   nature,   she   is   entitled to $250,000 per Defendant found liable for Jackson's death, for a total   of   $1,000,000.   Defendants   counter   that   the   statute   is compensatory   or   remedial   in   nature,   as   opposed   to   punitive,   and therefore,   if   they   are   found   liable,   the   four   Defendants (Lukowicz,   Kelley,   Thornton,   and   the   Town),   should   be   found jointly   and   severally   liable   for   the   statutory   minimum   of $250,000.

Each   party   is   quick   to   highlight   the   weakness   in   the other's   construction.   Under   Defendants'   interpretation,   if twenty-five   people   jointly   commit   a   brutal   murder,   each defendant would be exposed to a minimum of $10,000 in wrongful death damages; surely that a greater number of people caused a wrongful   death   does   not   render   the   defendants   any   less   culpable, Plaintiff   argues.   But   Plaintiff's   construction   does   not   fare

sufficient to cause Jackson's sudden cardiac arrest.   (Trial Tr. vol. 7, 66.)

109

any better.   Under Plaintiff's construction, the estate of a person whose death was caused by twenty-five people would recover a minimum of $6,250,000 in damages; surely an estate does not deserve to recover more in damages because the decedent's death was caused by a greater number of people.   The Court agrees that neither is the decedent's life "worth" more if more actors deprive him of it nor should a defendant's liability be lessened where more people partake in depriving the decedent of life.   But this is the scheme with which the Court is presented, and accordingly, it is for the Court to determine what the Supreme Court of Rhode Island would find the General Assembly's intent to be.

The Supreme Court of Rhode Island has repeatedly classified the Rhode Island wrongful death statute as compensatory or remedial in nature, expressing its purpose as providing "a remedy for the loss sustained by the death of" the decedent. Walsh v. Bressette, 155 A. 1, 3 (R.I. 1931); see also Read v. Dunn, 138 A. 210, 212 (R.I. 1927) ("The damages are for . . . the loss to the estate of the deceased resulting from the death." (citing McCabe v. Narragansett Elec. Lighting Co., 61 A. 667, 669 (R.I. 1905))); Burns v. Brightman, 117 A. 26, 28 (R.I. 1922) (stating that the statute's purpose is "to provide for and distribute to the designated relatives of deceased a legal compensation for the loss caused by the wrongdoer").

In an early case, McLay v. Slade, the Supreme Court of Rhode Island examined the punitive nature of the wrongful death statute in force at that time in Massachusetts.  138 A. 212, 213 (R.I. 1927).  In so doing, the Supreme Court distinguished the Rhode Island wrongful death statute on the basis that the Rhode Island statute serves to "provide for the recovery of damages against the wrongdoer as compensation . . . to the estate of the deceased for the loss resulting from the death."  Id.  The Supreme Court of Rhode Island continued:  "[I]f liability be established, the amount of damages is dependent, not upon the degree of blame which shall be ascribed to the wrongdoer, but solely upon the damage occasioned by his act."  Id.  In advancing this construction, the Supreme Court of Rhode Island cited favorably a decision of the United States Supreme Court stating that, "although a statute may have in some aspect a punitive purpose, it should not be considered as penal in an international sense, unless its purpose is to punish an offense against the public justice of the state, and not to afford a private remedy to a person injured by the wrongful act."  Id. (citing Huntington v. Attrill, 146 U.S. 657 (1892)).

Indeed, recovery of damages that exceed the statutory minimum is provided for by § 10-7-1.1, which finds a starting point in the decedent's prospective earning potential, not the defendant's culpability.  Accordingly, it is clear that the

Rhode Island wrongful death statute was enacted with the aim of providing a decedent's beneficiaries with compensation of not less than $250,000, and so, the Court holds that Defendants are jointly and severally liable for the $250,000.

### 3. Damages for Jackson's Pain and Suffering

Plaintiff also seeks damages for the pain and suffering endured by Jackson while he was unlawfully seized in Joyal's parking lot. Assigning such pain and suffering a monetary value is no easy task, and it goes without saying that "converting feelings such as pain, suffering, and mental anguish into dollars is not an exact science." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1198 (1st Cir. 1995). In awarding damages for pain and suffering, the fact-finder "is free . . . to harmonize the verdict at the highest or lowest points for which there is a sound evidentiary predicate," so long as the result does not "strike such a dissonant chord that justice would be denied were the judgment permitted to stand." Litif v. United States, 682 F. Supp. 2d 60, 85 (D. Mass. 2010), aff'd 670 F.3d 39 (1st Cir. 2012) (quoting Milone v. Moceri Family, Inc., 847 F.2d 35, 37 (1st Cir. 1988)).

Under the familiar eggshell plaintiff rule, which is applicable to § 1983 suits, Defendants are liable for the full extent of Jackson's pain and suffering, regardless of whether it was exacerbated by Jackson's mental health issues. See

112

Figueroa-Torres v. Toledo-Davila, 232 F.3d 270, 275 (1st Cir. 2000) ("The defendant of course is liable only for the extent to which the defendant's conduct has resulted in an aggravation of the pre-existing condition, and not for the condition as it was; but as to the aggravation, foreseeability is not a factor." (quoting W. Page Keeton et al., Prosser and Keeton on The Law of Torts § 43 at 291 (5th ed. 1984))).

Defendants estimate that the altercation between Jackson and Lukowicz and Kelley lasted "ten minutes or less than ten minutes." (Trial Tr. vol. 2, 144.) During the struggle, Jackson was knocked down three times, pepper-sprayed twice, and struck at least four times with batons. From this, Jackson sustained cuts, abrasions, and bruises all over his body. Jackson then struggled in handcuffs for several minutes, from the moment he was handcuffed through the officers' efforts to get him to walk and forcibly put him into the cruiser. He continued to struggle for the first half of the ride to the station, until he lost consciousness in the back seat of Lukowicz's cruiser.

The Court finds that the officers and Jackson engaged in a vigorous fight and that Jackson was very frightened for its duration. In quantifying the appropriate damages to compensate Jackson's estate for his pain and suffering, the Court recognizes that this case must be differentiated from a case in

which, for example, a victim was beaten or tortured to death. By this, the Court does not intend to minimize Jackson's pain and suffering, but rather to recognize that this event must be viewed within the spectrum of similar cases. In light of these considerations, the Court concludes that $250,000 is an appropriate pain and suffering award. Accordingly, Defendants Lukowicz, Kelley, and the Town are jointly and severally liable for $250,000.[38]

### 4. Punitive Damages

In order to recover punitive damages in a § 1983 suit, a plaintiff ordinarily must first, "establish[] liability for either compensatory or nominal damages," Kerr-Selgas v. Am. Airlines, Inc., 69 F.3d 1205, 1215 (1st Cir. 1995), and second, establish that the defendant exhibited a "reckless or callous indifference to" his or her constitutional rights. Powell v. Alexander, 391 F.3d 1, 18 (1st Cir. 2004) (quoting Smith v. Wade, 461 U.S. 30, 56 (1983)).

With respect to state law tort claims, punitive damages are only warranted "when a defendant's conduct requires deterrence and punishment over and above that provided in an award of compensatory damages." Fenwick v. Oberman, 847 A.2d 852, 854 (R.I. 2004) (quoting Palmisano v. Toth, 624 A.2d 314, 318 (R.I.

---

[38] With respect to the pain and suffering damages, the Town is a joint tortfeasor. See, e.g., Graff v. Motta, 695 A.2d 486, 494 (R.I. 1997).

1993) (internal quotation marks omitted)).  In order to be awarded punitive damages, a plaintiff must put forth "evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality that should be punished."  Id. at 854-55 (quoting Bourque v. Stop & Shop Cos., Inc., 814 A.2d 320, 326 (R.I. 2003) (per curiam)) (internal quotation marks omitted).

From the preceding discussion on the officers' violation of Jackson's Fourth Amendment rights and their gross negligence with respect to Jackson's need for emergency assistance, it is plain that the officers' conduct was in reckless disregard for Jackson's rights and well-being.  The Court believes that this conduct rightfully triggers a punitive-damages award in order to deter and punish the individual officers above that provided for by the compensatory damages.  See Fenwick, 847 A.2d at 854. Accordingly, the Court awards Plaintiff punitive damages in the amount of $3,000.  Each individual officer (Lukowicz, Kelley, and Thornton) shall be liable for $1,000 each.  The Court orders that this award shall be paid by the individual Defendants and that the Town shall not indemnify them for this punitive-damages award.

5.  Attorney's Fees

Plaintiff is entitled to reasonable attorney's fees, pursuant to 42 U.S.C. § 1988.  Plaintiff's counsel shall submit

an affidavit setting forth his fees as well as the supporting materials within thirty days of this decision.  Defendants may object in the usual course, and the Court will issue an order thereafter.

III. Conclusion

For the reasons set forth above, the Court finds for Plaintiff on Count I with respect to the alleged violations of Jackson's constitutional rights under the Fourth Amendment against Defendants Lukowicz and Kelley; Count II for the state law claim of assault and battery against Defendants Lukowicz, Kelley, Thornton, and the Town; and Count V for gross, willful, or wanton negligence against Defendants Lukowicz, Kelley, Thornton, and the Town.   The Court finds for Defendants Lukowicz, Kelley, and Thornton on Count I with respect to the claims of deliberate indifference and excessive force.

Moreover, the Court awards Plaintiff $250,000 pursuant to the Rhode Island wrongful death statute, for which Defendants Lukowicz, Kelley, Thornton, and the Town will be jointly and severally liable; $250,000 in compensatory damages for the pain and suffering associated with the unlawful seizure of Jackson's person for which Lukowicz, Kelley, and the Town are jointly and severally liable; and reasonable attorney's fees pursuant to 42 U.S.C. § 1988.  The Court awards punitive damages in the amount of $1,000 as to each individual Defendant (Lukowicz, Kelley, and

116

Thornton), to be paid by the individual Defendants and not to be indemnified by the Town.

No order shall enter until all issues are resolved.

*/s/ William E. Smith*
William E. Smith
United States District Judge
Date:  September 7, 2012

**APPENDIX**

| Time after officers' arrival at station | Event/ Transcription of Dispatch Transmissions | Back Lot Video Timer | Fire Department Timer[39] | Police Department Timer[40] |
|---|---|---|---|---|
| [-1:50][41] | Police Transmission #1<br><br>**72**: 72 to headquarters.<br><br>**Dispatcher**: Come in. | | | 23:10:41 |

---

[39] The fire department timer has been synchronized to the video timer (and therefore synchronized to time after arrival) by using when Officer Kelley can be viewed on the video performing chest compressions from 23:14:50 to 23:14:53 on the video timer (04:20 to 04:23 after arrival) as a point of reference. The Court finds that Private Cahoon radioed the fire dispatch, saying "Engine 1 to rescue. It appears to be a code" simultaneous to Officer Kelley performing chest compressions on Jackson (01:54 to 01:57 on the fire department timer).

[40] The police department timer was synchronized to the video timer (and therefore synchronized to time after arrival) by using when Officer Palazzo can be viewed on the video speaking into his lapel at 23:12:52 on the video timer (02:22 after arrival) as a point of reference. The Court finds that Palazzo was telling the police dispatcher to have rescue personnel "step it up" when he spoke into his lapel, which is recorded on the police dispatch as occurring at 23:14:53.

[41] The times that appear in brackets and highlighted in grey have been extrapolated by the Court using the points of reference for synchronization of the various clocks, as discussed supra n.39 & 40.

| Time after officers' arrival at station | Event/ Transcription of Dispatch Transmissions | Back Lot<br><br>Video Timer | Fire Department<br><br>Timer[39] | Police Department Timer[40] |
|---|---|---|---|---|
| | **72**: 80 and I are going to be 77 with a male subject. We don't know his name. Code 2, very large EDP. Have S-61 meet us downstairs.<br><br>**Dispatcher**: 10-4 | | | |
| 0:00 | OFFICERS ARRIVE AT LOT. | 23:10:30 | | |
| [1:14] | <u>Police Transmission #2</u><br><br>**Palazzo**: 75 to headquarters.<br><br>**Dispatcher**: Come in.<br><br>**Palazzo**: Can you start another rescue downstairs for this male?<br><br>**Dispatcher**: 10-4.<br><br>[Police dispatch contacted fire department dispatch and fire department dispatch asked for a reason for the call.] | | | 23:13:45 |

| Time after officers' arrival at station | Event/ Transcription of Dispatch Transmissions | | Back Lot Video Timer | Fire Department Timer[39] | Police Department Timer[40] |
|---|---|---|---|---|---|
| [1:30] | **Dispatcher**: 75.<br><br>**Palazzo**: Come in.<br><br>**Dispatcher**: Rescue's asking for a reason.<br><br>**Palazzo**: Possible minor injuries and intoxicated male. Unconscious male.<br><br>**Dispatcher**: 10-4. | | | | |
| 2:22 | PALAZZO SPEAKS INTO LAPEL. | <u>Police Transmission #3</u><br><br>**Palazzo**: 75, have them step it up.<br><br>**Dispatcher**: 10-4. | 23:12:52 | | 23:14:53 |

| Time after officers' arrival at station | Event/ Transcription of Dispatch Transmissions | Back Lot Video Timer | Fire Department Timer[39] | Police Department Timer[40] |
|---|---|---|---|---|
| [2:26] | Fire Dept. Transmission<br><br>Beep | | 0:00 | |
| [2:31] | **Dispatcher:** Rescue 2 still alarm. | | 0:05 | |
| [2:39] | Beep<br><br>**Dispatcher**: Rescue 2 respond rear police station male ETOH. | | 0:13 | |
| [2:55] | Telephone sounds twice in background<br><br>Beep<br><br>**Dispatcher**: Rescue 2 respond rear police station male ETOH unconscious. Police are asking to expedite. Time out 23:13. | | 0:29 | |

| Time after officers' arrival at station | Event/ Transcription of Dispatch Transmissions | | Back Lot<br><br>Video Timer | Fire Department<br><br>Timer[39] | Police Department Timer[40] |
|---|---|---|---|---|---|
| 4:20 (start)<br><br>4:23 (end) | OFFICER KELLEY PERFORMS CHEST COMPRESSIONS. | <u>Fire Dept. Transmission</u><br><br>**Pvt. Cahoon:** Engine 1 to rescue. It appears to be a code. | 23:14:50 (start)<br><br>23:14:53 (end) | 1:54 (start)<br><br>1:57 (end) | |
| 4:24 | PVT. CAHOON TAKES JACKSON'S PULSE. | | 23:14:54 | | |
| [4:29] | <u>Fire Dept. Transmission</u><br><br>**Lt. Croft**: Engine 1 on scene. | | | 2:03 | |
| 4:31 | LT. CROFT TAKES OVER CHEST COMPRESSIONS. | | 23:15:01 | | |
| [4:32] | <u>Fire Dept. Transmission</u><br><br>**Dispatcher**: Engine 1's on scene. 23:14. | | | 2:06 | |

| Time after officers' arrival at station | Event/ Transcription of Dispatch Transmissions | | Back Lot<br><br>Video Timer | Fire Department<br><br>Timer[39] | Police Department Timer[40] |
|---|---|---|---|---|---|
| 7:29 | FIRE RESCUE 2 ARRIVES ON SCENE. | Fire Dept. Transmission<br><br>**Rescue Personnel:** Rescue's on scene.<br><br>**Dispatch:** Rescue 1 on scene. 23:17. | 23:17:59 | 5:03<br><br><br><br>5:07 | |